HONORABLE RICHARD A. JONES

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

United Federation of Churches, LLC d/b/a The Satanic Temple,

    Plaintiff,

v.

David Alan Johnson *et al.*,

    Defendants.

Case No. 2:20-cv-00509-RAJ

**ORDER GRANTING MOTION TO DISMISS**

## I. INTRODUCTION

This matter comes before the Court on Defendants' Motion to Dismiss. Dkt. # 11. Having considered the submissions of the parties, the relevant portions of the record, and the applicable law, the Court finds that oral argument is unnecessary. For the reasons below, the Court **GRANTS** the motion.

## II. BACKGROUND

The Satanic Temple has its own Facebook page. In fact, it has two. It also has a Twitter page and a Google E-mail account. Former members of The Satanic Temple, as approved administrators, took control of the accounts, and The Satanic Temple is now bringing suit.

Plaintiff United Federation of Churches, LLC ("The Satanic Temple") is a

ORDER – 1

religious organization. Dkt. # 1 ¶ 7. As such, its mission is to "encourage benevolence and empathy among all people, reject tyrannical authority, advocate practical common sense and justice, and be directed by the human conscience to undertake noble pursuits guided by the individual will." *Id.* ¶ 9. To that end, it espouses "seven fundamental tenets." *Id.* ¶ 8. Among them are beliefs such as, "[o]ne's body is inviolable, subject to one's own will alone," and "[o]ne should take care never to distort scientific facts to fit one's beliefs." *Id.* (tenets 3 and 5).

There are Satanists throughout the country, comprising groups denominated as "Chapters." *Id.* ¶ 12. The State of Washington has its own Chapter ("Washington Chapter"). *See id.*

In 2014, the Washington Chapter created a "business page" on Facebook to disseminate information about The Satanic Temple. *Id.* ¶ 23. Facebook is a social media website that "permits users to create and share content," such as "links, commentary, and written conversations," either as individuals on personal pages or as organizations on business pages. *Id.* ¶ 17. Since creating the Facebook page, the Washington Chapter has garnered over 17,000 followers. *Id.* ¶ 24. Besides its primary Facebook page, the Washington Chapter has a few other online accounts. *Id.* ¶¶ 22, 25-26. For example, it has a Twitter account with about 4,000 followers, it has a secondary Facebook page named "TST WA allies" with about 500 followers, and it has a Google account. *Id.*

Initially, the two Facebook pages were "maintained and controlled exclusively by approved administrators." *Id.* ¶ 27. Administrators were subject to a written Code of Conduct. *Id.* ¶ 28. The Code of Conduct outlines the permissible online activity for Satanists, including the "administrators' authorization to access [The Satanic Temple]'s social media accounts." *Id.* ¶¶ 28-29. Defendants are all former members of The Satanic Temple, *id.* ¶¶ 13-16, and they had all been "entrusted with administrative rights" to the social media accounts "subject to the requirements set forth in the Code of Conduct," *id.* ¶ 30.

ORDER – 2

In March 2020, Defendant David Alan Johnson and Defendant Mickey Meeham "hacked" the Facebook pages. *Id.* ¶¶ 1, 36, 39. For the Washington Chapter's secondary Facebook page, Defendant Meeham "exceeded authorization" by "removing all [The-Satanic-Temple]-approved administrators except the other named Defendants." *Id.* ¶ 36. Defendant Meeham also changed the name of the secondary page to "Evergreen Memes for Queer Satanic Friends" and posted a manifesto. *Id.* In that manifesto, Defendant Meeham wrote that the page was "no longer affiliated with The Satanic Temple." *Id.* Defendant Meeham suggested that the Washington Chapter had supported "ableism, misogyny, and racism," transphobia, and police brutality. *Id.*

Days later, Defendant Johnson did something similar with the Washington Chapter's primary Facebook page. *Id.* ¶ 39. Defendant Johnson "exceeded authorization" by "removing all [The-Satanic-Temple]-approved administrators," modifying the Facebook cover page, and posting yet another manifesto. *Id.*; *see also* Dkt. # 1-5. According to The Satanic Temple, Defendant Johnson "levie[d] false claims that [The Satanic Temple] leadership is cozy with the alt-right, are white supremacists, [and] are generally insufficiently leftist." Dkt. # 1 ¶ 40. Two days after that, Defendant Johnson changed the name of the primary Facebook page from "The Satanic Temple Washington" to "Satanic Washington State – Archived Temple Chapter." *Id.* ¶ 43.

