[Senate Report 106-140]
[From the U.S. Government Publishing Office]

|  | Calendar No. 240 |
|---|---|
| 106th Congress | Report |
| SENATE | |
| 1st Session | 106-140 |

=======================================================================

THE ANTICYBERSQUATTING CONSUMER PROTECTION ACT

_____

August 5, 1999.--Ordered to be printed

_____

Mr. Hatch, from the Committee on the Judiciary, submitted the following

R E P O R T

[To accompany S. 1255]

    The Committee on the Judiciary, to which was referred the
bill (S. 1255) to protect consumers and promote electronic
commerce by amending certain trademark infringement, dilution,
and counterfeiting laws, and for other purposes, having
considered the same, reports favorably thereon, with an
amendment in the nature of a substitute, and recommends that
the bill, as amended, do pass.

CONTENTS

|  | Page |
|---|---|
| I. Purpose | 4 |
| II. Legislative history | 4 |
| III. Discussion | 4 |
| IV. Vote of the Committee | 12 |
| V. Section-by-section analysis | 12 |
| VI. Cost estimate | 18 |
| VII. Regulatory impact statement | 18 |
| VIII. Changes in existing law | 19 |

    The amendment is as follows:
    Strike all after the enacting clause and insert the
following:

SECTION 1. SHORT TITLE; REFERENCES.

    (a) Short Title.--This Act may be cited as the ``Anticybersquatting
Consumer Protection Act.''.
    (b) References to the Trademark Act of 1946.--Any reference in this
Act to the Trademark Act of 1946 shall be a reference to the Act
entitled ``An Act to provide for the registration and protection of
trade-marks used in commerce, to carry out the provisions of certain

international conventions, and for other purposes'', approved July 5,
1946 (15 U.S.C. 1501 et seq.).

SEC. 2. FINDINGS.

    Congress finds the following:
    (1) The registration, trafficking in, or use of a domain name that
is identical to, confusingly similar to, or dilutive of a trademark or
service mark of another that is distinctive at the time of registration
of the domain name, without regard to the goods or services of the
parties, with the bad-faith intent to profit from the goodwill of
another's mark (commonly referred to as ``cyberpiracy'' and
``cybersquatting'')--
    (A) results in consumer fraud and public confusion as to the true
source or sponsorship of goods and services;
    (B) impairs electronic commerce, which is important to interstate
commerce and the United States economy;
    (C) deprives legitimate trademark owners of substantial revenues
and consumer goodwill; and
    (D) places unreasonable, intolerable, and overwhelming burdens on
trademark owners in protecting their valuable trademarks.
    (2) Amendments to the Trademark Act of 1946 would clarify the
rights of a trademark owner to provide for adequate remedies and to
deter cyberpiracy and cybersquatting.

SEC. 3. CYBERPIRACY PREVENTION.

    (a) In General.--Section 43 of the Trademark Act of 1946 (15 U.S.C.
1125) is amended by inserting at the end the following:
    ``(d)(1)(A) Any person who, with bad-faith intent to profit from
the goodwill of a trademark or service mark of another, registers,
traffics in, or uses a domain name that is identical to, confusingly
similar to, or dilutive of such trademark or service work, without
regard to the goods or services of the parties, shall be liable in a
civil action by the owner of the mark, if the mark is distinctive at
the time of the registration of the domain name.
    ``(B) In determining whether there is a bad-faith intent described
under subparagraph (A), a court may consider factors such as, but not
limited to--
    ``(i) the trademark or other intellectual property rights of the
person, if any, in the domain name;
    ``(ii) the extent to which the domain name consists of the legal
name of the person or a name that is otherwise commonly used to
identify that person;
    ``(iii) the person's prior use, if any, of the domain name in
connection with the bona fide offering of any goods or services;
    ``(iv) the person's legitimate noncommercial or fair use of the
mark in a site accessible under the domain name;
    ``(v) the person's intent to divert consumers from the mark owner's
online location to a site accessible under the domain name that could
harm the goodwill represented by the mark, either for commercial gain
or with the intent to tarnish or disparage the mark, by creating a
likelihood of confusion as to the source, sponsorship, affiliation, or
endorsement of the site;
    ``(vi) the person's offer to transfer, sell, or otherwise assign
the domain name to the mark owner or any third party for substantial
consideration without having used, or having an intent to use, the
domain name in the bona fide offering of any goods or services;
    ``(vii) the person's intentional provision of material and
misleading false contact information when applying for the registration
of the domain name; and
    ``(viii) the person's registration or acquisition of multiple
domain names which are identical to, confusingly similar to, or
dilutive of trademarks or service marks of others that are distinctive
at the time of registration of such domain names, without regard to the

goods or services of such persons.
     ``(C) In any civil action involving the registration, trafficking,
or use of a domain name under this paragraph, a court may order the
forfeiture or cancellation of the domain name or the transfer of the
domain name to the owner of the mark.
     ``(2)(A) The owner of a mark may file an in rem civil action
against a domain name if--
     ``(i) the domain name violates any right of the registrant of a
mark registered in the Patent and Trademark Office, or section 43 (a)
or (c); and
     ``(ii) the court finds that the owner has demonstrated due
diligence and was not able to find a person who would have been a
defendant in a civil action under paragraph (1).
     ``(B) The remedies of an in rem action under this paragraph shall
be limited to a court order for the forfeiture or cancellation of the
domain name or the transfer of the domain name to the owner of the
mark.''.
     (b) Additional Civil Action and Remedy.--The civil action
established under section 43(d)(1) of the Trademark Act of 1946 (as
added by this section) and any remedy available under such action shall
be in addition to any other civil action or remedy otherwise
applicable.

SEC. 4. DAMAGES AND REMEDIES.

     (1) Injunctions.--Section 34(a) of the Trademark Act of 1946 (15
U.S.C. 1116(a)) is amended in the first sentence by striking ``section
43(a)'' and inserting ``section 43 (a), (c), or (d)''.
     (2) Damages.--Section 35(a) of the Trademark Act of 1946 (15 U.S.C.
1117(a)) is amended in the first sentence by inserting ``, (c), or
(d)'' after ``section 43 (a)''.
     (b) Statutory Damages.--Section 35 of the Trademark Act of 1946 (15
U.S.C. 1117) is amended by adding at the end the following:
     ``(d) In a case involving a violation of section 43(d)(1), the
plaintiff may elect, at any time before final judgment is rendered by
the trial court, to recover, instead of actual damages and profits, an
award of statutory damages in the amount of not less than $1,000 and
not more than $100,000 per domain name, as the court considers just.
The court shall remit statutory damages in any case in which an
infringer believed and had reasonable grounds to believe that use of
the domain name by the infringer was a fair or otherwise lawful use.''.

SEC. 5. LIMITATION ON LIABILITY.

