The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

UNITED FEDERATION OF CHURCHES, LLC d/b/a THE SATANIC TEMPLE,

Plaintiff,

v.

DAVID ALAN JOHNSON, an individual; LEAH FISHBAUGH, an individual; MICKEY MEEHAM, an individual; and NATHAN SULLIVAN, an individual,

Defendants.

No. 2:20-cv-00509-RAJ

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR RECONSIDERATION**

NOTED ON MOTION CALENDAR:
**March 12, 2021**

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

## I. INTRODUCTION

"Motions for reconsideration are disfavored. The court will ordinarily deny such motions in the absence of a showing of manifest error in the prior ruling or a showing of new facts or legal authority which could not have been brought to its attention earlier with reasonable diligence." LCR 7(h)(1). The Satanic Temple has not even attempted to meet these standards. As to the ACPA claim, instead of showing any error The Satanic Temple proposes a novel and unsupported interpretation of the ACPA—one that would exponentially expand the ACPA to potentially billions of social media users. The Satanic Temple's proposed interpretation is contradicted by the language of the ACPA, its legislative history, case law, and the realities of how the internet and domain names work. There are no grounds for reconsideration of the Court's correct ruling.

The Satanic Temple also fails to establish any grounds for reconsidering dismissal of the defamation claim. Instead of showing a manifest error of law, The Satanic Temple merely offers a conclusory rehash of the same arguments the Court previously considered and rejected. The Satanic Temple's Motion for Reconsideration should be denied.

## II. ARGUMENT

### A. The Satanic Temple has Failed to Show Manifest (or any) Error in Dismissal of the ACPA Claim.

#### 1. The ACPA Applies Only to Second-Level Domain Names That Have Been Registered With or Assigned by a Registration Authority.

"The paradigmatic harm that the ACPA was enacted to eradicate" is "the practice of cybersquatters registering several hundred domain names in an effort to sell them to the legitimate owners of the mark." *Lamparello v. Falwell*, 420 F.3d 309, 318-19 (4th Cir. 2005) (quoting *Lucas Nursery & Landscaping, Inc. v. Grosse*, 359 F.3d 806, 810 (6th Cir. 2004)). "The Act was also intended to stop the registration of multiple marks with the hope of selling them to the highest bidder." *Id.* Thus, to establish liability for "cyberpiracy" under the ACPA, a plaintiff must prove "(1) the defendant registered, trafficked in, or used a

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

domain name; (2) the domain name is identical or confusingly similar to a protected mark owned by the plaintiff; and (3) the defendant acted 'with bad faith intent to profit from that mark.'" *Multifab, Inc. v. ArlanaGreen.com*, 122 F. Supp. 3d 1055, 1066 (E.D. Wash. 2015).

As the Court correctly observed, by definition a domain name must be registered by a domain name registrar or registry. Order at 10 (the ACPA defines "domain name" as "any alphanumeric designation which is registered with or assigned by a domain name registrar, domain name registry, or other domain name registration authority as part of an electronic address on the Internet") (quoting 15 U.S.C. § 1127). As the Court also noted, numerous courts have defined a "domain name" as consisting of only two parts: a "top-level" domain and a "second-level" domain. *Id.* (quoting *Office Depot Inc. v. Zuccarini*, 596 F.3d 696, 698 (9th Cir. 2010)). The top-level domain ("TLD") includes the portion of the domain name to the right of the period, such as .com, .gov, .net, etc. *Id.* Each TLD is divided into second-level domains identified by the designation to the left of the period, such as "example" in "example.com" or "example.net." *Id.* The Court further correctly found that *only* these two domain levels are covered by the ACPA, and no court has found that the ACPA applies to any URL component beyond top-level and second-level domains. Order at 13 (citing *GoForIt Entm't, LLC v. DigiMedia.com L.P.*, 750 F.Supp.2d 712, 725 (N.D. Tex. 2010) ("The court has found no case, and [plaintiff] has cited none, that holds that a portion of a web address other than a second or top level domain constitutes a 'domain name' within the meaning of the ACPA.")).