As to Washington Chapter's other online accounts, Defendant Johnson "exceeded authorization" for the Twitter account by changing the account's profile description and by "following a number of extremist groups to create a false impression of affiliation between T[he Satanic Temple] and extremism." *Id.* ¶ 38. Likewise, Defendant Leah Fishbaugh "exceeded authorization" by changing the password to the Google accounts, changing the recovery email, and changing the phone number associated with the account. *Id.* ¶ 42. The Satanic Temple has since been able to recover the Twitter and Google accounts. *Id.* ¶ 54.

But The Satanic Temple has not been able to recover the two Facebook accounts.

ORDER – 3

*Id.* ¶ 55. Despite "repeatedly demand[ing] the return of the Facebook pages from both Facebook and Defendants," The Satanic Temple has not regained access. *Id.* ¶¶ 49, 55. Facebook asserts that the issue is a "[p]age admin issue," rather than an "infringement of [The Satanic Temple's] legal rights." *Id.* ¶ 50.

The Satanic Temple now seeks relief in federal court. *Id.* ¶ 55. On April 3, 2020, The Satanic Temple filed the instant complaint. Dkt. # 1. Two months later, Defendants moved to dismiss. Dkt. # 11. The motion is ripe for adjudication.

### III.  LEGAL STANDARD

Under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court may dismiss a complaint for failure to state a claim. The court must assume the truth of the complaint's factual allegations and credit all reasonable inferences arising from those allegations. *Sanders v. Brown*, 504 F.3d 903, 910 (9th Cir. 2007). The court "need not accept as true conclusory allegations that are contradicted by documents referred to in the complaint." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Instead, the plaintiff must point to factual allegations that "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 568 (2007). If the plaintiff succeeds, the complaint avoids dismissal if there is "any set of facts consistent with the allegations in the complaint" that would entitle the plaintiff to relief. *Id*. at 563; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

On a motion to dismiss, a court typically considers only the contents of the complaint. However, a court is permitted to take judicial notice of facts that are incorporated by reference in the complaint. *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may . . . consider certain materials documents attached to the complaint, documents incorporated by reference in the complaint."); *Mir v. Little Co. of Mary Hosp.*, 844 F.2d 646, 649 (9th Cir. 1988) ("[I]t is proper for the district court to 'take judicial notice of matters of public record outside the pleadings' and consider them for purposes of the motion to dismiss.") (quoting *MGIC Indem. Corp. v. Weisman*, 803

ORDER – 4

F.2d 500, 504 (9th Cir. 1986)).

## IV.  DISCUSSION

The Satanic Temple asserts five causes of action: (1) violation of the Computer Fraud and Abuse Act ("CFAA"), (2) violation of the Anti–Cybersquatting Consumer Protection Act ("ACPA"), (3) tortious interference with business expectancy, (4) violation of Washington's Consumer Protection Act ("CPA"), and (5) defamation. The Court addresses each in turn.

### A.  Computer Fraud and Abuse Act

The Satanic Temple's first cause of action is for a "CFAA Violation."  Dkt. # 1 ¶¶ 56-66.  The complaint does not specify what subsection of the statute the claim is brought under.  *Id.*  Defendants assume that it is brought under 18 U.S.C. § 1030(a)(4). Dkt. # 11 at 9.  The Satanic Temple, on the other hand, suggests that it is relying on 18 U.S.C. § 1030(a)(2)(C).  Dkt. # 12 at 4.  For purposes of this order, the specific subsection is not important.  Either applies only if someone accesses a computer "without authorization" or "exceeds authorized access."

The CFAA creates criminal and civil liability for "acts of computer trespass by those who are not authorized users or who exceed authorized use." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1065 (9th Cir. 2016).  A protected computer may be improperly accessed in one of two ways, (1) by "obtaining access without authorization" or (2) by "obtaining access with authorization but then using that access improperly."  *Id.* (quoting *Musacchio v. United States*, 136 S. Ct. 709, 713 (U.S. 2016)). Summarizing the Ninth Circuit's historical application of the CFAA, the court in *Facebook v. Power Ventures* explained "two general rules."  *Id.* at 1067.

> First, a defendant can run afoul of the CFAA when he or she has no permission to access a computer or when such permission has been revoked explicitly. Once permission has been revoked, technological gamesmanship or the enlisting of a third party to aid in access will not excuse liability. Second, a violation of the terms of use of a website—without more— cannot establish liability under the CFAA.

ORDER – 5

*Id.* at 1067.