     Section 32(2) of the Trademark Act of 1946 (15 U.S.C. 1114) is
amended--
     (1) in the matter preceding subparagraph (A) by striking ``under
section 43(a)'' and inserting ``under section 43 (a) or (d)''; and
     (2) by redesignating subparagraph (D) as subparagraph (E) and
inserting after subparagraph (C) the following:
     ``(D)(i) A domain name registrar, a domain name registry, or other
domain name registration authority that takes any action described
under clause (ii) affecting a domain name shall not be liable for
monetary relief to any person for such action, regardless of whether
the domain name is finally determined to infringe or dilute the mark.
     ``(ii) An action referred to under clause (i) is any action of
refusing to register, removing from registration, transferring,
temporarily disabling, or permanently canceling a domain name--
     ``(I) in compliance with a court order under section 43(d); or
     ``(II) in the implementation of a reasonable policy by such
registrar, registry, or authority prohibiting the registration of a
domain name that is identical to, confusingly similar to, or dilutive
of another's mark registered on the Principal Register of the United
States Patent and Trademark Office.
     ``(iii) A domain name registrar, a domain name registry, or other

domain name registration authority shall not be liable for damages
under this section for the registration or maintenance of a domain name
for another absent a showing of bad faith intent to profit from such
registration or maintenance of the domain name.
     ``(iv) If a registrar, registry, or other registration authority
takes an action described under clause (ii) based on a knowing and
material misrepresentation by any person that a domain name is
identical to, confusingly similar to, or dilutive of a mark registered
on the Principal Register of the United States Patent and Trademark
Office, such person shall be liable for any damages, including costs
and attorney's fees, incurred by the domain name registrant as a result
of such action. The court may also grant injunctive relief to the
domain name registrant, including the reactivation of the domain name
or the transfer of the domain name to the domain name registrant.''.

SEC. 6. DEFINITIONS.

     Section 45 of the Trademark Act of 1946 (15 U.S.C. 1127) is amended
by inserting after the undesignated paragraph defining the term
``counterfeit'' the following:
     ``The term `Internet' has the meaning given that term in section
230(f)(1) of the Communications Act of 1934 (47 U.S.C. 230(f)(1)).
     ``The term `domain name' means any alphanumeric designation which
is registered with or assigned by any domain name registrar, domain
name registry, or other domain name registration authority as part of
an electronic address on the Internet.''.

SEC. 7. SAVINGS CLAUSE.

     Nothing in this Act shall affect any defense available to a
defendant under the Trademark Act of 1946 (including any defense under
section 43(c)(4) of such Act or relating to fair use) or a person's
right of free speech or expression under the first amendment of the
United States Constitution.

SEC. 8. SEVERABILITY.

     If any provision of this Act, an amendment made by this Act, or the
application of such provision or amendment to any person or
circumstances is held to be unconstitutional, the remainder of this
Act, the amendments made by this Act, and the application of the
provisions of such to any person or circumstance shall not be affected
thereby.

SEC. 9. EFFECTIVE DATE.

     This Act shall apply to all domain names registered before, on, or
after the date of enactment of this Act, except that statutory damages
under section 35(d) of the Trademark Act of 1946 (15 U.S.C. 1117), as
added by section 4 of this Act, shall not be available with respect to
the registration, trafficking, or use of a domain name that occurs
before the date of enactment of this Act.

                              I. Purpose

     The purpose of the bill is to protect consumers and
American businesses, to promote the growth of online commerce,
and to provide clarity in the law for trademark owners by
prohibiting the bad-faith and abusive registration of
distinctive marks as Internet domain names with the intent to
profit from the goodwill associated with such marks--a practice
commonly referred to as ``cybersquatting.''

                         II. Legislative History

On June 21, 1999, Senator Abraham introduced S. 1255 as the
``Anticybersquatting Consumer Protection Act.'' The bill was
cosponsored by Senators Torricelli, Hatch, McCain, and Breaux.
A hearing was held by the Judiciary Committee on July 22, 1999.
The Committee heard testimony from Anne H. Chasser, president
of International Trademark Association; Gregory D. Phillips, a
trademark practitioner with Howard, Phillips & Anderson in Salt
Lake City, UT; and Christopher D. Young, president and chief
operating officer of Cyveillance, Inc.

On July 29, 1999 the Judiciary Committee met in executive
session to consider the bill. The Chairman, Senator Hatch, and
Ranking Member, Senator Leahy, offered an amendment in the
nature of a substitute, which was cosponsored by Senators
Abraham, Torricelli, DeWine, Kohl, and Schumer, and which
reflected the text of S. 1462, which was introduced the same
day by the Chairman and the Ranking Member, with the same
Senators listed as cosponsors. The substitute amendment was
considered and agreed to by unanimous consent. The bill, as
amended, was then ordered favorably reported to the Senate by
unanimous consent.

### III. Discussion

Trademark owners are facing a new form of piracy on the
Internet caused by acts of ``cybersquatting,'' which refers to
the deliberate, bad-faith, and abusive registration of Internet
domain names in violation of the rights of trademark owners.
For example, when Mobil and Exxon announced their proposed
merger in December, 1998, a speculator registered every
variation of the possible resulting domain name, i.e., mobil-
exxon.com, exxon mobil.com, mobilexxon.com, etc., ad infinitum.
In another example of bad-faith abuses of the domain name
registration system, Network Solutions--the domain name
registry that administers the Internet's ``.com,'' ``.net,''
``.org,'' and ``.edu'' top level domains  pulled on a London
computer club in May, 1999, that had registered over 75,000
domain names using an automated computer program.[1]
Their aim was to lock up all available four letter domains by
systematically reserving every possible combination of letters,
starting with aaaa.com, then aaab.com, aaac.com, up to
zzzz.com, until every available combination had been reserved.

\1\  Run on Domain Names Foiled, Wired News, May 27, 1999,
available at http://www.wired.com/news/news/business/story/19913.html
(last visited Aug. 2, 1999).

The practice of cybersquatting harms consumers, electronic
commerce, and the goodwill equity of valuable U.S. brand names,
upon which consumers increasingly rely to locate the true
source of genuine goods and services on the Internet. Online
consumers have a difficult time distinguishing a genuine site
from a pirate site, given that often the only indications of
source and authenticity of the site, or the goods and services
made available thereon, are the graphical interface on the site
itself and the Internet address at which it resides. As a
result, consumers have come to rely heavily on familiar brand
names when engaging in online commerce. But if someone is
operating a web site under another brand owner's trademark,
such as a site called ``cocacola.com'' or ``levis.com,''
consumers bear a significant risk of being deceived and
defrauded, or at a minimum, confused. The costs associated with
these risks are increasingly burdensome as more people begin
selling pharmaceuticals, financial services, and even groceries
over the Internet. Regardless of what is being sold, the result
of online brand name abuse, as with other forms of trademark

violations, is the erosion of consumer confidence in brand name
identifiers and in electronic commerce generally.