The Satanic Temple offers no authority that contradicts either of these two fundamental aspects of the definition of a domain name, *i.e.*, (1) a domain name consists only of a top-level and second-level domain, (2) which is registered with or assigned by a domain name registrar, domain name registry, or other domain name registration authority. Nor has it shown that the Facebook account at issue here meets these required elements—

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

and indeed it does not. The Satanic Temple's claim is based on a *post*-domain portion of its Facebook URL.[1] This part of the URL was not issued by a DNS registry or included on a DNS registry and is not part of the top-level or second-level domain.

**2. The Satanic Temple's Novel Theory is not Supported by any Authority.**

Instead of establishing any error of law, The Satanic Temple argues that the Court should adopt a novel—and entirely unsupported—interpretation of the ACPA. The Satanic Temple suggests that under the ACPA, social media companies, such as Facebook, should be considered domain name registration authorities, and that post-domain URLs issued by social media companies should be considered domain names under the ACPA. Motion for Reconsideration at 2-5. In addition to being entirely unsupported by the language of the ACPA, its legislative history, and case law, The Satanic Temple's theory demonstrates a fundamental misunderstanding of how the domain name system works.

In brief summary, the internet domain name system ("DNS") is overseen by an entity called the Internet Corporation for Assigned Names and Numbers ("ICANN").[2] ICANN is a not-for-profit corporation formed in 1998 and selected by the U.S. Department of Commerce to administer the internet DNS with input from a governmental advisory committee, in which the U.S. Department of Commerce participates. *Vizer v. VIZERNEWS.COM*, 869 F. Supp. 2d 75, 77-78 (D.D.C. 2012) (citing *ICANN*, National Telecommunications & Information Administration, U.S. Department of Commerce, http://www.ntia.doc.gov/category/icann). The DNS links user-friendly names, such as "uscourts.gov," to unique numeric addresses that identify servers connected to the internet.

---

[1] The URL at issue is https://www.facebook.com/**TheSatanicTempleWashington/**") (bolded portion is the post-domain path at issue).

[2] "The Court may take judicial notice of a fact, such as the role of ICANN, which is not subject to 'reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Vizer v. VIZERNEWS.COM*, 869 F. Supp. 2d 75, 77 n.3 (D.D.C. 2012) (citing Fed. R. Evid. 201(b) and *United States v. Philip Morris USA, Inc.*, No. 99-2496, 2004 WL 5355971, at *1-*2 (D.D.C., Aug. 2, 2004)).

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

*Id.* at 78 (citing *Balsam v. Tucows Inc.*, 627 F.3d 1158, 1159 (9th Cir. 2010); *Domain Name System,* National Telecommunications & Information Administration, U.S. Department of Commerce, http://www.ntia.doc. gov/category/domain-name-system (describing the domain name system and ICANN)).

ICANN itself is not a registrar. Instead, it coordinates the DNS by entering into Registry Agreements with Internet registries. *Id.* Each top-level domain name—such as .com, .net, or .org—is operated by one of the authorized registries that maintains information on each registered domain name and ensures that each name registered in its domain is unique. Registries also offer a variety of services, such as permitting consumers to check if a particular name within its domain has been registered and, if so, the expiration date for this registration. *Id.* For example, Verisign, Inc. ("Verisign") is the registry for ".com" and ".net" domains and is responsible for registering names on these domains in accordance with its Registry Agreement with ICANN. Because Verisign is prohibited from accepting requests for domain names directly from consumers, Verisign only accepts and registers domain names received from registrars. *Id.*; *Dotster, Inc. v. ICANN*, 296 F. Supp. 2d 1159, 1160 (C.D. Cal. 2003); *Vizer,* 869 F. Supp. 2d at 78 (citing *What Does ICANN Do?,* ICANN, http://www.icann.org/en/about/participate/what); *see also Office Depot, Inc. v. Zuccarini,* 596 F.3d 696, 699 (9th Cir. 2010).

The Satanic Temple argues that Facebook, in its role as a social media company, should be considered an "other domain name registration authority" under Section 1127 because Facebook users register their Facebook accounts with Facebook. Motion for Reconsideration at 2. This argument fails to acknowledge or understand that a registration authority means something very specific in the DNS industry: it is a registry under a Registry Agreement with ICANN or an authorized registrar for that registry that registers domain names with the registry. The Satanic Temple has alleged no facts that Facebook, as a social media provider, operates as an authorized DNS registration authority, *i.e.*, that

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

Facebook has entered a Registry Agreement with ICANN or that it registers domain names with an authorized DNS registry, much less that it has registered the particular URL at issue here. The fact that Facebook's users register their Facebook accounts with Facebook is irrelevant—that has nothing to do with the registration of domain names under the DNS process overseen by ICANN.