Of the two rules, The Satanic Temple says Defendants violated the second. Dkt. # 12 at 4-8. It does not currently allege or argue that Defendants' actions were done "without authorization." In fact, it alleges the opposite. In its complaint, The Satanic Temple claims that each Defendant had authorization, each having been "entrusted with administrative rights" to its social media accounts. Dkt. # 1 ¶ 30.

Instead, The Satanic Temple's argument is that Defendants "exceeded their authority." Dkt. # 12 at 4. It says that Defendants' authority "to access the administrative privileges of the Facebook account" was "predicated on the Code of Conduct." *Id.* at 7; Dkt. # 1 ¶¶ 28-30. According to The Satanic Temple, Defendant Johnson's and Defendant Meeham's actions on Facebook—posting links and commentary, posting a manifesto, and removing previously-approved administrators except Defendants—violated the Code of Conduct and therefore exceeded the authority granted to them. *Id.* ¶¶ 30, 33, 36-44.

This circuit has already considered and rejected that argument. Violating a company's terms of use (here, the Code of Conduct) is insufficient to state a CFAA claim. The Ninth Circuit made that clear in *United States v. Nosal*, 676 F.3d 854, 857, 863 (9th Cir. 2012) (en banc). There, the court held that, under the CFAA, the phrase "exceeds authorized access" applies only to "violations of restrictions on *access* to information, and not restrictions on its *use*." *Id.* at 863-64 (emphasis in original). Thus, it held that the CFAA "does not extend to violations of [a company's computer] use restrictions." *Id.*

Here, Defendants had authority. Each was granted administrative privileges to The Satanic Temple's Facebook accounts. Dkt. # 1 ¶¶ 28-30. The Code of Conduct limited Defendants' *use* of those accounts, but it did not limit their *access* to the accounts. *Id.* ¶¶ 30, 33, 36-44. Defendants allegedly violated that Code of Conduct. *Id.* Yet, under *Nosal*, violation of that Code of Conduct does not itself amount to "exceeding authority"

ORDER – 6

and is insufficient to state a claim under the CFAA.

The *Nosal* court gave an example of when authority may have been "exceeded." 676 F.3d at 856-57. "[A]ssume an employee is permitted to access only product information on [a] company's computer but accesses customer data: He would 'exceed[] authorized access' if he looks at the customer lists." *Id.* (third alteration in original). That is simply not what is alleged here. The Satanic Temple does not claim that it prohibited Defendants from accessing its Facebook accounts altogether, yet they accessed it anyway. Nor does it claim that it restricted Defendants' access to certain features of those accounts, yet Defendants wandered where they were not allowed. Instead, it claims that it restricted Defendants' *use* of those accounts through its Code of Conduct, which Defendants violated, an argument squarely rejected in *Nosal*.

At most, The Satanic Temple alleges that Defendants have misappropriated the authority granted to them. Dkt. # 1 ¶¶ 30, 35. But the CFAA is an "anti-hacking statute," not a "misappropriation statute." *Nosal*, 676 F.3d at 857. Defendants may have very well abused their authority, but The Satanic Temple has not alleged that they exceeded it.

For its part, The Satanic Temple argues that the Court must look beyond *Nosal*. Other cases, it says, suggest that companies may place "explicit limits on authorization." Dkt. # 12 at 5. It cites several decisions after *Nosal* but mostly explores two district court cases: *Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962, 968 (N.D. Cal. 2013) and *Ticketmaster L.L.C. v. Prestige Entm't W., Inc.*, 315 F. Supp. 3d 1147 (C.D. Cal. 2018). Dkt. # 12 at 4-8.

Neither case is applicable: unlike the plaintiffs there, The Satanic Temple does not allege that it ever explicitly revoked Defendants' authority. *Craigslist* and *Ticketmaster* share a few common features. In both cases, defendants initially had authority to access plaintiffs' websites, defendants violated plaintiffs' terms of use, plaintiffs revoked defendants' access to their websites by sending defendants cease and desist letters, and defendants ignored the revocations. The decisions turned not on defendants' initial

ORDER – 7

violation of plaintiffs' terms of use; they turned on defendants' continued access of plaintiffs' websites after authority was revoked. *Craigslist*, 942 F. Supp. 2d at 969-70 ("Defendants' *continued use* of [plaintiff's website] *after the clear statements regarding authorization in the cease and desist letters* and the technological measures to block them constitutes unauthorized access under the [CFAA]." (emphasis added)); *Ticketmaster*, 315 F. Supp. 3d at 1171 ("To be clear, it is the violation of the terms of the [cease and desist l]etter, *not of [plaintiff]'s Terms of Use*, on which the Court bases its finding of a well-pled CFAA claim." (emphasis added)).