Cybersquatters target distinctive marks for a variety of
reasons. Some register well-known brand names as Internet
domain names in order to extract payment from the rightful
owners of the marks, who find their trademarks ``locked up''
and are forced to pay for the right to engage in electronic
commerce under their own brand name. For example, several years
ago a small Canadian company with a single shareholder and a
couple of dozen domain names demanded that Umbro International,
Inc., which markets and distributes soccer equipment, pay
$50,000 to its sole shareholder, $50,000 to an Internet
charity, and provide a free lifetime supply of soccer equipment
in order for it to relinquish the ``umbro.com''
name.[2] The Committee also heard testimony that
Warner Bros. was reportedly asked to pay $350,000 for the
rights to the names ``warner-records.com'', ``warner-bros-
records.com'', ``warner pictures.com'', ``warner bros
pictures'', and ``warnerpictures.com''.[3]
--------------------------------------------------------------
\2\  See Umbro International, Inc. v. 3263851 Canada, Inc., 1999 WL
117760 (Va. Cir. Ct., Feb. 3, 1999).
\3\  Cybersquatting and Consumer Protection: Ensuring Domain Name
Integrity, 1999: Hearings Before the Senate Comm. on the Judiciary,
106th Cong., 1st Sess. (1999) (Statement of Anne Chasser, President,
International Trademark Association).
--------------------------------------------------------------

Others register well-known marks as domain names and
warehouse those marks with the hope of selling them to the
highest bidder, whether it be the trademark owner or someone
else. For example, the Committee heard testimony regarding an
Australian company operating on the Internet under the name
``The Best Domains,'' which was offering such domain names as
``911porsche.com,'' at asking prices of up to $60,911, with a
caption that reads ``PORSCHE: DO I NEED TO SAY ANYTHING?''
[4] The Committee also heard testimony regarding a
similarly enterprising cybersquatter whose partial inventory of
domain names--the listing of which was limited by the fact that
Network Solutions will only display the first 50 records of a
given registrant  includes names such as Coca Cola, Pepsi,
Burger King, KFC, McDonalds, Subway, Taco Bell, Wendy's, BMW,
Chrysler, Dodge, General Motors, Honda, Hyundai, Jaguar, Mazda,
Mercedes, Nissan, Porsche, Rolls-Royce, Saab, Saturn, Toyota,
and Volvo, all of which are available to the highest bidder
through an online offer sheet. [5]
--------------------------------------------------------------
\4\  Cybersquatting and Consumer Protection: Ensuring Domain Name
Integrity, 1999: Hearings Before the Senate Comm. on the Judiciary,
106th Cong., 1st Sess. (1999) (Statement of Gregory D. Phillips,
trademark practitioner and outside trademark counsel for Porsche Cars
North America, Inc.).
\5\  Id.
--------------------------------------------------------------

In addition, cybersquatters often register well-known marks
to prey on consumer confusion by misusing the domain name to
divert customers from the mark owner's site to the
cybersquatter's own site, many of which are pornography sites
that derive advertising revenue based on the number of visits,
or ``hits,'' the site receives. For example, the Committee was
informed of a parent whose child mistakenly typed in the domain
name for ``dosney.com,'' expecting to access the family-
oriented content of the Walt Disney home page, only to end up
staring at a screen of hardcore pornography because a
cybersquatter had registered that domain name in anticipation

that consumers would make that exact mistake. Other instances
of diverting unsuspecting consumers to pornographic web sites
involve malicious attempts to tarnish a trademark owner's mark
or to extort money from the trademark owner, such as the case
where a cybersquatter placed pornographic images of celebrities
on a site under the name ``pentium3.com'' and announced that it
wouldsell the domain name to the highest bidder.[6]
Others attempt to divert unsuspecting consumers to their sites in order
to engage in unfair competition. For example, the business operating
under the domain name ``disneytransportation.com'' greets online
consumers at its site with a picture of Mickey Mouse and offers shuttle
services in the Orlando area and reservations at Disney hotels,
although the company is in no way affiliated with the Walt Disney
Company and such fact is not clearly indicated on the site. Similarly,
the domain name address ``wwwcarpoint.com,'' without a period following
``www'', was used by a cybersquatter to offer a competing service to
Microsoft's popular Carpoint car buying service.
-------------------------------------------------------------------------
    \6\ See Statement of Anne Chasser, supra note 3.
-------------------------------------------------------------------------

    Finally, and most importantly, cybersquatters target
distinctive marks to defraud consumers, including to engage in
counterfeiting activities. For example, the Committee heard
testimony regarding a cybersquatter who registered the domain
names ``attphonecard.com'' and ``attcallingcard.com'' and used
those names to establish sites purporting to sell calling cards
and soliciting personally identifying information, including
credit card numbers.[7] We also heard the account of a
cybersquatter purporting to sell Dell Computer products under
the name ``dellspares.com'', when in fact Dell does not
authorize online resellers to market its products, and a
similar account of someone using the name
``levis501warehouse.com'' to sell Levis jeans despite the fact
that Levis is the only authorized online reseller of its
jeans.[8] Of even greater concern was the example of
an online drug store selling pharmaceuticals under the name
``propeciasales.com'' without any way for online consumers to
tell whether what they are buying is a legitimate product, a
placebo, or a dangerous counterfeit.[9]
-------------------------------------------------------------------------
    \7\ See id.
    \8\ Cybersquatting and Consumer Protection: Ensuring Domain Name
Integrity, 1999: Hearings Before the Senate Comm. on the Judiciary,
106th Cong., 1st Sess. (1999) (Statement of Christopher D. Young,
President and Co-founder, Cyveillance, Inc.).
    \9\ See id.
-------------------------------------------------------------------------

The need for legislation banning cybersquatting

    Current law does not expressly prohibit the act of
cybersquatting. The World Intellectual Property Organization
(WIPO) has identified cybersquatting as a global problem and
recognized in its report on the domain name process that,
``[f]amous and well-known marks have been the special target of
a variety of predatory and parasitical practices on the
Internet.'' [10] Trademark holders are battling
thousands of cases of cybersquatting each year, the vast
majority of which cannot be resolved through the dispute
resolution policy set up by Internet domain name registries.
-------------------------------------------------------------------------
    \10\ World Intellectual Property Organization, Management of
Internet Names and Addresses: Intellectual Proerty Issues 8 (1999).
-------------------------------------------------------------------------

Instances of cybersquatting continue to grow each year
because there is no clear deterrent and little incentive for
cybersquatters to discontinue their abusive practices. While
the Federal Trademark Dilution Act has been useful in pursuing
cybersquatters, cybersquatters have become increasingly
sophisticated as the case law has developed and now take the
necessary precautions to insulate themselves from liability.
For example, many cybersquatters are now careful to no longer
offer the domain name for sale in any manner that could
implicate liability under existing trademark dilution case law.
And, in cases of warehousing and trafficking in domain names,
courts have sometimes declined to provide assistance to
trademark holders,leaving them without adequate and effective
judicial remedies. This uncertainty as to the trademark law's
application to the Internet has produced inconsistent judicial
decisions and created extensive monitoring obligations, unnecessary
legal costs, and uncertainty for consumers and trademark owners alike.

In cases where a trademark owner can sue, the sheer number
of domain name infringements, the costs associated with
hundreds of litigation matters, and the difficulty of obtaining
damages in standard trademark infringement and dilution actions
are significant obstacles for legitimate trademark holders.
Frequently, these obstacles lead trademark owners to simply
``pay off'' cybersquatters, in exchange for the domain name
registration, rather than seek to enforce their rights in
court.

Legislation is needed to address these problems and to
protect consumers, promote the continued growth of electronic
commerce, and protect the goodwill of American businesses.
Specifically, legislation is needed to clarify the rights of
trademark owners with respect to bad faith, abusive domain name
registration practices, to provide clear deterrence to prevent
bad faith and abusive conduct, and to provide adequate remedies
for trademark owners in those cases where it does occur.