In other words, without any supporting authority, The Satanic Temple is proposing an entirely new and different system from the DNS, whereby social media companies who do not provide any of the authorized DNS services—but instead provide social media accounts to their users—should somehow be considered "domain name registration authorities" under the ACPA. This proposition is entirely unsupported. Indeed, the ACPA's legislative history underscores that the plain language of the definition of domain name in 15 U.S.C. § 1127 refers only to authorized DNS registries who register second-level domain names. ACPA co-sponsor Senator Patrick Leahy's comments on the bill are illuminating:

> Domain names are narrowly defined to mean alphanumeric designations registered with or assigned by domain name registrars or registries, or other domain name registration authority as part of an electronic address on the Internet. *Since registrars only register second level domain names, this definition effectively excludes file names, screen names, and e-mail addresses and, under current registration practice, applies only to second level domain names*.
>
> *The terms "domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name" in Section 3002(a) of the Act, amending 15 U.S.C. 1125(d)(2)(a), is intended to refer only to those entities that actually place the name in a registry, or that operate the registry*, and would not extend to other entities such as the ICANN or any of its constituent units, that have some oversight or contractual relationship with such registrars and registries. Only these entities that actually offer the challenged name, placed it in a registry, or operate the relevant registry are intended to be covered by those terms.

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

145 Cong. Rec. 14986, 15025 (1999) (emphasis added) (p. 15025 is attached as Exhibit 1 for the Court's convenience).

If The Satanic Temple's proposal to expand the ACPA to social media companies were accepted, the ACPA would suddenly expand well beyond the DNS and registered domain names and would apply to potentially billions[3] of social media accounts that are not registered with the DNS. Such a vast shift in the scope of the ACPA should be left to Congress, not the courts.

**3. The Satanic Temple Failed to Plead an Essential Element of an ACPA Claim.**

Even if this Court accepts The Satanic Temple's re-writing of the ACPA, which it should not, the Court must dismiss its ACPA claim because it has failed to plead an essential element of such a claim, *i.e.*, that Defendants had a bad faith intent to profit from their use of the Facebook page. *See* Motion at 12-13; Reply at 9-10.

**B. The Court Properly Dismissed The Satanic Temple's Defamation Claim.**

The Satanic Temple's motion is devoid of grounds for reconsideration of dismissal of its defamation claim. The Satanic Temple appears to argue that the doctrine of ecclesiastical abstention means the Court should turn its civil judicial decision-making role over to the church and allow the church to decide if the statements at issue are defamatory. Motion for Reconsideration at 5-6 ("As the Court found, the defamation claim will require a showing that TST does not promote, e.g., fascism. If that is an unavoidable question of TST's doctrine, then well-settled law binds the Court to TST's position."). This is an incorrect statement of the law. As the case cited by The Satanic Temple explains, the doctrine of ecclesiastical abstention only requires a court to defer to a church's decision if *the plaintiff* is challenging an internal decision by the church's tribunal implementing

[3] The Court may take judicial notice that Facebook alone has over three billion users. https://about.fb.com/company-info/

1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250



church rules. *Paul v. Watchtower Bible & Tract Soc. of New York, Inc.*, 819 F.2d 875, 878 n.1 (9th Cir. 1987) ("Ecclesiastical abstention thus provides that civil courts may not redetermine the correctness of an interpretation of canonical text or some decision relating to government of the religious polity. Rather, we must accept as a given whatever the entity decides."); *see also Serbian E. Orthodox Diocese for U.S. of Am. & Canada v. Milivojevich*, 426 U.S. 696, 724-25, 96 S. Ct. 2372, 2387-88, 49 L. Ed. 2d 151 (1976) ("[T]he First and Fourteenth Amendments permit hierarchical religious organizations to establish their own rules and regulations for internal discipline and government, and to create tribunals for adjudicating disputes over these matters. When this choice is exercised and ecclesiastical tribunals are created to decide disputes over the government and direction of subordinate bodies, the Constitution requires that civil courts accept their decisions as binding upon them.").