Following *Craigslist* and *Ticketmaster*, the Court makes two observations. First, the holdings in both cases are consistent with circuit authority. *See, e.g.*, *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067-68 (9th Cir. 2016) ("[Plaintiff] expressly rescinded [] permission when [it] issued its written cease and desist letter to [defendant] . . . . We therefore hold that, after receiving written notification . . ., [defendant] accessed [plaintiff]'s computers 'without authorization' within the meaning of the CFAA and is liable under that statute."); *United States v. Nosal*, 844 F.3d 1024, 1029 (9th Cir. 2016) ("*Nosal II*") ("[A] person uses a computer 'without authorization' under [the CFAA] . . . when the employer has rescinded permission to access the computer and the defendant uses the computer anyway." (internal quotation marks omitted) (quoting *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127 (9th Cir. 2009)).

Second, unlike those cases, The Satanic Temple has not alleged that it revoked Defendants' authority. At most, it has pled in conclusory fashion that "it demanded the return of the Facebook pages" from Defendants. Dkt. # 1 ¶ 49. This is insufficient. Apart from being conclusory, this allegation does not state when the revocation occurred, how that revocation was communicated, and what actions Defendants undertook afterwards. Without such allegations, The Satanic Temple's comparison to *Craigslist* and *Ticketmaster* is strained and unpersuasive.

The Satanic Temple has failed to allege a violation under the CFAA. Its theory

ORDER – 8

that Defendants "exceeded authorized access" by violating The Satanic Temple's Code of Conduct has been expressly rejected by the Ninth Circuit. The Court **DISMISSES** this claim.

### B.  Anti–Cybersquatting Consumer Protection Act

"The Anti–Cybersquatting Consumer Protection Act establishes civil liability for 'cyberpiracy' where a plaintiff proves that (1) the defendant registered, trafficked in, or used a domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acted 'with bad faith intent to profit from that mark.'" *DSPT Int'l, Inc. v. Nahum*, 624 F.3d 1213, 1218-19 (9th Cir. 2010); *see also* 15 U.S.C. § 1125. "ACPA applies to all domain names, whether registered before or after the enactment of the statute." *GoPets Ltd. v. Hise*, 657 F.3d 1024, 1030 (9th Cir. 2011).

In October 2014, The Satanic Temple created a business page on Facebook. Dkt. # 1 ¶ 23. Since then, the Facebook page has amassed more than 17,000 followers. *Id.* ¶ 24. The page has a corresponding uniform resource locator ("URL"), "https://www.facebook.com/**TheSatanicTemple**Washington/." *Id.* ¶¶ 47, 71 (emphasis in original). And The Satanic Temple owns the trademark, "The Satanic Temple," contained in the URL. *Id.* ¶¶ 11, 70. Because Defendants have "hijacked" the Facebook page, by removing all approved administrators except Defendants and by refusing to return control, The Satanic Temple claims that Defendants are "trafficking in" the trademark. *Id.* ¶¶ 67-73. To that end, The Satanic Temple asserts a claim for "cyberpiracy." *Id.*

Defendants argue, however, that the claim is deficiently pled. Dkt. # 11 at 9-13; Dkt. # 17 at 8-12. It is deficient, they argue, for two reasons. The Satanic Temple fails to allege that Defendants had a "bad faith intent to profit" from the trademark and that The Satanic Temple does not own the domain name at issue. Dkt. # 11 at 9-13; Dkt. # 17 at 8-12.

ORDER – 9

As explained below, the trademark here is contained in the URL's "post-domain path," not the "domain name." This case presents an issue of first impression: Are vanity URLs, or "post-domain paths" generally, considered "domain names" under the ACPA? The Court holds they are not. Statute and precedent define the term "domain name"; post-domain paths do not fit that definition.

### i.  "Domain Name"

The ACPA itself defines the term "domain name." It means "any alphanumeric designation which is registered with or assigned by any domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet." 15 U.S.C. § 1127.

The Ninth Circuit has provided additional clarity. *Office Depot Inc. v. Zuccarini*, 596 F.3d 696, 698 (9th Cir. 2010). It explained that a domain name consists of two parts, a "top-level" domain and a "second-level" domain, and is ultimately registered with a registry operator:

> The hierarchy of each domain name is divided by periods. Thus, reading a domain name from right to left, the portion of the domain name to the right of the first period is the top-level domain ("TLD"). TLDs include .com, .gov, .net., and .biz. Each TLD is divided into second-level domains identified by the designation to the left of the first period, such as "example" in "example.com" or "example.net." . . . *Each domain name is unique and thus can only be registered to one entity . . . .*
>
> A domain name is created when it is registered with the appropriate registry operator. A registry operator maintains the definitive database, or registry, that associates the registered domain names with the proper IP numbers for the respective domain name servers. The domain name servers direct Internet queries to the related web resources. A registrant can register a domain name only through companies that serve as registrars for second level domain names. Registrars accept registrations for new or expiring domain names, connect to the appropriate registry operator's TLD servers to determine whether the name is available, and register available domain names on behalf of registrants . . . .