The Committee substitute amendment


The Internet remains a relatively new and exciting medium
for communication, electronic commerce, education,
entertainment, and countless other yet-to-be-determined uses.
It is a global medium whose potential is only just beginning to
be understood. Abusive conduct, like cybersquatting, threatens
the continued growth and vitality of the Internet as a platform
for all these uses. But in seeking to curb such abuses,
Congress must not cast its net too broadly or impede the growth
of technology, and it must be careful to balance the legitimate
interests of Internet users with the other interests sought to
be protected.

Prior to Committee consideration of the bill, the Chairman
and Ranking Member, in cooperation with the sponsors of the
bill, engaged in many hours of discussions with Senators and
affected parties on all sides to refine the bill and to clarify
its application with respect to noninfringing trademark uses.
The result is a balanced Committee substitute amendment to the
bill that protects the rights of Internet users and the
interests of all Americans in free speech and protected uses of
trademarked names for such things as parody, comment,
criticism, comparative advertising, news reporting, etc. * * *
At the same time, the amendment is true to the aim of the
underlying bill by providing clarity in the law for trademark
owners and much needed protections for American consumers
online.

Balancing cybersquatting deterrence with protected trademark uses
online

Like the underlying bill, the Committee substitute allows trademark owners to recover statutory damages in cybersquatting cases, both to deter wrongful conduct and to provide adequate remedies for trademark owners who seek to enforce their rights in court. The substitute goes beyond simply stating the remedy, however, and sets forth a substantive cause of action, based in trademark law, to define the wrongful conduct sought to be deterred and to fill in the gaps and uncertainties of current trademark law with respect to cybersquatting. Under the bill, as amended, the abusive conduct that is made actionable is appropriately limited just to bad-faith registrations and uses of others' marks by persons who seek to profit unfairly from the goodwill associated therewith. Specifically, the bill prohibits ``the registration, trafficking in, or use of a domain name that is identical to, confusingly similar to, or dilutive of '' a mark that is distinctive (i.e., had attained trademark status) at the time the domain name is registered, ``with bad-faith intent to profit from the goodwill'' associated with that mark.

The Committee intends the prohibited ``use'' of a domain name to describe the use of a domain name ``by the domain name registrant, with the bad-faith intent to profit from the goodwill of the mark of another. The concept of ``use'' does not extend to uses of the domain name made by those other than the domain name registrant, such as the person who includes the domain name as a hypertext link on a web page or as part of a directory of Internet addresses.

In addition, the bill, as amended, balances the property interests of trademark owners with the interests of Internet users who would make fair use of others' marks or otherwise engage in protected speech online. First, the bill sets forth a number of balancing factors that a court may wish to consider in deciding whether the requisite bad-faith intent is present in any given case:

(i) The trademark rights of the domain name registrant in the domain name;

(ii) Whether the domain name is the legal or nickname of the registrant;

(iii) The prior use by the registrant of the domain name in connection with the bona fide offering of any goods or services;

(iv) The registrant's legitimate noncommercial or fair use of the mark at the site under the domain name;

(v) The registrant's intent to divert consumers from the mark's owner's online location in a manner that could harm the mark's goodwill, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation or endorsement of the site;

(vi) The registrant's offer to sell the domain name for substantial consideration without having or having an intent to use the domain name in the bona fide offering of goods or services;

(vii) The registrant's intentional provision of material false and misleading contact information when applying for the registration of the domain name; and

(viii) The registrant's registration of multiple domain names that are identical or similar to or dilutive of another's trademark.

Each of these factors reflect indicators that, in practice, commonly suggest bad-faith intent or a lack thereof in cybersquatting cases. The Committee understands that the presence or absence of any of these factors may not be

determinative. For example, while noncommercial uses of a mark,
such as for comment, criticism, parody, news reporting, etc. *
* *, are beyond the scope of the bill's prohibitions, the fact
that a person uses the domain name at issue in connection with
a site that makes a noncommercial or fair use of the mark does
not necessarily mean that the domain name registrant lacked bad
faith. To recognize such an exemption would eviscerate the
protections of the bill by suggesting a blueprint for
cybersquatters who would simply create criticism sites in order
to immunize themselves from liability despite their bad-faith
intentions. By the same token, the fact that a defendant
provided erroneous information in applying for a domain name
registration or registered multiple domain names that were
identical to, confusingly similar to, or dilutive of
distinctive marks does not necessarily show bad-faith. The
Committee recognizes that such false information may be
provided without a bad-faith intent to trade on the goodwill of
another's mark, and that there are likely to be instances in
which multiple domain name registrations are consistent with
honest business practices. Similar caveats can be made for each
of the eight balancing factors, which is why the list of
factors is nonexclusive and nonexhaustive. Courts must
ultimately weigh the facts of each case and make a
determination based on those facts whether or not the defendant
registered, trafficked in, or used the domain name with bad-
faith intent to profit from the goodwill of the mark of
another.
    Second, the amended bill underscores the bad-faith
requirement by requiring a court to remit statutory damages in
any case where a defendant believed, and the court finds that
the defendant had reasonable grounds to believe, that the
registration or use of the domain name was a fair or otherwise
lawful use. In addition, the bill makes clear that the newly
created statutory damages shall apply only with respect to bad-
faith conduct occurring on or after the date of enactment of
the bill.
        Definition of ``domain name''
    The bill, as amended, provides a narrow definition of the
term ``domain name'' in order to tailor the bill's reach
narrowly to the problem sought to be addressed. Thus, the term
``domain name'' describes any alphanumeric designation which is
registered with or assigned by any domain name registrar,
domain name registry, or other domain name registration
authority as part of an electronic address on the Internet.
This definition essentially covers the second-level domain
names assigned by domain name registration authorities (i.e.,
the name located immediately to the left of the ``.com,''
``.net'', ``.edu,'' and ``.org'' generic top level domains),
but is technology neutral enough to accommodate names other
than second-level domains that are actually registered with
domain name registration authorities, as may be the case should
Internet domain name registrars begin to issue third or fourth
level domains. The limited nature of the definition is
important in that it excludes such things as screen names, file
names, and other identifiers not assigned by a domain name
registrar or registry, which have little to do with
cybersquatting in practice.
        In rem jurisdiction
    As amended, the bill provides for in rem jurisdiction,
which allows a mark owner to seek the forfeiture, cancellation,
or transfer of an infringing domain name by filing an in rem
action against the name itself, provided the domain name itself
violates substantive Federal trademark law, where the mark
owner has satisfied the court that it has exercised due
diligence in trying to locate the owner of the domain name but

is unable to do so. A significant problem faced by trademark owners in the fight against cybersquatting is the fact that many cybersquatters register domain names under aliases or otherwise provide false information in their registration applications in order to avoid identification and service of process by the mark owner. The bill, as amended, will alleviate this difficulty, while protecting the notions of fair play and substantial justice, by enabling a mark owner to seek an injunction against the infringing property in those cases where, after due diligence, a mark owner is unable to proceed against the domain name registrant because the registrant has provided false contact information and is otherwise not to be found.