This case, however, does not involve *a plaintiff* who is challenging a church tribunal's application of its own rules or governing system. Instead, the plaintiff, The Satanic Temple, has brought a civil action against its former members, alleging that they made defamatory statements regarding The Satanic Temple's beliefs and practices. The Satanic Temple cites no case suggesting that the Court must defer to The Satanic Temple to decide its own civil defamation claim against Defendants. To the contrary, as the Court correctly found, in the context of a civil defamation claim involving a church's practices or beliefs, the doctrine of ecclesiastical abstention requires the Court to dismiss the claim. *See* Order at 18-19; *see also, e.g.*, *Hartwig v. Albertus Magnus Coll.*, 93 F. Supp. 2d 200, 219 (D. Conn. 2000) (dismissing defamation claim where review of the claim would require the court to delve into and weigh competing views of church doctrine).

The Satanic Temple also contradicts its own argument. On one hand it argues that because the defamation claim involves church doctrine, it asks the Court to defer to The Satanic Temple to decide if the statement at issue is defamatory. Yet, immediately after this

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

argument The Satanic Temple offers the same conclusory argument that it made in its Opposition to Defendants' Motion to Dismiss that "TST's doctrine is not really at issue." Motion for Reconsideration at 6. In addition to being inconsistent, the Court has already addressed and rejected this exact argument. Order at 18. In violation of LCR 7(h)(1) The Satanic Temple simply rehashes the same argument it already made.

The Court's ruling was correct. The defamation claim asserts that certain Defendants "falsely ascrib[ed] extremist ideologies and affiliations to T[he Satanic Temple]." Order at 17 (quoting Complaint ¶ 92). The ideologies include ableism, misogyny, racism, transphobia, and endorsement of police brutality, and the affiliations include Neo-Nazis and the alt-right. *Id.* at 17-18 (citing Complaint ¶ 36 & Ex. 5 at 2). The Court correctly found that to determine if the statements were defamatory, the Court or jury must necessarily determine if they were false. *Id.* (citing *Herron v. KING Broad. Co.*, 776 P.2d 98, 101 (Wash. 1989); *Hyung Jin Moon v. Hak Ja Han Moon*, 431 F. Supp. 3d 394, 413 (S.D.N.Y. 2019), *aff'd,* 833 F.App'x 876 (2d Cir. 2020); *Kavanagh v. Zwilling*, 997 F. Supp. 2d 241, 250 (S.D.N.Y.), *aff'd*, 578 F. App'x 24 (2d Cir. 2014)). The Satanic Temple does not dispute (or even address) that as an element of a defamation claim the Court would have to decide the truth or falsity of the statements. The Satanic Temple also does not dispute (or discuss) that a determination as to whether the statements were false necessarily would require the Court or jury to define the beliefs held by The Satanic Temple and to determine that ableism, misogyny, racism, fascism, and transphobia fall outside of those beliefs. Order at 18. Instead, without any analysis, The Satanic Temple merely offers the conclusory assertion that The Satanic Temple's doctrine "is not really at issue."

## III. CONCLUSION

For the foregoing reasons, The Satanic Temple's Motion for Reconsideration should be denied.

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

DATED: March 29, 2021.

**ARETE LAW GROUP PLLC**

By: _/s/ Jeremy E. Roller_
Jeremy E. Roller, WSBA No. 32021
1218 Third Avenue, Suite 2100
Seattle, WA 98101
Phone: (206) 428-3250
Fax: (206) 428-3251
jroller@aretelaw.com

*Attorneys for Defendants David Alan Johnson, Leah Fishbaugh, Mickey Meehan, and Nathan Sullivan*

OPPOSITION TO MOTION
FOR RECONSIDERATION
No. 2:20-cv-00509-RAJ – Page 9

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

**CERTIFICATE OF SERVICE**

I, Janet Fischer, certify that on March 29, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, thereby sending a notification of such filing to the following parties:

Benjamin Justus, WSBA No. 38855
LYBECK PEDREIRA & JUSTUS, PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA 98040
(206) 687-7805
ben@lpjustus.com

DATED: March 29, 2021, at Seattle, Washington.