*Id.* (alteration in original) (emphasis added) (quoting *Coalition for ICANN Transparency,*

ORDER – 10

*Inc. v. VeriSign, Inc.*, 464 F. Supp. 2d 948, 951-52 (N.D. Cal. 2006)).

### ii. Vanity URLs and Post-Domain Paths

Each web page within a website has its own URL, for example "a2zsolutions.com/desks/floor/laptraveler/dkfl-lt.htm." *Interactive Prod. Corp. v. a2z Mobile Office Sols., Inc.*, 326 F.3d 687, 691 (6th Cir. 2003). A URL consists of a domain name (a2zsolutions.com) and a "post-domain path" (/desks/floor/laptraveler/dkfl-lt.htm). *Id.* As one court put it, the post-domain path is "the text that comes after the slash." *Patmont Motor Werks, Inc. v. Gateway Marine, Inc.*, No. 3:96-cv-02703-TEH, 1997 WL 811770, at *4 n.6 (N.D. Cal. Dec. 18, 1997) ("goped" in "www.idiosync.com/goped").

What is more, some social media websites, such as Facebook, permit a user to create a unique, personalized URL known as a "vanity URL." Natalma M. McKnew, *Post-Domain Infringement: In Search of a Remedy*, Am. B. Ass'n (Mar. 22, 2010), https://www.americanbar.org/groups/business_law/publications/blt/2010/03/08_mcknew/; *see also* Natalma M. McKnew, *The Easy and the Not-Easy Pieces: Trademarks and Internet Advertising*, 14 J. Internet L. 1, 15 (2010). For example, Facebook user John Doe might be reached at www.facebook.com/johndoe. The vanity URL, "/johndoe," is thus contained in the post-domain path. *See, e.g.*, *Wilens v. Doe Defendant No. 1*, No. 3:14-cv-02419-LB, 2015 WL 4606238, at *17 (N.D. Cal. July 31, 2015), *report and recommendation adopted*, No. 5:14-cv-02419-LHK, 2015 WL 5542529 (N.D. Cal. Sept. 18, 2015) (providing example of vanity URL, "twitter.com/Jeffrey_Wilens," for Twitter user Jeffrey Wilens).

Some courts have held that, though trademark law clearly applies to domain names, it does not apply to trademarks contained in post-domain paths. *See, e.g.*, *Interactive*, 326 F.3d at 696-98 (6th Cir. 2003) ("The post-domain path of a URL, however, does not typically signify source. . . . Because post-domain paths do not typically signify source, *it is unlikely that the presence of another's trademark in a post-domain path of a URL would ever violate trademark law*." (emphasis added)); *Patmont*,

ORDER – 11

1997 WL 811770, at *4 n.6 ("Nothing in the post-domain path of a URL indicates a website's source of origin, and [plaintiff] has cited no case in which the use of a trademark within a URL's path formed the basis of a trademark violation. Therefore, the fact that the Go–Ped mark appeared in the path of [defendant]'s website's URL— 'www.idiosync.com/goped'—does not affect the Court's conclusion that the website does not imply [plaintiff]'s sponsorship or endorsement."); *Wilens*, 2015 WL 4606238, at *17 ("The ACPA says nothing about social media profiles, and the mark JEFFREY WILENS is found within the post-domain name path, and not the domain name itself, for twitter.com/Jeffrey_Wilens.").

### iii.   facebook.com/TheSatanicTempleWashington

The Satanic Temple owns the trade name "The Satanic Temple." Dkt. # 1 ¶ 11. The "domain in question," it says, is "facebook.com/**TheSatanicTemple**Washington." Dkt. # 12 at 9 (emphasis in original). According to The Satanic Temple, Defendants have commandeered its social media profile and are holding it "hostage." *Id.* at 8-12. It now seeks the ACPA's protection.