Additionally, some have suggested that dissidents and others who are online incognito for legitimate reasons might give false information to protect themselves and have suggested the need to preserve a degree of anonymity on the Internet particularly for this reason. Allowing a trademark owner to proceed against the domain names themselves, provided they are, in fact, infringing or diluting under the Trademark Act, decreases the need for trademark owners to join the hunt to chase down and root out these dissidents or others seeking anonymity on the Net. The approach in the amended bill is a good compromise, which provides meaningful protection to trademark owners while balancing the interests of privacy and anonymity on the Internet.

Encouraging cooperation and fairness in the effort to combat cybersquatting

Like the underlying bill, the substitute amendment encourages domain name registrars and registries to work with trademark owners to prevent cybersquatting by providing a limited exemption from monetarydamages for domain name registrars and registries that suspend, cancel, or transfer domain names pursuant to a court order or in the implementation of a reasonable policy prohibiting the registration of infringing domain names. The amended bill goes further, however, in order to protect the rights of domain name registrants against overreaching trademark owners. Under the amended bill, a trademark owner who knowingly and materially misrepresents to the domain name registrar or registry that a domain name is infringing is liable to the domain name registrant for damages, including costs and attorneys' fees, resulting from the suspension, cancellation, or transfer of the domain name. In addition, the court may award injunctive relief to the domain name registrant by ordering the reactivation of the domain name or the transfer of the domain name back to the domain name registrant. The bill, as amended, also promotes the continued ease and efficiency users of the current registration system enjoy by codifying current case law limiting the secondary liability of domain name registrars and registries for the act of registration of a domain name.[11]

--------------------------------------------------------------------------

\11\ See Panavision Int'l v. Toeppen, 141 F.3d 1316, 1319 (9th Cir. 1998) (holding that NSI is not responsible for making ``a determination about registrant's right to use a domain name.''); Lockheed Martin Corporation v. Networks Solutions, Inc., 985 F.Supp. 949 (C.D. Ca. 1997) (holding registrar not liable); Academy of Motion Picture Arts and Science v. Network Solutions, Inc., 989 F.Supp. 1276, (C.D.Ca. 1997)(holding that holder of registered trademarks could not obtain a preliminary injunction against domain name registrar).

--------------------------------------------------------------------------

Preservation of first amendment rights and trademark defenses

Finally, the substitute amendment includes an explicit savings clause making clear that the bill does not affect traditional trademark defenses, such as fair use, or a person's first amendment rights, and it ensures that any new remedies

created by the bill will apply prospectively only.

    In summary, the legislation is a balanced approach to protecting the legitimate interests of businesses, Internet users, e-commerce, and consumers.

## IV. Vote of the Committee

    The Senate Committee on the Judiciary, with a quorum present, met on Thursday, July 29, 1999, at 2:30 p.m., to consider the ``Anticybersquatting Consumer Protection Act.'' The Committee considered and accepted by unanimous consent an amendment in the nature of a substitute offered by the Chairman (for himself, Mr. Leahy, Mr. Abraham, Mr. Torricelli, Mr. DeWine, Mr. Kohl, and Mr. Schumer). The Committee then ordered the ``Anticybersquatting Consumer Protection Act'' reported favorably to the Senate, as amended, by unanimous consent, with a recommendation that the bill do pass.

## V. Section-by-Section Analysis

Section 1. Short title; references

    This section provides that the act may be cited as the ``Anticybersquatting Consumer Protection Act'' and that any references within the bill to the Trademark Act of 1946 shall be a reference to the act entitled ``An Act to provide for the registration and protection of trademarks used in commerce, to carry out the provisions of certain international conventions, and for other purposes,'' approved July 5, 1946 (15 U.S.C. 1051 et seq.), also commonly referred to as the Lanham Act.

Section 2. Findings

    This section sets forth Congress' findings that cybersquatting and cyberpiracy--defined as the registration, trafficking in, or use of a domain name that is identical to, confusingly similar to, or dilutive of a distinctive trademark or service mark of another with the bad faith intent to profit from the goodwill of that mark--harms the public by causing consumer fraud and public confusion as to the true source or sponsorship of goods or services, by impairing electronic commerce, by depriving trademark owners of substantial revenues and consumer goodwill, and by placing unreasonable, intolerable, and overwhelming burdens on trademark owners in protecting their own marks. Amendments to the Trademark Act would clarify the rights of trademark owners to provide for adequate remedies for the abusive and bad faith registration of their marks as Internet domain names and to deter cyberpiracy and cybersquatting.

Section 3. Cyberpiracy prevention

    Subsection (a). In General. This subsection amends section the Trademark Act to provide an explicit trademark remedy for cybersquatting under a new section 43(d). Under paragraph (1)(A) of the new section 43(d), actionable conduct would include the registration, trafficking in, or use of a domain name that is identical to, confusingly similar to, or dilutive of the trademark or service mark of another, provided that the mark was distinctive (i.e., enjoyed trademark status) at the time the domain name was registered. The bill is carefully and narrowly tailored, however, to extend only to cases where the plaintiff can demonstrate that the defendant registered, trafficked in, or used the offending domain name with bad-faith

intent to profit from the goodwill of a mark belonging to
someone else. Thus, the bill does not extent to innocent domain
name registrations by those who are unaware of another's use of
the name, or even to someone who is aware of the trademark
status of the name but registers a domain name containing the
mark for any reason other than with bad faith intent to profit
from the goodwill associated with that mark.

Paragraph (1)(B) of the new section 43(d) sets forth a
number of nonexclusive, nonexhaustive factors to assist a court
in determining whether the required bad-faith element exists in
any given case. These factors are designed to balance the
property interests of trademark owners with the legitimate
interests of Internet users and others who seek to make lawful
uses of others' marks, including for purposes such as
comparative advertising, comment, criticism, parody, news
reporting, fair use, etc. The bill suggests a total of eight
factors a court may wish to consider. The first four suggest
circumstances that may tend to indicate an absence of bad-faith
intent to profit from the goodwill of a mark, and the last four
suggest circumstances that may tend to indicate that such bad-
faith intent exists.

First, under paragraph (1)(B)(i), a court may consider
whether the domain name registrant has trademark or any other
intellectual property rights in the name. This factor
recognizes, as does trademark law in general, that there may be
concurring uses of the same name that are noninfringing, such
as the use of the ``Delta'' mark for both air travel and sink
faucets. Similarly, the registration of the domain name
``deltaforce.com'' by a movie studio would not tend to indicate
a bad faith intent on the part of the registrant to trade on
Delta Airlines or Delta Faucets' trademarks.

Second, under paragraph (1)(B)(ii), a court may consider
the extent to which the domain name is the same as the
registrant's own legal name or a nickname by which that person
is commonly identified. This factor recognizes, again as does
the concept of fair use in trademark law, that a person should
be able to be identified by their own name, whether in their
business or on a web site. Similarly, a person may bear a
legitimate nickname that is identical or similar to a well-
known trademark, such as in the well-publicizedcase of the
parents who registered the domain name ``pokey.org'' for their young
son who goes by that name, and these individuals should not be deterred
by this bill from using their name online. This factor is not intended
to suggest that domain name registrants may evade the application of
this act by merely adopting Exxon, Ford, or other well-known marks as
their nicknames. It merely provides a court with the appropriate
discretion to determine whether or not the fact that a person bears a
nickname similar to a mark at issue is an indication of an absence of
bad-faith on the part of the registrant.