*/s/ Janet Fischer*
Janet Fischer, Legal Assistant

ARÊTE LAW GROUP
1218 THIRD AVE., STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

# **EXHIBIT 1**




United States of America

# Congressional Record

PROCEEDINGS AND DEBATES OF THE 106th CONGRESS, FIRST SESSION

Vol. 145 WASHINGTON, FRIDAY, NOVEMBER 19, 1999 No. 165

# Senate

**REVISED NOTICE—NOVEMBER 17, 1999**

If the 106th Congress, 1st Session, adjourns sine die on or before November 18, 1999, a final issue of the Congressional Record for the 106th Congress, 1st Session, will be published on December 3, 1999, in order to permit Members to revise and extend their remarks.

All material for insertion must be signed by the Member and delivered to the respective offices of the Official Reporters of Debates (Room HT–60 or S–123 of the Capitol), Monday through Friday, between the hours of 10:00 a.m. and 3:00 p.m. through December 1. The final issue will be dated December 3, 1999, and will be delivered on Monday, December 6, 1999.

If the 106th Congress does not adjourn until a later date in 1999, the final issue will be printed at a date to be announced.

None of the material printed in the final issue of the Congressional Record may contain subject matter, or relate to any event that occurred after the sine die date.

Senators' statements should also be submitted electronically, either on a disk to accompany the signed statement, or by e-mail to the Official Reporters of Debates at ''Records@Reporters''.

Members of the House of Representatives' statements may also be submitted electronically by e-mail or disk, to accompany the signed statement, and formatted according to the instructions for the Extensions of Remarks template at http://clerkhouse.house.gov. The Official Reporters will transmit to GPO the template formatted electronic file only after receipt of, and authentication with, the hard copy, signed manuscript. Deliver statements (and template formatted disks, in lieu of e-mail) to the Official Reporters in Room HT–60.

Members of Congress desiring to purchase reprints of material submitted for inclusion in the Congressional Record may do so by contacting the Congressional Printing Management Division, at the Government Printing Office, on 512–0224, between the hours of 8:00 a.m. and 4:00 p.m. daily.

By order of the Joint Committee on Printing.

WILLIAM M. THOMAS, *Chairman.*

**NOTICE**

Effective January 1, 2000, the subscription price of the Congressional Record will be $357 per year, or $179 for 6 months. Individual issues may be purchased for $3.00 per copy. The cost for the microfiche edition will remain $141 per year; single copies will remain $1.50 per issue. This price increase is necessary based upon the cost of printing and distribution.

MICHAEL F. DiMARIO, *Public Printer.*

● This ''bullet'' symbol identifies statements or insertions which are not spoken by a Member of the Senate on the floor.

Printed on recycled paper.

and child poisoner created by the movie.

There is a world of difference between these sorts of sites and those which use deceptive naming practices to draw attention to their site for example, whitehouse.com, or those who use domain names to misrepresent the goods or services they offer, for instance, dellmemory.com, which may be confused with the Dell computer company.

We must also recognize certain technological realities. For example, merely mentioning a trademark is not a problem. Posting a speech that mentions AOL on my web page and calling the page aol.html, confuses no one between my page and America Online's site. Likewise, we must recognize that while the Web is a key part of the Internet, it is not the only part. We simply do not want to pass legislation that may impose liability on Internet users with e-mail addresses, which may contain a trademarked name. Nor do we want to crack down on newsgroups that use trademarks descriptively, such as alt.comics.batman.

In short, it is important that we distinguish between the legitimate and illegitimate use of domain names, and the cybersquatting legislation that we pass today does just that.

Due to the significant flaws in S. 1255, the Senate Judiciary Committee reported and the Senate passed a complete substitute to that bill. On July 29, 1999, Senator HATCH and I, along with several other Senators, introduced S. 1461, the ''Domain Name Piracy Prevention Act of 1999.'' This bill then provided the text of the Hatch-Leahy substitute amendment that the Senate Judiciary Committee reported unanimously to S. 1255 the same day. This substitute amendment, with three additional refinements contained in a Hatch-Leahy clarifying amendment, was passed by the Senate on August 5, 1999.

This Hatch-Leahy substitute provided a better solution than the original, S. 1255, in addressing the cybersquatting problem without jeopardizing other important online rights and interests.

Following Senate passage of the bill, the House passed a version of the legislation, H.R. 3208, the ''Trademark Cyberprivacy Prevention Act'', which has been modified for inclusion in the FY 2000 Omnibus Appropriations bill.