This claim fails for one reason. The "domain in question" is not in fact "facebook.com/TheSatanicTempleWashington." The "domain name" is "facebook.com." And The Satanic Temple does not claim to own it. Its trademark lies in the post-domain path, which does not constitute a "domain name" under the ACPA. As explained above, the statute defines the term "domain name," and the case law provides further clarification. The Satanic Temple's claim fails under both.

In reverse order, cases in this circuit explain that there are two parts to a domain name, a top-level and a second-level. Post-domain paths are not included in that combination. Here, the top-level is ".com," and the second-level is "facebook." The Satanic Temple's trademark is contained in neither. Rather, "/TheSatanicTempleWashington" is a vanity URL. It comes "after the slash" and is thus contained in the post-domain path.

ORDER – 12

The outcome is no different under the statutory definition. Under 15 U.S.C. § 1127, to be considered a "domain name," an "alphanumeric designation" must be registered with a "domain name registrar, domain name registry, or other domain name registration authority." The domain "facebook.com" may well be registered. But nowhere in the complaint does The Satanic Temple allege that the term "/TheSatanicTempleWashingtion" itself is also registered.

The ACPA protects against the unauthorized use of a trademark in a domain name. According to the complaint, the trademark here is being used not in a domain name, but in a post-domain path. Those are not the same. The Court has found no authority suggesting that the ACPA extends to any URL component beyond top-level and second-level domains. Indeed, the Court has found the opposite. *See GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F. Supp. 2d 712, 725 (N.D. Tex. 2010) ("The court has found no case, and [plaintiff] has cited none, that holds that a portion of a web address other than a second or top level domain constitutes a 'domain name' within the meaning of the ACPA.").

The Court declines to stretch the ACPA to cover trademarks appearing in vanity URLs or post-domain paths. Because the ACPA is inapplicable, the Court need not address each claim element. The Court **DISMISSES** the ACPA claim.

**C.     Tortious Interference with Business Expectancy**

Under Washington law, to plead a claim for tortious interference with a business expectancy, a plaintiff must allege "(1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (5) resultant damage." *Leingang v. Pierce Cty. Med. Bureau, Inc.*, 930 P.2d 288, 300 (Wash. 1997).

For this claim, neither party offers serious argument. Neither addresses all five

ORDER – 13

elements of the claim. Instead, both offer the Court their own hypotheticals without any supporting authority. In Defendants' world, The Satanic Temple is a "customer," Facebook is a "merchant who sells widgets," and Defendants are former members who stole a widget from The Satanic Temple. Dkt. # 11 at 13-14. This roleplay supposedly shows that the theft of the widget "in no way effects [sic] the organization's ongoing relationship with the merchant" because the organization could always buy more widgets. *Id.* The Satanic Temple counters with its own hypothetical. Dkt. # 12 at 12-13. It likens Facebook to a sculptor and The Satanic Temple's Facebook page to "a work of art." *Id.* It says that Defendants, as former "employees," "convince[d] Facebook to give the employee exclusive access to the now-ornate sculpture, deface[d] it, and falsely represent[ed] the defaced sculpture as [their] own work." *Id.*

These arguments are unhelpful. They are not only unsupported; they are also incomplete. They only address one element of the tortious interference claim, whether a "breach or termination of the relationship or expectancy" occurred. Analyzing each element, the Court concludes that the first, third, and fifth are adequately pled and that the second and fourth are not.

The first, third, and fifth elements are sufficiently pled because the complaint alleges that The Satanic Temple's Facebook page had pecuniary value. According to the complaint, the Facebook page has an audience of more than 17,000 followers. Dkt. # 1 ¶ 24. Those followers provide The Satanic Temple with a monetary benefit. *Id.* ¶ 75. Having more followers increases awareness, increasing membership and increasing donations. *Id.* Thus, The Satanic Temple pleads that the Facebook page has a "cognizable dollar value" of nearly $35,000. *Id.* ¶ 75. This is a "valid business expectancy" that satisfies the first element. *Newton Ins. Agency & Brokerage, Inc. v. Caledonian Ins. Grp., Inc.*, 52 P.3d 30, 33 (Wash. 2002) ("A valid business expectancy includes any prospective contractual or business relationship that would be of pecuniary value."). Defendants allegedly brought an end to those benefits by hacking the Facebook

ORDER – 14

account and removing The Satanic Temple as administrators. Dkt. # 1 ¶ 39. This satisfies the third and fifth elements. Defendants suggest, however, that The Satanic Temple could simply "continu[e] to use Facebook products," presumably by creating a new page and re-building its following. Dkt. # 11 at 14. That argument is unconvincing. The Satanic Temple had a business expectancy in the specific Facebook accounts at issue, one with more than 17,000 followers, not a general expectancy to be able to use the Facebook website in the future.