Third, under paragraph (1)(B)(iii), a court may consider
the domain name registrant's prior use, if any, of the domain
name in connection with the bona fide offering of goods or
services. Again, this factor recognizes that the legitimate use
of the domain name in online commerce may be a good indicator
of the intent of the person registering that name. Where the
person has used the domain name in commerce without creating a
likelihood of confusion as to the source or origin of the goods
or services and has not otherwise attempted to use the name in
order to profit from the goodwill of the trademark owner's
name, a court may look to this as an indication of the absence
of bad faith on the part of the registrant.

Fourth, under paragraph (1)(B)(iv), a court may consider
the person's legitimate noncommercial or fair use of the mark
in a web site that is accessible under the domain name at
issue. This factor is intended to balance the interests of

trademark owners with the interests of those who would make
lawful noncommercial or fair uses of others' marks online, such
as in comparative advertising, comment, criticism, parody, news
reporting, etc. Under the bill, the use of a domain name for
purposes of comparative advertising, comment, criticism,
parody, news reporting, etc., even where done for profit, would
not alone satisfy the bad-faith intent requirement. The fact
that a person may use a mark in a site in such a lawful manner
may be an appropriate indication that the person's registration
or use of the domain name lacked the required element of bad-
faith. This factor is not intended to create a loophole that
otherwise might swallow the bill, however, by allowing a domain
name registrant to evade application of the Act by merely
putting up a noninfringing site under an infringing domain
name. For example, in the well know case of Panavision Int'l v.
Toeppen, 141 F.3d 1316 (9th Cir. 1998), a well known
cybersquatter had registered a host of domain names mirroring
famous trademarks, including names for Panavision, Delta
Airlines, Neiman Marcus, Eddie Bauer, Lufthansa, and more than
100 other marks, and had attempted to sell them to the mark
owners for amounts in the range of $10,000 to $15,000 each. His
use of the ``panavision.com'' and ``panaflex.com'' domain names
was seemingly more innocuous, however, as they served as
addresses for sites that merely displayed pictures of Pana
Illinois and the word ``Hello'' respectively. This bill would
not allow a person to evade the holding of that case--which
found that Mr. Toeppen had made a commercial use of the
Panavision marks and that such uses were, in fact, diluting
under the Federal Trademark Dilution Act--merely by posting
noninfringing uses of the trademark on a site accessible under
the offending domain name, as Mr. Toeppen did. Similarly, the
bill does not affect existing trademark law to the extent it
has addressed the interplay between first amendment protections
and the rights of trademark owners. Rather, the bill gives
courts the flexibility to weigh appropriate factors in
determining whether the name was registered or used in bad
faith, and it recognizes that one such factor may be the use
the domain name registrant makes of the mark.
    Fifth, under paragraph (1)(B)(v), a court may consider
whether, in registering or using the domain name, the
registrant intended to divert consumers away from the trademark
owner's website to a website that could harm the goodwill of
the mark, either for purposes of commercial gain or with the
intent to tarnish or disparage the mark, by creating a
likelihood of confusion as to the source,sponsorship,
affiliation, or endorsement of the site. This factor recognizes that
one of the main reasons cybersquatters use other people's trademarks is
to divert Internet users to their own sites by creating confusion as to
the source, sponsorship, affiliation, or endorsement of the site. This
is done for a number of reasons, including to pass off inferior goods
under the name of a well-known markholder, to defraud consumers into
providing personally identifiable information, such as credit card
numbers, to attract eyeballs to sites that price online advertising
according to the number of ``hits'' the site receives, or even just to
harm the value of the mark. Under this provision, a court may give
appropriate weight to evidence that a domain name registrant intended
to confuse or deceive the public in this manner when making a
determination of bad-faith intent.
    Sixth, under paragraph (1)(B)(vi), a court may consider a
domain name registrant's offer to transfer, sell, or otherwise
assign the domain name to the mark owner or any third party for
substantial consideration, where the registrant has not used,
and did not have any intent to use, the domain name in the bona
fide offering of any goods or services. This factor is
consistent with the court cases, like the Panavision case

mentioned above, where courts have found a defendant's offer to
sell the domain name to the legitimate mark owner as being
indicative of the defendant's intent to trade on the value of a
trademark owner's marks by engaging in the business of
registering those marks and selling them to the rightful
trademark owners. It does not suggest that a court should
consider the mere offer to sell a domain name to a mark owner
or the failure to use a name in the bona fide offering of goods
or services is sufficient to indicate bad faith. Indeed, there
are cases in which a person registers a name in anticipation of
a business venture that simply never pans out. And someone who
has a legitimate registration of a domain name that mirrors
someone else's domain name, such as a trademark owner that is a
lawful concurrent user of that name with another trademark
owner, may, in fact, wish to sell that name to the other
trademark owner. This bill does not imply that these facts are
an indication of bad-faith. It merely provides a court with the
necessary discretion to recognize the evidence of bad-faith
when it is present. In practice, the offer to sell domain names
for exorbitant amounts to the rightful mark owner has been one
of the most common threads in abusive domain name
registrations.

Seventh, under paragraph (1)(B)(vii), a court may consider
the registrant's intentional provision of material and
misleading false contact information in an application for the
domain name registration. Falsification of contact information
with the intent to evade identification and service of process
by trademark owners is also a common thread in cases of
cybersquatting. This factor recognizes that fact, while still
recognizing that there may be circumstances in which the
provision of false information may be due to other factors,
such as mistake or, as some have suggested in the case of
political dissidents, for purposes of anonymity. This bill
balances those factors by limiting consideration to the
person's contact information, and even then requiring that the
provision of false information be material and misleading. As
with the other factors, this factor is nonexclusive and a court
is called upon to make a determination based on the facts
presented whether or not the provision of false information
does, in fact, indicate bad-faith.

Eighth, under paragraph (1)(B)(viii), a court may consider
the domain name registrant's acquisition of multiple domain
names that are identical to, confusingly similar to, or
dilutive of others' marks. This factor recognizes the
increasingly common cybersquatting practice known as
``warehousing'', in which a cybersquatter registers multiple
domain names--sometimes hundreds, even thousands--that mirror
the trademarks of others. By sitting on these marks and not
making the first move to offer to sell them to the mark owner,
these cybersquatters have been largely successful in evading
the case law developed under the Federal Trademark Dilution
Act. This bill does not suggest that the mere registration of
multiple domain names is an indication of bad faith, but allows
a court to weigh the fact that a person has registered multiple
domain names that infringe or dilute the trademarks of others
as part of its consideration of whether the requisite bad-faith
intent exists.

Paragraph (1)(C) makes clear that in any civil action
brought under the new section 43(d), a court may order the
forfeiture, cancellation, or transfer of a domain name to the
owner of the mark.