This legislation, now called the ''Anti-Cybersquatting Consumer Protection Act'', would amend section 43 of the Trademark Act by adding a new section to make liable for actual or statutory damages any domain name registrant, who with bad-faith intent to profit from the goodwill of another's trademark, without regard to the goods or services of the parties, registers, traffics in or uses a domain name that is identical or confusingly similar to a distinctive trademark or dilutive of a famous trademark. The fact that the domain name registrant did not compete with the trademark owner would not be a bar to recovery. This legislation also makes clear that personal names that are protected as marks would also be covered by new section 1125.

Furthermore, this legislation should not in any way frustrate the global efforts already underway to develop inexpensive and expeditious procedures for resolving domain name disputes that avoid costly and time-consuming litigation in the court systems either here or abroad. In fact, the legislation expressly provides liability limitations for domain name registrars, registries or other domain name registration authorities when they take actions pursuant to a reasonable policy prohibiting the registration of domain names that are identical or confusingly similar to another's trademark or dilutive of a famous trademark. The ICANN and WIPO consideration of these issues will inform the development by domain name registrars and registries of such reasonable policies.

Uses of infringing domain names that support liability under the legislation are expressly limited to uses by the domain name registrant or the registrant's authorized licensee. This limitation makes clear that ''uses'' of domain names by persons other than the domain name registrant for purposes such as hypertext linking, directory publishing, or for search engines, are not covered by the prohibition.

Other significant sections of this legislation are discussed below:

Domain names are narrowly defined to mean alphanumeric designations registered with or assigned by domain name registrars or registries, or other domain name registration authority as part of an electronic address on the Internet. Since registrars only register second level domain names, this definition effectively excludes file names, screen names, and e-mail addresses and, under current registration practice, applies only to second level domain names.

The terms ''domain name registrar, domain name registry, or other domain name authority that registered or assigned the domain name'' in Section 3002(a) of the Act, amending 15 U.S.C. 1125(d)(2)(a), is intended to refer only to those entities that actually place the name in a registry, or that operate the registry, and would not extend to other entities, such as the ICANN or any of its constituent units, that have some oversight or contractual relationship with such registrars and registries. Only these entities that actually offer the challenged name, placed it in a registry, or operate the relevant registry are intended to be covered by those terms.

Liability for registering a trademark name as a domain name requires ''bad faith intent to profit from that mark''. The following non-exclusive list of nine factors are enumerated for courts to consider in determining whether such bad faith intent to profit is proven:

(i) the trademark or the intellectual property rights of the domain name registrant in the domain name;

(ii) whether the domain name is the legal name or the nickname of the registrant;

(iii) the prior use by the registrant of the domain name in connection with the bona fide offering of any goods or services;

(iv) the registrant's legitimate noncommercial or fair use of the mark at the site accessible under the domain name;

(v) the registrant's intent to divert consumers from the mark owner's online location in a manner that could harm the mark's goodwill, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation or endorsement of the site;

(vi) the registrant's offer to sell the domain name for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of goods or services or the registrant's prior conduct indicating a pattern of such conduct;

(vii) the registrant's intentional provision of material, false and misleading contact information when applying for the registration of the domain name, intentions, failure to maintain accurate information, or prior conduct indicating a pattern of such conduct;

(viii) the registrant's registration of multiple domain names that are identical or similar to or dilutive of another's trademark; and

(ix) the extent to which the mark is or is not distinctive.

Significantly, the legislation expressly states that bad faith shall not be found ''in any case in which the count determines that the person believed and had reasonable grounds to believe that the case of the domain name was a false use or otherwise lawful.'' In other words, good faith, innocent or negligent uses of a domain name that is identical or confusingly similar to another's mark or dilutive of a famous mark are not covered by the legislation's prohibition.

In short, registering a domain name while unaware that the name is another's trademark would not be actionable. Nor would the use of a domain name that contains a trademark for purposes of protest, complaint, parody or commentary satisfy the requisite scienter requirement.

Bad-faith intent to profit is required for a violation to occur. This requirement of bad-faith intent to profit is critical since, as Professor Litman pointed out in her testimony, our trademark laws permit multiple businesses to register the same trademark for different classes of products. Thus, she explains:

> Although courts have been quick to impose liability for bad faith registration, they have been far more cautious in disputes involving a domain name registrant who has a legitimate claim to use a domain name and registered it in good faith. In a number of cases,