Turning to the remaining two elements, for the second, The Satanic Temple must allege that Defendants "had knowledge of facts giving rise to the existence of the relationship." *Calbom v. Knudtzon*, 396 P.2d 148, 153 (Wash. 1964). It must allege that Defendants were "aware of some kind of business arrangement" between The Satanic Temple and Facebook. *Topline Equip., Inc. v. Stan Witty Land, Inc.*, 639 P.2d 825, 830 (Wash. Ct. App. 1982). For the fourth element, the interference "must be wrongful by some measure beyond the fact of the interference itself, such as a statute, regulation, recognized rule of common law, or an established standard of trade or profession." *Moore v. Commercial Aircraft Interiors, LLC*, 278 P.3d 197, 200 (Wash. 2012).

As to these elements, The Satanic Temple's allegations fall short. It does not allege that Defendants knew about the Facebook pages' pecuniary value or knew that there was some business arrangement between Facebook and The Satanic Temple. At best, it alleges that "Defendants had subjective knowledge of the business relationship." Dkt. # 1 ¶ 76. This conclusory recitation of the second element is insufficient to state a claim. Likewise, The Satanic Temple does not allege that the interference was wrongful beyond the interference itself—no alleged violation of a statute, regulation, common law rule, or professional standard.

In sum, The Satanic Temple fails to state a claim for tortious interference, and the claim is therefore **DISMISSED**.

ORDER – 15

### D. Washington Consumer Protection Act

"Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." RCW § 19.86.020. To plead a CPA claim, a plaintiff must allege "(1) an unfair or deceptive act (2) in trade or commerce (3) that affects the public interest, (4) injury to the plaintiff in his or her business or property, and (5) a causal link between the unfair or deceptive act complained of and the injury suffered." *Trujillo v. Nw. Tr. Servs., Inc.*, 355 P.3d 1100, 1107 (Wash. 2015) (citing *Klem v. Wash. Mut. Bank*, 295 P.3d 1179 (Wash. 2013)). "A plaintiff alleging injury under the CPA must establish all five elements." *Michael v. Mosquera-Lacy*, 200 P.3d 695, 699 (Wash. 2009).

As to the third prong, the Washington Supreme Court has held, "[i]n a private action, a plaintiff can establish that the lawsuit would serve the public interest by showing a likelihood that other plaintiffs have been or will be injured in the same fashion." *Trujillo*, 355 P.3d at 1108. Courts may also consider four more factors to assess the public interest element: "(1) whether the defendant committed the alleged acts in the course of his/her business, (2) whether the defendant advertised to the public in general, (3) whether the defendant actively solicited this particular plaintiff, and (4) whether the plaintiff and defendant have unequal bargaining positions." *Id.*

The parties argue only a few of the CPA elements. Defendants say that The Satanic Temple has failed to allege that the unfair or deceptive acts here occurred "in trade or commerce," given that neither party sells assets or services. Dkt. # 11 at 15. The Satanic Temple, on the other hand, argues that "[c]ommerce is implicated by the stolen Facebook pages because they have an economic value" to The Satanic Temple. Dkt. # 12 at 13-14.

The Court need not settle that dispute. To state a CPA claim, The Satanic Temple must allege all five elements. One element, unaddressed by either the parties' briefing or the complaint, is that an unfair or deceptive act must "affect the public interest." On this

ORDER – 16

1  score, all The Satanic Temple alleges is that Defendants "deceive[d] the public with a
2  deliberate, willful intent to disparage or pass off competitor services as those of T[he
3  Satanic Temple]." Dkt. # 1 ¶¶ 84, 87. This conclusory allegation fails to satisfy the third
4  CPA prong. It fails to allege that "other plaintiffs have been or will be injured in the
5  same fashion." *Trujillo*, 355 P.3d at 1108. And the other four public interest facts are
6  equally unaddressed. For that reason, The Satanic Temple fails to state a claim under the
7  CPA, and this claim is **DISMISSED**.