Paragraph (2)(A) provides for in rem jurisdiction, which
allows a markowner to seek the forfeiture, cancellation, or
transfer of an infringing domain name by filing an in rem
action against the name itself, where the markowner has

satisfied the court that it has exercised due diligence in
trying to locate the owner of the domain name but is unable to
do so. As indicated above, a significant problem faced by
trademark owners in the fight against cybersquatting is the
fact that many cybersquatters register domain names under
aliases or otherwise provide false information in their
registration applications in order to avoid identification and
service of process by the markowner. This bill will alleviate
this difficulty, while protecting the notions of fair play and
substantial justice, by enabling a markowner to seek an
injunction against the infringing property in those cases
where, after due diligence, a markowner is unable to proceed
against the domain name registrant because the registrant has
provided false contact information and is otherwise not to be
found, provided the markowner can show that the domain name
itself violates substantive Federal trademark law (i.e., that
the domain name violates the rights of the registrant of a mark
registered in the Patent and Trademark Office, or section 43
(a) or (c) of the Trademark Act). Paragraph (2)(B) limits the
relief available in such an in rem action to an injunction
ordering the forfeiture, cancellation, or transfer of the
domain name.

    Subsection (b). Additional civil action and remedy. This
subsection makes clear that the creation of a new section 43(d)
in the Trademark Act does not in any way limit the application
of current provisions of trademark, unfair competition and
false advertising, or dilution law, or other remedies under
counterfeiting or other statutes, to cybersquatting cases.


Section 4. Damages and remedies

    This section applies traditional trademark remedies,
including injunctive relief, recovery of defendant's profits,
actual damages, and costs, to cybersquatting cases under the
new section 43(d) of the Trademark Act. The bill also amends
section 35 of the Trademark Act to provide for statutory
damages in cybersquatting cases, in an amount of not less than
$1,000 and not more than $100,000 per domain name, as the court
considers just. The bill requires the court to remit statutory
damages in any case where the infringer believed and had
reasonable grounds to believe that the use of the domain name
was a fair or otherwise lawful use.


Section 5. Limitation on liability

    This section amends section 32(2) of the Trademark Act to
extend the Trademark Act's existing limitations on liability to
the cybersquatting context. This section also creates a new
subparagraph (D) in section 32(2) to encourage domain name
registrars and registries to work with trademark owners to
prevent cybersquatting through a limited exemption from
liability for domain name registrars and registries that
suspend, cancel, or transfer domain names pursuant to a court
order or in the implementation of a reasonable policy
prohibiting cybersquatting. The bill anticipates a reasonable
policy against cybersquatting will apply only to marks
registered on the Principal Register of the Patent and
Trademark Office in order to promote objective criteria and
predictability in the dispute resolution process.
    This section also protects the rights of domain name
registrants against overreaching trademark owners. Under a new
section subparagraph (D)(iv) in section 32(2), a trademarkowner
who knowingly andmaterially misrepresents to the domain name
registrar or registry that a domain name is infringing shall be liable
to the domain name registrant for damages resulting from the

suspension, cancellation, or transfer of the domain name. In addition, the court may grant injunctive relief to the domain name registrant by ordering the reactivation of the domain name or the transfer of the domain name back to the domain name registrant. Finally, in creating a new subparagraph (D)(iii) of section 32(2), this section codifies current case law limiting the secondary liability of domain name registrars and registries for the act of registration of a domain name, absent bad-faith on the part of the registrar and registry.

Section 6. Definitions

   This section amends the Trademark Act's definitions section (section 45) to add definitions for key terms used in this act. First, the term ``Internet'' is defined consistent with the meaning given that term in the Communications Act (47 U.S.C. 230(f)(1)). Second, this section creates a narrow definition of ``domain name'' to target the specific bad-faith conduct sought to be addressed while excluding such things as screen names, file names, and other identifiers not assigned by a domain name registrar or registry.

Section 7. Savings clause

   This section provides an explicit savings clause making clear that the bill does not affect traditional trademark defenses, such as fair use, or a person's first amendment rights.

Section 8. Severability

   This section provides a severability clause making clear Congress' intent that if any provision of this act, an amendment made by the act, or the application of such provision or amendment to any person or circumstances is held to be unconstitutional, the remainder of the Act, the amendments made by the act, and the application of the provisions of such to any person or circumstance shall not be affected by such determination.

Section 9. Effective date

   This section provides that new statutory damages provided for under this bill shall not apply to any registration, trafficking, or use of a domain name that took place prior to the enactment of this act.

                    VI. Cost Estimate

                         U.S. Congress,
                    Congressional Budget Office,
                         Washington, DC, August 5, 1999.
Hon. Orrin G. Hatch, Chairman,
Committee on the Judiciary, U.S. Senate, Washington, DC.
   Dear Mr. Chairman: The Congressional Budget Office has prepared the enclosed cost estimate for S. 1255, the Anticybersquatting Consumer Protection Act.
   If you wish further details on this estimate, we will be pleased to provide them. The CBO staff contacts are Mark Hadley (for Federal costs) and Shelley Finlayson (for the State and local impact).
            Sincerely,

                         Barry B. Anderson
                    (For Dan L. Crippen, Director).

       VII. Regulatory Impact Statement

In compliance with paragraph 11(b)(1), rule XXVI of the Standing Rules of the Senate, the Committee, after due consideration, concludes that S. 1255 will not have significant regulatory impact.

### congressional budget office cost estimate

S. 1255--Anticybersquatting Consumer Protection Act

Cybersquatting (or cyberpiracy) consists of registering, trafficking in, or using domain names (Internet addresses) that are identical or confusingly similar to trademarks with the bad-faith intent to profit from the goodwill of the trademarks. S. 1255 would allow trademark owners to sue anyone who engages in such conduct for the higher of actual damages or statutory damages of $1,000 to $100,000 for each domain name. The bill also would allow the courts to order the forfeiture, cancellation, or transfer of domain names in such instances.

Because S. 1255 would not significantly affect the workload of the Patent and Trademark Office or the court system, CBO estimates that implementing the bill would not have a significant effect on the Federal budget. S. 1255 would not affect direct spending or receipts; therefore, pay-as-you-go procedures would not apply.

S. 1255 contains no intergovernmental or private-sector mandates as defined in the Unfunded Mandates Reform Act and could benefit State, local, or tribal governments to the extent that these governments would be able to sue and recover damages from infringement or dilution of trademarks based on the provisions of the bill. Any such benefits are expected to be minimal based on the potential damage awards and the costs of litigating such suits.

The CBO staff contacts are Mark Hadley (for Federal costs) and Shelley Finlayson (for the State and local impact). This estimate was approved by Robert A. Sunshine, Deputy Assistant Director for Budget Analysis.