### E. Defamation

The First Amendment limits the role of civil courts in resolving "religious controversies that incidentally affect civil rights." *Puri v. Khalsa*, 844 F.3d 1152, 1162 (9th Cir. 2017) (quoting *Serbian E. Orthodox Diocese for U.S. & Can. v. Milivojevich*, 426 U.S. 696, 710 (1976)). Known in this circuit as the "doctrine of ecclesiastical abstention," the doctrine maintains that "civil courts may not []determine the correctness of an interpretation of canonical text or some decision relating to government of the religious polity." *Paul v. Watchtower Bible & Tract Soc. of New York, Inc.*, 819 F.2d 875, 878 n.1 (9th Cir. 1987). That said, there are "two principal approaches to deciding church disputes without 'jeopardiz[ing] values protected by the First Amendment.'" *Puri*, 944 F.3d 1162 (quoting *Presbyterian Church in U.S. v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church*, 393 U.S. 440, 449 (1969)). Still, those approaches only apply if the dispute "involves no consideration of doctrinal matters." *Id.* (quoting *Jones v. Wolf*, 443 U.S. 595, 602 (1979)).

This claim asserts that certain Defendants made false public statements about The Satanic Temple, a religious organization. Dkt. # 1 ¶¶ 7, 36, 92. The Satanic Temple alleges that Defendants have maligned the organization through public Facebook posts. *Id.* ¶¶ 36, 92; Dkt. # 1-5. In those posts, Defendants have "falsely ascrib[ed] extremist ideologies and affiliations to T[he Satanic Temple]." Dkt. # 1 ¶ 92. Based on the complaint and its attachments, the Court presumes that those "ideologies" include

ORDER – 17

ableism, misogyny, racism, fascism, transphobia, and endorsement of police brutality, *id.* ¶ 36, and those "affiliations" include Neo-Nazis and the "alt-right," Dkt. # 1-5 at 2.

Defendants argue that these statements are not actionable. The defamation claim, they say, is barred by the First Amendment because resolving the claim would "require the Court or jury to delve into the tenets and beliefs of The Satanic Temple to determine whether or to what extent The Satanic Temple's practices or beliefs are in line with or oppose [those ideologies or affiliations]." Dkt. # 11 at 17. The Satanic Temple, on the other hand, argues that this case does not require "judicial interference into ecclesiastical affairs." Dkt. # 12 at 14. Rather, it says, "T[he Satanic Temple] simply asks the Court to find that [it] and its principals are not neo-Nazis, as Defendants falsely claimed." *Id.*

The Court agrees with Defendants. The doctrine of ecclesiastical abstention applies. The Court may not resolve the defamation claim without delving into doctrinal matters. To determine whether Defendants' statements were defamatory, the Court or jury must inevitably determine that the statements were false. *Herron v. KING Broad. Co.*, 776 P.2d 98, 101 (Wash. 1989) ("The plaintiff alleging defamation must show four elements: *falsity*, an unprivileged communication, fault and damage." (emphasis added)). That would require the Court or jury to define the beliefs held by The Satanic Temple and to determine that ableism, misogyny, racism, fascism, and transphobia fall outside those beliefs. That the Court cannot do without violating the First Amendment. *Hyung Jin Moon v. Hak Ja Han Moon*, 431 F. Supp. 3d 394, 413 (S.D.N.Y. 2019), *aff'd*, 833 F. App'x 876 (2d Cir. 2020) ("Because the Court may not, consistent with the First Amendment, pass upon the truth or falsity of statements concerning plaintiff's or Mrs. Moon's purported religious standing, plaintiff's remaining defamation claim must be dismissed."); *Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 250 (S.D.N.Y.), *aff'd*, 578 F. App'x 24 (2d Cir. 2014) ("[W]here a court or jury would have to determine the truth of the defendants' statements . . . and, in doing so, would examine and weigh competing views of church doctrine, the result is entanglement in a matter of ecclesiastical concern

ORDER – 18

that is barred by the First Amendment." (internal quotation marks omitted)).

Because this claim could not be cured by additional allegations, the Court **DISMISSES it with prejudice**.

## V. CONCLUSION

For the reasons stated above, the Court **GRANTS** Defendants' Motion to Dismiss. Dkt. # 11.[1] The Satanic Temple's CFAA, ACPA, tortious interference, and CPA claims are **DISMISSED with leave to amend**. Its defamation claim, however, is **DISMISSED with prejudice**. The Court grants The Satanic Temple leave to file an amended complaint **within thirty days** of the entry of this Order.

DATED this 26th day of February, 2021.

*Richard A. Jones*
The Honorable Richard A. Jones
United States District Judge

---

[1] Because each claim, at bottom, is deficiently pled and because none survives the motion to dismiss, the Court need not address each Defendant's individual actions. Hence, the Court need not reach the parties' civil conspiracy arguments. Dkt. # 12 at 7-8; Dkt. # 17 at 7-8. That said, the Court observes that the original complaint hardly addresses the coordination between the Defendants, casting doubt on the Court's ability to impute one Defendant's actions to all.

ORDER – 19