### VIII. Changes in Existing Law

In compliance with paragraph 12 of rule XXVI of the Standing Rules of the Senate, changes in existing law made by S. 1255, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, and existing law in which no change is proposed is shown in roman):

### THE TRADEMARK ACT OF 1946

*        *        *        *        *        *        *

### remedies

Section 32. [15 U.S.C. Sec. 1114](1) Any person who shall, without the consent of the registrant--
          (a) use in * * *

*        *        *        *        *        *        *

(2) Notwithstanding any other provision of this Act, the remedies given to the owner of a right infringed under this Act or to a person bringing an action [under section 43(a)] under section 43 (a) or (d) [15 U.S.C. Sec. 1125(a)] shall be limited

as follows:

```
     *      *      *      *      *      *      *
```

(A) Where * * *

```
     *      *      *      *      *      *      *
```

(D)(i) A domain name registrar, a domain name
registry, or other domain name registration authority
that takes any action described under clause (ii)
affecting a domain name shall not be liable for
monetary relief to any person for such action,
regardless of whether the domain name is finally
determined to infringe or dilute the mark.
(ii) An action referred to under clause (i) is any
action of refusing to register, removing from
registration, transferring, temporarily disabling, or
permanently canceling a domain name
            (I) in compliance with a court order under
         section 43(d); or
            (II) in the implementation of a reasonable
         policy by such registrar, registry, or
         authority prohibiting the registration of a
         domain name that is identical to, confusingly
         similar to, or dilutive of another's mark
         registered on the Principal Register of the
         United States Patent and Trademark Office.
(iii) A domain name registrar, a domain name
registry, or other domain name registration authority
shall not be liable for damages under this section for
the registration or maintenance of a domain name for
another absent a showing of bad faith intent to profit
from such registration or maintenance of the domain
name.
(iv) If a registrar, registry, or other registration
authority takes an action described under clause (ii)
based on a knowing and material misrepresentation by
any person that a domain name is identical to,
confusingly similar to, or dilutive of a mark
registered on the Principal Register of the United
States Patent and Trademark Office, such person shall
be liable for any damages, including costs and
attorney's fees, incurred by the domain name registrant
as a result of such action. The court may also grant
injunctive relief to the domain name registrant,
including the reactivation of the domain name or the
transfer of the domain name to the domain name
registrant.
[(D)](E) As used in this paragraph--

```
     *      *      *      *      *      *      *
```

Section 34. [15 U.S.C. Sec. 1116] (a) The several courts
vested with jurisdiction of civil actions arising under this
act shall have power to grant injunctions, according to the
principles of equity and upon such terms as the court may deem
reasonable, to prevent the violation of any right of the
registrant of a mark registered in the Patent and Trademark
Office or to prevent a violation under [section 43(a)] section
43(a), (c), or (d) [15 U.S.C. Sec. 1125(a)]. Any such
injunction may include a provision directing the defendant to
file with the court and serve on the plaintiff within thirty
days after the service on the defendant of such injunction, or
such extended period as the court may direct, a report in

writing under oath setting forth in detail the manner and form
in which the defendant has complied with the injunction. Any
such injunction granted upon hearing, after notice to the
defendant, by any district court of the United States, may be
served on the parties against whom such injunction is granted
anywhere in the United States where they may be found, and
shall be operative and may be enforced by proceedings to punish
for contempt, or otherwise, by the court by which such
injunction was granted, or by any other United States district
court in whose jurisdiction the defendant may be found.

         *      *      *      *      *      *      *

    Section 35. [15 U.S.C. Sec. 1117] (a) When a violation of
any right of the registrant of a mark registered in the Patent
and Trademark Office, or a violation under section 43 (a), (c),
or (d) [15 U.S.C. Sec. 1125(a)], shall have been established in
any civil action arising under this act, the plaintiff shal be
entitled, subject to the provisions of sections 29 [15 U.S.C.
Sec. 1111] and 32 [15 U.S.C. Sec. 1114], and subject to the
principles of equity, to recover (1) defendant's profits, (2)
any damages sustained by the plaintiff, and (3) the costs of
the action. The court shall assess such profits and damages or
cause the same to be assessed under its direction. In assessing
profits the plaintiff shall be required to prove defendant's
sales only; defendant must prove all elements of cost or
deduction claimed. In assessing damages the court may enter
judgment, according to the circumstances of the case, for any
such sum above the amount found as actual damages, not
exceeding three times such amount. If the court shall find that
the amount of recovery based on profits is either inadequate or
excessive the court may in its discretion enter judgment for
such sum as the court shall find to be just, according to the
circumstances of the case. Such sum in either of the above
circumstances shall constitute compensation and not a penalty.
The court in exceptional cases may award reasonable attorney
fees to the prevailing party.

         *      *      *      *      *      *      *

    (d) In a case involving a violation of section 43(d)(1),
the plaintiff may elect, at any time before final judgment is
rendered by the trial court, to recover, instead of actual
damages and profits, an award of statutory damages in the
amount of not less than $1,000 and not more than $100,000 per
domain name, as the court considers just. The court shall remit
statutory damages in any case in which an infringer believed
and had reasonable grounds to believe that use of the domain
name by the infringer was a fair or otherwise lawful use.

         *      *      *      *      *      *      *

      false designations of origin and false descriptions, and dilution
                          forbidden

    Section 43. [15 U.S.C. Sec. 1125] (a)(1) Any person who, on
or in connection with any goods or services, or any container
for goods, uses in commerce any word, term, name, symbol, or
device, or any combination thereof, or any false designation of
origin, false or misleading description of fact, or false or
misleading representation of fact, which--

         *      *      *      *      *      *      *

(c)(1) The owner * * *

     *      *      *      *      *      *      *

(d)(1)(A) Any person who, with bad-faith intent to profit from the goodwill of a trademark or service mark of another, registers, traffics in, or uses a domain name that is identical to, confusingly similar to, or dilutive of such trademark or service mark, without regard to the goods or services of the parties, shall be liable in a civil action by the owner of the mark, if the mark is distinctive at the time of the registration of the domain name.

(B) In determining whether there is a bad-faith intent described under subparagraph (A), a court may consider factors such as, but not limited to

       (i) the trademark or other intellectual property rights of the person, if any, in the domain name;

       (ii) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;

       (iii) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;

       (iv) the person's legitimate noncommercial or fair use of the mark in a site accessible under the domain name;

       (v) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;

       (vi) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for substantial consideration without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services;

       (vii) the person's intentional provision of material and misleading false contact information when applying for the registration of the domain name; and

       (viii) the person's registration or acquisition of multiple domain names which are identical to, confusingly similar to, or dilutive of trademarks or service marks of others that are distinctive at the time of registration of such domain names, without regard to the goods or services of such persons.

(C) In any civil action involving the registration, trafficking, or use of a domain name under this paragraph, a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark.

(2)(A) The owner of a mark may file an in rem civil action against a domain name if

       (i) the domain name violates any right of the registrant of a mark registered in the Patent and Trademark Office, or section 43 (a) or (c); and

       (ii) the court finds that the owner has demonstrated due diligence and was not able to find a person who would have been a defendant in a civil action under paragraph (1).

(B) The remedies of an in rem action under this paragraph shall be limited to a court order for the forfeiture or cancellation of the domain name or the transfer of the domain

name to the owner of the mark.

        *     *     *     *     *     *     *


       construction and definitions; intent of chapter

    Section 45. [15 U.S.C. Sec. 1127] In the construction of
this Act, unless the contrary is plainly apparent from the
context--

        *     *     *     *     *     *     *


    A ``counterfeit'' is a spurious mark which is identical
with, or substantially indistinguishable from, a registered
mark.
    The term ``Internet'' has the meaning given that term in
section 230(f)(1) of the Communications Act of 1934 (47 U.S.C.
230(f)(1)).
    The term ``domain name'' means any alphanumeric designation
which is registered with or assigned by any domain name
registrar, domain name registry, or other domain name
registration authority as part of an electronic address on the
Internet.

        *     *     *     *     *     *     *