1

The Honorable Richard A. Jones

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON

9

10

UNITED FEDERATION OF CHURCHES,
LLC d/b/a THE SATANIC TEMPLE,

11

No. 2:20-cv-00509-RAJ

12

Plaintiff,

**DEFENDANTS' MOTION TO
DISMISS SECOND AMENDED
COMPLAINT**

13

v.

14

DAVID ALAN JOHNSON, an individual;
LEAH FISHBAUGH, an individual;
MICKEY MEEHAM, an individual; and
NATHAN SULLIVAN, an individual,

NOTE ON MOTION CALENDAR:
**July 2, 2021**

15

16

Defendants.

17

18

19

20

21

22

23

24

25

26

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1  David Alan Johnson, Leah Fishbaugh, Mickey Meehan, and Nathan Sullivan

2  (collectively, "Defendants") move to dismiss the Second Amended Complaint ("SAC")

3  filed against them by United Federation of Churches, LLC d/b/a The Satanic Temple ("The

4  Satanic Temple" or "TST") under Fed. R. Civ. P. 12(b)(6) and Fed. R. Civ. P. 12(b)(1).

## I.   INTRODUCTION

6  This case involves a dispute between a religious organization, TST, and its former

7  members, Defendants, regarding views about the tenets and practices of TST. Defendants

8  posted critical content on two of TST's Facebook pages, a Chapter page and an "Allies"

9  page. At TST's request and after the filing of the original complaint, Facebook removed

10  Defendants as administrators of the Chapter page and TST retains exclusive control of that

11  page. TST does not allege that Defendants have accessed the Chapter page since then. TST

12  does not allege that it ever asked either Facebook or Defendants to return the Allies page.

13  In April of 2020, TST brought various claims against the Defendants for their

14  Facebook posts, including defamation, "hacking" under the Computer Fraud and Abuse Act

15  ("CFAA"), cyberpiracy under the Anticybersquatting Consumer Protection Act ("ACPA"),

16  tortious interference, and violation of the Washington Consumer Protection Act ("CPA").

17  *See* Complaint (Dkt. No. 1). The Court dismissed all claims for failure to state a claim upon

18  which relief could be granted. Order Granting Motion to Dismiss (Dkt. No. 20) (the

19  "Dismissal Order"). The defamation claim was dismissed with prejudice; the CFAA,

20  ACPA, tortious interference, and CPA claims were dismissed with leave to amend. *Id.*

21  Though TST admits that its main request for injunctive relief (*i.e.*, return of the

22  Chapter page) has been moot since May 2020, *see* SAC ¶ 4, TST still seeks to punish these

23  dissenting former members for the critical posts by reasserting a CFAA "hacking" claim

24  and a tortious interference claim. TST has not tried to salvage its CPA or cyberpiracy

25  claims; rather it asserts new trespass to chattels, conversion, and trademark dilution claims.

26

1    For its CFAA claim, TST has not alleged that Defendants, who were Facebook page

2    administrators at the time of the acts complained of, did anything more than use the pages

3    to post critical content. TST acknowledges that Facebook had determined that Defendants

4    were permitted to post per Facebook's (the website owner's) policies at the time of the

5    posts. This allegation, among other fatal defects, mandates dismissal of the CFAA claim.[1]

6    TST's tortious interference claim also fails as a matter of law. TST fails adequately

7    to plead the fourth element of improper purpose/means because it does not allege the

8    interference was wrongful by some measure beyond the fact of the interference itself. In

9    addition, for the Allies Facebook page, TST does not allege the fifth element of damages.

10   Grasping at any straw to try to punish Defendants, TST asserts new claims for

11   common law conversion and trespass, based on Defendants' use of the Facebook pages and

12   Defendants' alleged possession of documents. However, the claims relating to the

13   documents and Allies page fail because TST does not allege that it ever demanded return of

14   the rightfully obtained documents or the Allies page, or that Defendants refused to return

15   them. Absent the required demand and refusal, there is no conversion or trespass to chattels.

16   The conversion and trespass claims relating to the Chapter Facebook page also fail

17   because they are moot. TST admits that its prior request for injunctive relief (*i.e.*, return of

18   the Chapter page) is now largely moot, yet it continues to seek injunctive relief to enjoin

19   *future* access to the page. TST offers no facts, or even any speculation, indicating how the

20   now-removed Defendants could access the Chapter page. Absent any facts showing that the

21   now-resolved situation could reoccur, the claims are moot and must be dismissed.

22   Finally, TST's claim under the Federal Trademark Dilution Revision Act

23   ("FTDRA") also fails as a matter of law because it fails adequately to allege use of the

24   mark, or that the use is commercial. The core of TST's use allegations is the conclusory and

25   unsupported statement that the Defendants are using its trademark in the name of their

26

---

[1] The CFAA claim must be dismissed for additional reasons as described below. *See* Sections III.B.1.b-d, *infra*.


ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

purported organization allegedly called "The Satanic Temple 2: Electric Boogalo." SAC ¶ 111. TST has not alleged any facts indicating the actual existence of such a competing organization. Nor has TST alleged that Defendants have used its marks for a commercial purpose. Instead, the alleged facts show that Defendants were engaged in criticism of their former church, which is non-commercial, protected speech that falls outside of the FTDRA.

For these and other reasons, the SAC must be dismissed in its entirety. In the alternative, in the event the Court dismisses the CFAA and FTDRA claims (the source of the Court's original jurisdiction) but one or more of the state law claims survive, the Court should dismiss any remaining claims for lack of subject matter jurisdiction.

## II.    FACTS

For purposes of this Motion to Dismiss only, the following allegations are taken as true (though many are vigorously disputed). TST is a religious organization. SAC ¶ 8. At the relevant time, TST was organized at local levels in Chapters. *Id.* TST uses social media accounts such as Facebook, Twitter, and Google to communicate with its members and to create and store documents. *Id.* ¶¶ 26-29. TST's Washington Chapter created Facebook pages and a Twitter account between 2014 and 2018. *Id.* ¶¶ 29-32.

TST's Washington Chapter was led by two individuals, one serving as Chapterhead and the other serving as Media Liaison. *Id.* ¶ 14. Until March 12, 2020, the Chapterhead was assisted by an advisory council. *Id.* ¶ 17. Defendants were councilors on the advisory council. *Id.* In connection with their positions, Defendants managed the Chapter's social media with other councilors and had administrative rights to TST's social media accounts. *Id.* ¶¶ 17, 36. TST contends that its Code of Conduct formed the contours of administrators' authorization to access its social media accounts. *Id.* ¶¶ 34-35 & Ex. 4. In their positions on the advisory council, Defendants also had access to certain materials, including membership listings, internal policies and procedures, and meeting notes. *Id.* ¶¶ 37-38.

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

On March 12, 2020, TST removed Defendants from the council because of interpersonal conflicts with Chapter leadership and other councilors. *Id.* ¶ 43. On March 14, 2020, Defendant Meehan removed other administrators from TST's "Allies" Facebook page and changed the name to "Evergreen Memes for Queer Satanic Friends." *Id.* ¶ 46. Meehan then began posting material allegedly in violation of TST's Code of Conduct. *Id.* ¶ 47.

The Washington Chapterhead purportedly removed Defendants from administrative access privileges to the remaining social media accounts. *Id.* ¶ 49. On March 18, 2020, Defendant Johnson allegedly accessed TST's Twitter account, removed approved administrators, replaced them with the other Defendants, followed a number of alleged unspecified extremist groups, and changed the description on the account. *Id.* ¶ 50. On March 20, 2020, Defendant Fishbaugh allegedly attempted to change the password to the Chapter's Google-based email account, although there is no allegation that they succeeded. *Id.* ¶ 56. TST recovered the Twitter and email accounts. *Id.* ¶ 68. TST does not allege the Defendants have accessed, attempted to access, or have any means of accessing these accounts since Defendants were removed as administrators.

On March 20, 2020, Defendant Johnson removed other administrators from TST's "Chapter" Facebook page and posted to that page regarding his and others' apparent ejection from TST. *Id.* ¶¶ 51-52. The Chapter's media liaison emailed Johnson and asked him to return the Chapter Facebook page, but Johnson did not respond. *Id.* ¶¶ 53-54. In the following days Johnson re-posted articles about TST on that Facebook page. *Id.* ¶ 55. On March 22, 2020, Johnson changed the name of the Chapter Facebook page from "The Satanic Temple Washington" to "Satanic Washington State – Archived Temple Chapter" and modified the profile picture. *Id.* ¶ 57. TST's attorney sent a letter to Defendant Johnson asking him to relinquish control of the Chapter Facebook page, but Johnson did not respond. *Id.* ¶¶ 64-65. TST claims to have lost between 20 and 30 members due to allegedly false claims that Johnson published to the Chapter page. *Id.* ¶ 62.

MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 4

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1    TST requested control of the Chapter page from Facebook, but Facebook initially

2  refused and instead stated that this was a "Page admin issue" not involving "infringements

3  of [TST's] legal rights." *Id.* ¶ 63. However, Facebook later removed Defendants as

4  administrators and gave control of the Chapter page to TST. *Id.* ¶¶ 4, 66 & Ex. 2. Since

5  then, TST does not allege that Defendants have accessed, attempted to access, or have any

6  means of accessing the Chapter Facebook page. TST also does not allege that it ever sought

7  return of the Allies Facebook page from Defendants or Facebook. *Id.* ¶ 32.

8    TST further alleges that prior to these events, Defendants obtained certain

9  documents, such as membership listings, internal policies and procedures, and meeting

10  notes. *Id.* ¶¶ 37-38, 59. Nowhere does TST provide an inventory of the documents to which

11  it claims to have lost access, allege that it asked for the return of these documents, or allege

12  that Defendants have refused to return them.

13                          **III.    ARGUMENT**

14  **A. Applicable Standards**

15    **1. Fed. R. Civ. P. 12(b)(6) Standard**

16    To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6) "a complaint must

17  contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible

18  on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not

19  akin to a probability requirement, but it asks for more than a sheer possibility that a

20  defendant has acted unlawfully. . . . Where a complaint pleads facts that are merely

21  consistent with a defendant's liability, it stops short of the line between possibility and

22  plausibility of entitlement to relief." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

23  556-57 (2007)). Absent facial plausibility, a plaintiff's claims must be dismissed. *Id.*

24  Dismissal is appropriate where the complaint "fails to state a cognizable legal theory . . . to

25  support a claim." *Singleton v. Intellisist, Inc.*, No. C17-1712RSL, 2018 WL 2113973, at *1

26  (W.D. Wash., May 8, 2018). "Determining whether a complaint states a plausible claim for

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1  relief will . . . be a context-specific task that requires the reviewing court to draw on its

2  judicial experience and common sense." *Iqbal*, 556 U.S. at 679. In addition, a court should

3  not accept as true allegations that state legal conclusions. *See id.* at 678-79.

4  **2. Fed. R. Civ. P. 12(b)(1) Standard**

5  A complaint may be dismissed for lack of subject matter jurisdiction under Fed. R.

6  Civ. P. 12(b)(1). *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987). Specifically,

7  "[r]ule 12(b)(1) presents a threshold challenge to the court's jurisdiction . . . [and] the court

8  is obligated to determine whether it has subject matter jurisdiction in the first instance."

9  *Agrocomplect, AD v. Republic of Iraq*, 524 F. Supp. 2d 16, 21 (D.D.C. 2007). A Rule

10  12(b)(1) motion to dismiss for lack of subject matter jurisdiction may be facial or factual.

11  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). In resolving a facial

12  attack, the challenger asserts that the allegations of the complaint are insufficient on their

13  face to invoke the court's jurisdiction. *Id.* Where a defendant makes a facial challenge, the

14  court must accept as true the allegations and consider those allegations in the light most

15  favorable to the non-moving party. *See, e.g.*, *Price v. Socialist People's Libyan Arab*

16  *Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002).

17  **B. The Satanic Temple's Second Amended Complaint Should be Dismissed**

18  Even taking all allegations in the SAC as true, TST has failed to state a claim upon

19  which relief can be granted. In addition, the trespass and conversion claims relating to the

20  Chapter Facebook page must be dismissed as moot. Because all claims against Defendants

21  fail, the SAC should be dismissed in its entirety.

22  **1. The Satanic Temple has Failed to State a Hacking Claim under the CFAA**

23  The CFAA imposes criminal and civil liability for various acts of computer

24  hacking.[2] 18 U.S.C. § 1030(a). "The CFAA is an 'anti-hacking' statute and not a

25

26  _____

[2] A plaintiff may maintain a civil action only if certain factors are met, specifically (1) loss within a year of at least $5,000 in value, (2) modification or impairment, or potential modification or impairment, of the medical examination, diagnosis, treatment, or care of one or more individuals, (3) physical injury to any person, (4) a threat to public health or safety, or (5) damage affecting a computer used by or for the United States



ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

misappropriation statute." *Zoom Imaging Sols., Inc. v. Roe*, 219CV01544WBSKJN, 2019 WL 5862594, at *10 (E.D. Cal., Nov. 8, 2019). "The plain language of the CFAA 'target[s] the unauthorized procurement or alteration of information, not its misuse or misappropriation.'" *United States v. Nosal*, 676 F.3d 854, 863 (9th Cir. 2012). In the Ninth Circuit "the phrase 'exceeds authorized access' in the CFAA does not extend to violations of use restrictions." *Id.* Applying this law, this Court dismissed TST's first CFAA claim because its assertion "that Defendants 'exceeded authorized access' by violating TST's Code of Conduct has been expressly rejected by the Ninth Circuit." Dismissal Order at 9.

In an attempt to salvage its CFAA hacking claim, TST reverses its position regarding whether Defendants were authorized to access the various social media accounts that are the subject of that claim. *Compare* Complaint ¶ 30 ("Defendants, each, were entrusted with administrative rights to the above-described social media accounts . . . .") *with* SAC ¶ 44 ("By removing Defendants from their advisory positions, the Washington Chapter leadership revoked Defendants' authorization to manage the Chapter's social media activity . . . .") & ¶ 49; *see also* Dismissal Order at 6 ("[TST] does not currently allege or argue that Defendants' actions were done 'without authorization.' In fact, it alleges the opposite.").

Setting aside the implausibility of such a stark reversal of allegations, TST's CFAA hacking claim fails for multiple reasons, any one of which is fatal.

### a.  TST Admits Access was Authorized by the Computer Owner

TST has *not* pled that the owner of the websites at issue (Facebook) did not authorize Defendants' use, access, and changes to those websites. Rather, TST pleads that at the time of the acts, Facebook determined that Defendants were authorized to do

---

Government in furtherance of the administration of justice, national defense, or national security. 18 U.S.C. § 1030(g); 18 U.S.C § 1030(c)(4)(A)(i)(I)-(V). The only factor cited by TST for its right to bring this lawsuit is alleged loss of at least $5,000. SAC ¶¶ 70, 77.



everything of which TST complains. TST admits that Facebook owns the websites at issue, and that it and Defendants were simply users. SAC ¶ 23.

In certain circumstances a party other than a computer owner may assert a CFAA claim for damages the party suffers due to unauthorized access to a third-party's computer. *Theofel v. Farey-Jones*, 359 F.3d 1066, 1078 (9th Cir. 2004). However, here TST has not pled that Facebook—the owner of the website—did not authorize Defendants to access or alter the Facebook pages. Indeed, TST has affirmatively alleged that at the time of the conduct upon which its CFAA claim is based, Facebook *explicitly determined that Johnson was authorized to access and alter the Chapter Page. See* SAC ¶ 63 ("Facebook refused to correct the matter, mislabeling the issue as a 'Page admin issue' to the exclusion of 'infringement of your [TST's] legal rights.'"); *see also* SAC ¶ 66 ("Facebook did not respond [to demand that Facebook grant control of the page to TST] and did not return control of the Chapter page until after the original complaint.").

Because TST has failed to allege that Facebook did not permit Defendants to use the Facebook pages, and indeed affirmatively has alleged that Facebook found that Johnson was permitted to act as an administrator for the Chapter Page, Defendants cannot have acted without authorization or in excess of authorized use as defined by the CFAA. *Cf. Courser v. Allard*, 969 F.3d 604, 619 (6th Cir. 2020) (affirming dismissal of CFAA claim on grounds that plaintiff failed sufficiently to allege damages and that "the computers . . . searched [allegedly in violation of the CFAA] belonged to the House, not [plaintiff]"). Accordingly, TST's CFAA claim must be dismissed.

### b. TST has Failed to Allege that It Explicitly Revoked Defendants' Authority to Access the Computers or that It Informed Defendants of any Revocation of Authority

In a complete reversal from its original complaint, TST now contends not that Defendants exceeded authorization with respect to the Facebook pages, but rather that

Defendants obtained access to those pages without authorization.[3] TST concedes that Defendants did have authorization to access those Facebook pages, but has now changed its story to allege that the access was revoked. TST's revocation allegations are limited to the following:

> On March 12, 2020, TST's Washington leadership removed Defendants from their advisory positions.
>
> Defendants' positions on the advisory council entailed the authorization to manage the Chapter's social media activity. By removing Defendants from their advisory positions, the Washington Chapter leadership revoked Defendants' authorization to manage the Chapter's social media activity and revoked Defendants' authorization to serve as custodians of records.

SAC ¶¶ 43-44.

> TST continued:
>
> Following Meeham's [sic, Meehan's] usurpation of the Allies page, the Washington Chapterhead removed all defendants from administrative access privileges to the remaining social media accounts. More specifically, the Chapterhead removed all administrative privileges of Johnson, Fishbaugh, Meeham [sic, Meehan], and Sullivan to the Facebook Chapter account and the Twitter and Google accounts referenced herein.

*Id.* ¶ 49. Following TST Chapterhead's amorphous removal of "all defendants from administrative access privileges to the remaining social media accounts," TST alleges that Johnson continued to access and change the Facebook Chapter page "despite having a subjective awareness that he no longer had authorization to use TST's Facebook Chapter page." *See, e.g.*, *id.* ¶¶ 51, 52, 55, 57.

In its original Complaint, TST attempted to shoehorn revocation of authority into the conclusory allegation that "it demanded the return of the Facebook pages" from Defendants. *Id.* ¶ 49. This Court found that inadequate:

> At most, it has pled in a conclusory fashion that "it demanded return of the Facebook pages" from Defendants. Dkt. # 1 ¶ 49. This is insufficient. Apart from being conclusory, this allegation does not state when the revocation

---

[3] As this Court observed, "[a] protected computer may be improperly accessed in one of two ways, (1) by 'obtaining access without authorization' or (2) by 'obtaining access with authorization but then using that access improperly.'" Dismissal Order at 5 (quoting *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1065 (9th Cir. 2016)).

MOTION TO DISMISS
No. 2:20-cv-00509-RAJ – Page 9

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

occurred, how the revocation was communicated, and what actions Defendants undertook afterward. Without such allegations, The Satanic Temple's comparison to *Craigslist* and *Ticketmaster* is strained and unpersuasive.

Dismissal Order at 8.[4] The SAC fares little better and falls well short of alleging explicit revocation of authority necessary to state a CFAA claim.

As the Ninth Circuit Court of Appeals has observed, "a defendant can run afoul of the CFAA when he or she has no permission to access a computer or when such permission has been revoked *explicitly*." *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d 1058, 1067 (9th Cir. 2016) (emphasis added). As stated in *Power Ventures*, the revocation of authority must be explicit. *Id.*; *Ticketmaster L.L.C. v. Prestige Entm't, Inc.*, 306 F. Supp. 3d 1164, 1175-76 (C.D. Cal. 2018) (finding that despite demands that defendants "cease and desist from any further violations of Ticketmaster's rights" the demands "do not actually revoke access authority"); *Domain Name Comm'n v. DomainTools, LLC*, 449 F. Supp. 3d 1024, 1027 (W.D. Wash. 2020) ("If the computer owner has not affirmatively rescinded the defendant's right to access the computer, any existing authorization/permission remains."); *123 Los Robles LLC v. Metzler*, No. 2:17-CV-00392-RGK-SK, 2017 WL 10311210, at *3 (C.D. Cal., Aug. 14, 2017) (finding that despite defendant's removal from position of limited liability company managing member and bookkeeper, purported revocation of authority to access computer was insufficiently explicit to support CFAA claim).

Abundant caselaw shows that to state a claim for unauthorized access to a protected computer a plaintiff must plead that a defendant who previously had permission to access the computer received notification of revocation of that authority. *See, e.g.*, *DomainTools*, 449 F. Supp. 3d at 1027 (letter demanding defendant use computer in accordance with terms of use did not revoke permission and that permission was only revoked after defendant received letter revoking "defendant's right to access the .nz servers entirely");

---

[4] *Craigslist* and *Ticketmaster* refer to *Craigslist Inc. v. 3Taps Inc.*, 942 F. Supp. 2d 962 (N.D. Cal. 2013), and *Ticketmaster L.L.C. v. Prestige Entm't W., Inc.*, 315 F. Supp. 3d 1147 (C.D. Cal. 2018).



*123 Los Robles*, 2017 WL 10311210, at *3 (lack of "explicit[] notifi[cation] that LLC had revoked authorization to access Plaintiff's financial records" warranted dismissal of CFAA claim); *Power Ventures*, 844 F.3d at 1068 (defendant violated CFAA "after receiving written notification from Facebook" that permission to access computer had been revoked).

TST falls short of alleging that it "explicitly revoked" Defendants' authorization to access TST social media websites. Instead, TST merely alleges that "[b]y removing Defendants from their advisory positions, the Washington Chapter leadership revoked Defendants' authorization to manage the Chapter's social media activity" and that "the Washington Chapterhead removed all defendants from administrative access privileges to the remaining social media accounts." SAC ¶¶ 44, 49. Alleged removal of "administrative access privileges" is not explicit revocation of authority to access a computer. But even if purportedly stripping "administrative access privileges" could constitute "explicit revocation" of authority to access a computer, TST has failed to allege that it informed Defendants of such revocation. Without such an allegation, TST's CFAA claim fails.[5] *123 Los Robles*, 2017 WL 10311210, at *3; *Power Ventures*, 844 F.3d at 1068; *DomainTools*, 449 F. Supp. 3d at 1027; *see also* Dismissal Order at 8 (rejecting TST's contention that "it demanded return of the Facebook pages" as insufficient revocation of authority, in part, because it failed to describe "how that revocation was communicated").

---

[5] The closest TST gets to alleging that it communicated the purported revocation of authority to access the social media websites is that "[o]n March 20 at 11:29pm, the Chapter's media liaison emailed Johnson a cease-and-desist instruction, stating 'I'd like you to return the Facebook page back to us please.'" SAC ¶ 53 & Ex. 7. But that email does not explicitly revoke Johnson's permission to access the Facebook Chapter page. To the contrary, it is simply a request to "re-add me [Tarkus Claypool] and Siri as admins." *Id.* Ex. 7. The email does not inform Johnson that he may not access the Facebook Chapter page. Indeed, this Court has already found that this request was "conclusory" and failed to meet the required explicit revocation of authority necessary to maintain a CFAA claim. Dismissal Order at 8. Similarly, TST's lawyer, in a letter threatening a lawsuit for trademark and copyright infringement, asked that Johnson return the Chapter page by letter dated March 23, 2020. But TST alleges no more than that Johnson retained control after that letter was sent. SAC ¶¶ 64-65 & Ex. 9. Without alleging "what actions Defendants undertook afterward" the CFAA claim fails. Dismissal Order at 8. TST does not allege that it ever sought the return of the Allies page.



### c. TST Fails Adequately to Plead it Meets the $5,000 "Loss" Threshold

Among other requirements, to assert a private claim for an alleged CFAA violation, a plaintiff must establish that the violation causes "loss to 1 or more persons during any 1-year period . . . aggregating at least $5,000 in value." 18 U.S.C § 1030(c)(4)(A)(i)(I). "Loss" means "any reasonable cost to any victim, including the cost of responding to an offense, conducting a damage assessment, and restoring the data, program, system, or information to its condition prior to the offense, and any revenue lost, costs incurred, or other consequential damages incurred because of interruption of service." 18 U.S.C. § 1030(e)(11). Accordingly, "'loss' refers to the monetary injuries imposed on plaintiff by defendant's conduct." *DomainTools*, 449 F. Supp. 3d at 1030. "The CFAA's definition of loss includes lost revenue incurred because of an interruption of service, . . . , but does not include claims for lost business opportunities, damaged reputation, and other missed revenue opportunities." *Advanced Fluid Systems, Inc. v. Huber*, 28 F. Supp. 3d 306, 330 (M.D. Pa. 2014) (internal citation omitted).

TST's "loss" allegations are sparse and fall well below the level required to assert a plausible CFAA claim. TST's allegations as to loss are limited to the following:

> There is a cognizable dollar value to social media accounts. Preliminary estimates of the "loss" related to the misappropriation of the Chapter page is $33,689.70, plus $1,037.52 for the Allies page. The Twitter page, if successfully misappropriated, would have lost $8,246.70. The aggregate sum being $42,973.92—well in excess of the $5,000 jurisdictional requirement.

> Defendants were aware that the social media accounts had an economic value to TST. The social media accounts were the primary means for TST to communicate with the general public and TST's supporters, and those communications help to foster the kind of relationship that results in charitable donations to support TST's organizational purposes. By depriving TST of its social media accounts, Defendants intended to diminish those donations and divert donations to their competitor organization, provisionally named "The Satanic Temple 2: Electric Boogaloo." Exhibit 5 at p. 4.

> Further compounding the losses are TST's attorney's fees for investigating this matter, entering futile demands for corrective action: both of Facebook and from Defendants, and drafting this complaint. TST will continue to

incur losses in the costs and fees related to this lawsuit. TST's costs and attorney's fees well exceed the $6,000 incurred in researching and drafting the original complaint.

SAC ¶¶ 77-79.

Starting with TST's allegation that attorney's fees should be applied to the $5,000 loss threshold, although some courts have recognized that attorney's fees incurred in *remediating* harm from a CFAA violation may count as a "loss," attorney's fees incurred in *prosecuting* a CFAA claim are not such a "loss." *Wichansky v. Zowine*, 150 F. Supp. 3d 1055, 1071-72 (D. Ariz. 2015) ("litigation expenses . . . are not a cognizable loss under the CFAA"); *Brooks v. AM Resorts, LLC*, 954 F. Supp. 2d 331, 338 (E.D. Pa. 2013) (expert witness fees are not a "loss"); *Wilson v. Moreau*, 440 F. Supp. 2d 81, 110 (D.R.I. 2006), *aff'd* 492 F.3d 50 (1st Cir. 2007) ("loss" does not include litigation expenses). As to attorney's fees, the only dollar figure TST alleges is $6,000 for preparation of the original complaint. Those fees do not count as a "loss." Further, this alleged "loss" is far less specific and plausible than the allegation of "loss in an amount far in excess of the $5,000 statutory minimum . . . [that] includes . . . the costs [plaintiff] has incurred in investigating and responding to [defendant's] misconduct" that Judge Lasnik found insufficient in *DomainTools*. *DomainTools*, 449 F. Supp. 3d at 1030.

TST asserts that the three alleged CFAA violations, *i.e.*, as to the Chapter and Allies Facebook pages and as to the Twitter page, caused it to suffer $42,973.92 in "losses." SAC ¶ 77. But there are no facts alleged to support that figure. What are the losses? Costs incurred in recovering the allegedly hacked websites? Decreased donations from TST's members? Something else? We have no idea. Conclusory allegations of loss are insufficient to support this element of a CFAA claim. *Delacruz v. State Bar of Cal.*, No. 16-cv-06858-BLF, 2018 WL 3077750, at *8 (N.D. Cal., Mar. 12, 2018) (allegation that plaintiff "incurred over $45,000 in damages and loss per year by conducting a damages assessment to the impairment of the integrity of [his] confidential and information" is "nothing more

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

than a conclusory allegation" insufficient to support a CFAA claim); *Brodsky v. Apple Inc.*, No. 19-CV-00712-LHK, 2019 WL 4141936, at *8 (N.D. Cal., August 30, 2019).

Setting aside the totally conclusory nature of the "aggregate sum [of] $42,973.92" in alleged losses, to the extent TST contends that the alleged improper access resulted in fewer "communications . . . to foster the kind of relationship that results in charitable donations to support TST's organizational purposes," SAC ¶ 78, such alleged losses are not actionable under the CFAA. *See, e.g.*, *Eagle v. Morgan*, No. 11-4303, 2011 WL 6739448, at *9 (E.D. Pa., Dec. 22, 2011) (loss of business relations are "precisely the type of damages that courts repeatedly have deemed beyond the purview of the CFAA").

Finally, TST's CFAA claim fails for lack of a sufficient loss allegation as to the Allies page because TST alleges only $1,037.52 for that alleged violation. SAC ¶ 77. Because the "loss" is considered on a computer-by-computer, not aggregate, basis, TST cannot meet the $5,000 threshold as to the Allies page. *Hayes v. Packard Bell NEC, Inc.*, 193 F. Supp. 2d 910, 912 (E.D. Tex. 2001); *Thurmond v. Compaq Computer Corp.*, 171 F. Supp. 2d 667, 681 (E.D. Tex. 2001). Further, as to the Twitter page TST alleges that "if successfully misappropriated, [it] would have lost $8,246.70." The "loss" must have been actually suffered, not speculative loss had the alleged hacking been successful. *See* 18 U.S.C. § 1030(g) (requiring actual "damage or loss by reason of a violation").

#### d.   TST Fails to Allege Fishbaugh's and Sullivan's Involvement in the Purported CFAA Violations or how Meehan's Alleged Actions were Fraudulent

"Rule 9(b) plainly applies to section 1030(a)(4)'s requirement that the defendant's acts further the intended fraud." *Oracle America, Inc. v. Service Key, LLC*, No. C 12-00790 SBA, 2012 WL 6019580, at *6 (N.D. Cal., Dec. 3, 2012); *see also Synopsys, Inc. v. Ubiquiti Networks, Inc.*, 313 F. Supp. 3d 1056, 1072 (N.D. Cal. 2018) ("For the § 1030(a)(4) claim, defendants [sic, plaintiff] must also allege facts supporting a knowing intent to defraud defendants with particularity under Rule 9."). Accordingly, "[t]o satisfy

the heightened pleading requirements for fraud or fraud-based claims, the pleadings must

allege 'the who, what, when, where, and how' of the alleged fraudulent conduct, *Cooper v.*

*Pickett*, 137 F.3d 616, 627 (9th Cir. 1997) and 'set forth an explanation as to why [a]

statement or omission complained of was false and misleading." *Oracle America*, 2012 WL

6019580, at *7.

 TST has fallen well below this standard as to Defendants Fishbaugh, Sullivan, and

Meehan for the alleged fraudulent conduct and as to Defendant Johnson regarding the

Twitter account:

- TST has failed to allege any conduct by Sullivan relating to alleged hacking other

than acknowledging the alterations to the Allies page. *See* SAC ¶ 48.

- As to Fishbaugh, TST alleges only that "Fishbaugh attempted to change the

password to the Chapter's Google-based email account by changing the recovery email and

changing the phone number." SAC ¶ 56. Most fundamentally, TST fails to plead any CFAA

violation as to Fishbaugh because TST fails to allege that the loss from this alleged

misconduct exceeds the $5,000 threshold as required by 18 U.S.C. § 1030(g). Ignoring that

stark failure, the SAC is further devoid of any allegation that this conduct was fraudulent,

much less describing the "who, what, when, where, and how" of the alleged fraudulent

conduct as required by Rule 9(b).

- As to Meehan, TST alleges only that he exceeded authorization for the "Allies"

Facebook page by removing other administrators, changing the name of that page, and

posting a "manifesto." SAC ¶ 46. TST fails to explain how that conduct was fraudulent

(particularly where the alleged "manifesto" explicitly states that "[t]his page is no longer

affiliated with The Satanic Temple."). *Id.*

- As to Johnson's alleged hacking of the Twitter account, TST admits that the alleged

acts were not successful. *See* SAC ¶ 77. Further, TST's allegation of a theoretical "loss" in

the amount of $8,246.70 that would have occurred had the hacking been successful is

1    entirely conclusory, and therefore fails to meet the $5,000 loss threshold. *See* Section

2    III.B.1.c, *supra*. Accordingly, TST's claim against Johnson as to the Twitter account fails.

3            Thus, in addition to failing to allege, to the level required for a CFAA violation, that

4    Defendants were not authorized to access these computers, TST's claims against Sullivan,

5    Fishbaugh, Meehan, and Johnson (as to the Twitter account) must also be dismissed for

6    failure to allege essential elements for a 18 U.S.C. § 1030(a)(4) claim or to plead the

7    fraudulent aspect of that claim with particularity as required by Rule 9(b).

8            **2.    TST's Tortious Interference Claim Fails**

9            TST alleges a tortious interference claim based on the Chapter Facebook page

10    (which it controls[6]) and the Allies Facebook page (for which it has never requested control

11    from either Facebook or Defendants). Tortious interference with a contractual or business

12    relationship has five elements: (1) a business relationship or expectancy, (2) defendant's

13    knowledge of the relationship, (3) intentional interference resulting in the termination of the

14    relationship, (4) improper purpose/means, and (5) damages. *Woods View II, LLC v. Kitsap

15    Cty.*, 188 Wn. App. 1, 29-30, 352 P.3d 807, 821 (2015); *Pac. Nw. Shooting Park Ass'n v.

16    City of Sequim*, 158 Wn.2d 342, 351, 144 P.3d 276 (2006).

17            In the SAC, TST again fails to satisfy the second element. In dismissing the original

18    Complaint, the Court found that TST's allegation that "Defendants had subjective

19    knowledge of the business" was too conclusory to satisfy the second element of a tortious

20    interference claim. Dismissal Order at 15. In the SAC, TST again includes an entirely

21    conclusory statement that "[a]t the relevant time, Defendants had subjective knowledge of

22    the business relationship between Facebook and TST." SAC ¶ 85. Although TST also

23    alleges that Facebook is well-known as a separate company from the organizations that

24

25

26    _____

[6] TST's claim as to the Chapter Facebook page also fails because TST has not alleged that its relationship with the Chapter Facebook page has been terminated. *Woods View II, LLC v. Kitsap Cty.*, 188 Wn. App. 1, 29-30, 352 P.3d 807, 821 (2015) (a necessary element of a tortious interference claim is "intentional interference resulting in termination of relationship").



1   have pages on its proprietary network, this does not establish Defendants' knowledge and

2   does nothing to make the allegation any less conclusory.

3         For both the Chapter and Allies page, TST fails to adequately plead the fourth

4   element of improper purpose/means. For this element, the plaintiff must allege the

5   interference is "wrongful by some measure beyond the fact of the interference itself, such as

6   a statute, regulation, recognized rule of common law, or an established standard of trade or

7   profession." *Moore v. Commercial Aircraft Interiors, LLC,* 168 Wn. App. 502, 510, 278

8   P.3d 197, 200 (2012). TST fails to do this. Instead, it merely alleges that "Defendants

9   abused TST's social media presence as a channel to publish derogatory messages directly to

10   TST's intended audience and to falsely suggest that the Washington Chapter was replaced

11   by Defendants' competitor organization." SAC ¶ 88. TST does not allege a violation of a

12   statute, regulation, common law rule or professional standard.

13         In addition, as to the Allies page, TST fails to allege any damages. Although it

14   alleges that it lost approximately 20 to 30 members due to content that the Defendants

15   posted to the Chapter page (SAC ¶ 62), it does not allege any damages relating to the Allies

16   page, which in its original Complaint TST said had "about 500 followers." The closest TST

17   comes is one completely conclusory, factually unsupported statement that the value of the

18   Allies page is $1,037.52. SAC ¶ 77. This entirely conclusory statement is insufficient as a

19   matter of law to allege damages. *Ashcroft*, 556 U.S. at 678 ("Threadbare recitals of the

20   elements of a cause of action, supported by mere conclusory statements do not suffice.").

21      **3.   TST's Trespass and Conversion Claims Must Be Dismissed**

22         **a.   The Trespass and Conversion Claims Relating to the Chapter**
23              **Facebook Page are Moot**

24         Article III of the U.S. Constitution limits the exercise of federal judicial power to

25   actual cases and controversies. *N.A.A.C.P., W. Region v. City of Richmond*, 743 F.2d 1346,

26   1350 (9th Cir. 1984). The case or controversy requirement deprives federal courts of

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

jurisdiction to hear moot cases. *Tur v. YouTube, Inc.*, 562 F.3d 1212, 1214 (9th Cir. 2009) ("Mootness is jurisdictional."). For a federal court to have subject matter jurisdiction over a claim, Article III of the Constitution requires an actual, live controversy between the parties at each stage of the proceedings. *Timbisha Shoshone Tribe v. Dep't of Interior*, 824 F.3d 807, 812 (9th Cir. 2016). A case becomes moot when interim events have eradicated the effects of the defendant's act or omission, and there is no reasonable expectation that the alleged violation will recur. *See, e.g.*, *County of Los Angeles v. Davis,* 440 U.S. 625, 631 (1979); *Lodge 1380, Broth. of Ry. etc. v. Dennis*, 625 F.2d 819, 822 (9th Cir. 1980).

Those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III by alleging an actual live case or controversy. *O'Shea v. Littleton*, 414 U.S. 488, 493 (1974). Past exposure to illegal conduct does not in itself show a present live controversy requiring injunctive relief if unaccompanied by any continuing, present adverse effects. *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983). Instead, in the context of seeking injunctive relief, a plaintiff must show a real or immediate threat that the plaintiff will be wronged again—a "likelihood of substantial and immediate irreparable injury." *Id.* at 111 (quoting *O'Shea*, 414 U.S. at 502). In this case, TST has failed to meet this threshold showing for its trespass and conversion claims relating to the Chapter Facebook page.

TST asserts claims for trespass to chattels and conversion based in part on Defendants' alleged misuse of the Chapter Facebook page while they were administrators of the pages. However, TST admits that the main injunctive relief it had been seeking in its original Complaint (the return of the Chapter Facebook page) is now moot. SAC ¶ 4 ("Since the filing of the original Complaint, the rightful Washington Chapter leadership has reclaimed the Facebook page. This moots the need of injunctive relief to return the website to its rightful owners . . ."). Despite being mooted, TST continues to seek "injunctive relief in the form of a permanent injunction enjoining Defendants from accessing any of TST's

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

'protected computers' under threat of contempt . . . " *Id.* ¶¶ 4, 99. TST has not even attempted to make any showing entitling it to injunctive relief against possible future access to the Facebook page. The SAC states that Facebook removed the Defendants as administrators of the Chapter Facebook page and TST has been in full control of the Facebook page since that time. SAC ¶¶ 4, 66 & Ex. 2. There is not a single allegation that Defendants' conduct while they were administrators of the Chapter Facebook page could reoccur now that they have been removed as administrators. TST has not alleged that Defendants have tried to access the administrative controls of the Chapter Facebook page after Facebook delivered administrative access to TST or that there is any means by which they could do so. Absent even a single allegation in support of establishing a live controversy for which the requested injunctive relief relating to the Chapter Facebook page would be appropriate, TST has failed to meet its threshold of establishing a live controversy and jurisdiction under Article III of the Constitution. For this reason, its trespass and conversion claims relating to the Chapter Facebook page must be dismissed as moot.

### b. TST's Trespass and Conversion Claims Relating to the Allies Page and Certain Documents Fail

In conversion or trespass claims based on a bailee's retention of personal property, a plaintiff must plead that it demanded the return of the property and the defendant wrongfully refused. *See, e.g.*, *Judkins v. Sadler-Mac Neil*, 61 Wn. 2d 1, 5, 376 P.2d 837, 839 (1962) ("The rule is stated succinctly in Restatement, Torts (1934), § 237: 'One in possession of a chattel as bailee or otherwise, who *on demand, refuses* to surrender its possession to another entitled to the immediate possession thereof, is liable for its conversion.'") (emphasis added); *Shaffer v. Walther*, 38 Wn. 2d 786, 792-93, 232 P.2d 94, 98 (1951) (quoting *Lee Tung v. Burkhart*, 59 Or. 194, 202, 116 P. 1066, 1068 (1911) ("Where one has the lawful possession of the goods of another, and has not converted them, this action will not lie until there has been a *refusal to deliver them on demand made*.")

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

(emphasis added)); *see also* David DeWolf, Keller W. Allen, 16 Washington Practice, Tort Law and Practice § 14:15 (trespass to chattels is an intentional tort and requires the intentional interference with the possession or physical condition of personal property in the possession of another without justification); Restatement (Second) of Torts § 217 (same).

TST alleges that Defendants had access to and control over certain unspecified paper and electronic documents and the Allies Facebook page prior to being terminated from their roles on the advisory council. SAC ¶¶ 17, 20, 36-37. In other words, TST alleges that the Defendants were bailees[7] of the Allies Facebook page and the documents. TST now asserts that Defendants continue to possess the documents and the Allies page, *id.* ¶¶ 38, 46, 59. However, TST does not allege that it ever requested the return of control of the Allies Facebook page – either from Defendants or from Facebook – or that Defendants refused such request. Similarly, nowhere in the SAC does TST allege that it ever asked the Defendants to return the documents at issue or that Defendants refused such request. Absent any allegations relating to a demand for return and a refusal to return, TST fails to allege an intentional refusal to surrender personal property as required for conversion and trespass to chattels claims. Thus, these claims, too, fail as a matter of law.

### 4. TST's Dilution Claim Must Be Dismissed.

TST's fifth claim under the FTDRA also fails as a matter of law because it fails adequately to allege any supporting facts relating to a purported use of TST's mark, or that the alleged use was commercial. To establish trademark dilution under the FTDRA, a trademark holder must prove four elements: (1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment. *New Flyer Indus. Canada ULC v. Rugby Aviation, LLC,*

---

[7] A "bailee" "is someone who receives personal property from another, and has possession of but not title to the property." Black's Law Dictionary (11th ed. 2019).

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

405 F. Supp. 3d 886, 905 (W.D. Wash. 2019); *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2008).

The FTDRA expressly provides that "[a]ny noncommercial use of a mark" is not actionable as trademark dilution. *Sporting Times, LLC v. Orion Pictures, Corp.*, 291 F. Supp. 3d 817, 826-27 (W.D. Ky. 2017) (quoting 5 U.S.C. § 1125(c)(3)(C)) (the artistic use of a mark in a film was not actionable "as the film does more than merely propose a commercial transaction"). Commercial speech is "that which does no more than propose a commercial transaction." *Id.* (citing *Mattel, Inc. v. MCA Records*, 296 F.3d 894, 903 (9th Cir. 2002)). "All speech which is not purely commercial 'is entitled to full First Amendment protection.'" *Id.* (quoting *Mattel*, 296 F.3d at 906 (citation omitted)). In other words, "the exemption for noncommercial speech is used 'as a somewhat inexact, shorthand reference to 'speech protected by the First Amendment.'" *Id.* at 827 (quoting *Am. Family Life Ins. Co. v. Hagan*, 266 F.Supp.2d 682, 694-95 (N.D. Ohio 2002) (citations omitted)); *see also, e.g.*, *Mossack Fonseca & Co., S.A. v. Netflix Inc.*, No. CV 19-9330-CBM-AS(X), 2020 WL 8509658, at *3 (C.D. Cal. Dec. 23, 2020) (Netflix's use of the plaintiff's logo in movie scene for the artistic purpose of making the scene realistic was not purely commercial and thus was protected under the First Amendment). One form of protected, non-commercial use of trademarks is criticism and commentary. *See, e.g.*, *Lamparello v. Falwell*, 420 F.3d 309, 318-19 (4th Cir. 2005) (in context of a cybersquatting claim under Lanham Act, court held that noncommercial uses of trademark, such as for comment, criticism, and parody were beyond the scope of the Lanham Act).

TST fails to allege any facts in support of its conclusory allegation that the Defendants are using its marks at all, much less for a commercial purpose. The core of TST's allegations relating to the use of its marks is the conclusory and completely unsupported statement that the Defendants purportedly founded a competing organization called either "The Satanic Temple 2: Electric Boogalo" or "Satanic Washington – Archived

Temple Chapter," which uses TST's trademark name "The Satanic Temple" in its name.

SAC ¶ 111. The sole fact alleged in support of this purported use is TST's Exhibit 5 at 4.

*See* SAC ¶ 87. This Exhibit shows Defendant Sullivan in a Facebook comments

conversation with a third-party in which the third-party appears to suggest several possible

names for a new religious organization:

> The Satanic Temple 2: Electric Boogalo?

> The Satanic Temple 2: The Second One?

> S2: The Mighty Satanists?

SAC, Ex. 5 at 4. Defendant Sullivan responds to these (obviously farcical) suggestions with

the comment: "Satanism Reloaded actually." *Id.* This Exhibit comes nowhere near

providing the required factual allegations for the assertion that Defendants have organized

and are running a competing religious organization that is using TST's trademark in its

name. Indeed, there are <u>no</u> facts as to what the purported organization is called (*i.e.*, is the

name the first, second or third (farcical) name suggested by the third-party?). Nor are there

any other basic facts that would indicate the existence of an organization. For example,

when was it founded? What type of organization is it? Where is it located? Who runs it?

Does it have any members? Etc., etc., etc. In short, there are no alleged facts indicating that

Defendants are using TST's marks through a competing organization. Although the court

must accept as true a complaint's well-pled facts, conclusory allegations of law and

unwarranted inferences will not defeat an otherwise proper Rule 12(b)(6) motion to dismiss.

*Hoefs v. Sig Sauer Inc.*, No. 3:20-CV-05173-RAJ, 2021 WL 615300, at *1 (W.D. Wash.

Feb. 17, 2021) (citing *Vazquez v. Los Angeles Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007);

*Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)); *Ashcroft,* 556 U.S.

at 678 ("Threadbare recitals of the elements of a cause of action, supported by

mere conclusory statements do not suffice."). Here, absent any facts showing that its marks

are being used at all, TST's FTDRA claim based on that conclusory assertion must fail.

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

In addition, even if TST had alleged facts that indicated the existence of Defendant's purported competing organization that is using its marks (which it has not), it has failed to allege that Defendants are using its marks for a commercial purpose. TST alleges that Defendants' purported competing organization used its marks for the purpose of criticizing it by suggesting that TST "promotes ableism, misogyny, racism," SAC ¶ 114, and "suggesting that TST is not a religious organization, but is instead an extremist political organization." SAC ¶ 116. These comments, on their face, are not proposing a commercial transaction but instead are offering criticisms of TST. As critical commentary, the comments are protected by the First Amendment and fall well outside the scope of the FTDRA. *Mattel*, 296 F.3d at 906 ("All speech which is not purely commercial 'is entitled to full First Amendment protection.'") (citation omitted).

TST also alleges that Defendants are using the Allies page to sell merchandise. However, TST does *not* allege that either the Allies page or the merchandise sold through that page uses its tradename (The Satanic Temple). Although TST conclusorily alleges that the t-shirts use "derivative marks," it does not identify what the purported derivative marks are, that they are protected trademarks that are famous and distinctive, or that the Defendants' alleged use of the marks is likely to cause dilution. Without these required factual allegations, TST's FTDRA claim based on the Allies page fails as a matter of law.

### C.  The Court Should Dismiss this Case with Prejudice

Given that TST has amended its complaint multiple times since first filing the original Complaint in April of 2020 and the futility of further amendment, this Court should dismiss the SAC with prejudice.  *Cafasso v. General Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th Cir. 2011).

### D.  Because the CFAA and FTDA Claims Should be Dismissed, the Court Should Decline to Exercise Jurisdiction Over any Surviving State Law Claims

A district court may assert supplemental jurisdiction over claims that "form part of the same case or controversy" over which a district court has original jurisdiction. 28

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1    U.S.C. § 1367(a). However, if a district court dismisses all claims over which it has original

2    jurisdiction, the court "may decline to exercise supplemental jurisdiction" over the

3    remaining claims. 28 U.S.C. § 1367(c)(3). If all original jurisdiction claims are dismissed

4    before trial, it is common practice to decline to exercise jurisdiction over any remaining

5    state law claims. *Blocktree Properties, LLC v. PUD No. 2 of Grant Cty*, 447 F. Supp. 3d

6    1030, 1046 (E.D. Wash. 2020), *aff'd sub nom. Cytline, LLC v. PUD No. 2 of Grant Cty.*,

7    No. 20-35324, 2021 WL 928655 (9th Cir., Mar. 11, 2021); *Acri v. Varian Assocs., Inc.*, 114

8    F.3d 999, 1001 (9th Cir. 1997); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7

9    (1988). Usually, "if the federal claims are dismissed before trial . . . the state claims should

10   be dismissed as well." *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966).

11           TST has asserted that this Court has jurisdiction over this case pursuant to its

12   original jurisdiction of the CFAA and trademark dilution claims and supplemental

13   jurisdiction of the state law common law claims. SAC ¶ 5. If the Court dismisses the CFAA

14   and FTDRA claims for failure to state a claim (as it should), there is no remaining basis for

15   federal question jurisdiction. TST has not alleged a basis for the Court to assert diversity

16   jurisdiction over the remaining state law claims. Thus, if the Court dismisses the CFAA and

17   FTDA claims, to the extent any of the common law claims survive the Court should decline

18   to exercise supplemental jurisdiction over them.

19                          IV.      CONCLUSION

20           For the foregoing reasons, TST's Second Amended Complaint must be dismissed in

21   its entirety for failure to state a claim upon which relief can be granted and because its

22   trespass and conversion claims seeking injunctive relief for the Chapter Facebook page are

23   moot. In the alternative, in the event the Court dismisses the CFAA and FTDA claims but

24   one or more of the state law claims survive, the Court should decline to exercise

25   supplemental jurisdiction over any such remaining claims pursuant to 28 U.S.C. §

26   1367(c)(3).

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DATED: June 7, 2021.

**ARETE LAW GROUP PLLC**

By: _/s/ Jeremy E. Roller_
Jeremy E. Roller, WSBA No. 32021
1218 Third Avenue, Suite 2100
Seattle, WA 98101
Phone:  (206) 428-3250
Fax:  (206) 428-3251
jroller@aretelaw.com

*Attorneys for Defendants David Alan Johnson,*
*Leah Fishbaugh, Mickey Meehan, and Nathan*
*Sullivan*

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

1

## CERTIFICATION OF CONFERENCE

2      The undersigned counsel certifies that, per Paragraph 6 of the Standing Order for

3 Civil Cases Assigned to Judge Richard A. Jones, on April 14, 2021, and continuing for

4 several days thereafter, counsel for Defendants conferred with Matthew Kezhaya, counsel

5 for The Satanic Temple, regarding a potential motion to dismiss the First Amended

6 Complaint.  Although that conferral process ultimately resulted in The Satanic Temple

7 dropping its request for punitive damages, it did not produce an accord that would eliminate

8 the need for this motion as to The Satanic Temple's Computer Fraud and Abuse Act,

9 tortious interference, trespass to chattels, or conversion claims.  Following The Satanic

10 Temple's filing of its Second Amended Complaint, on June 3, 2021, counsel for Defendants

11 conferred with Mr. Kezhaya regarding a motion to dismiss the Second Amended

12 Complaint.  The parties were unable to reach an accord that would eliminate the need for

13 this motion.

14

15 DATED: June 7, 2021.

16                                                 **ARETE LAW GROUP PLLC**

17                                                 By: */s/ Jeremy E. Roller*
                                                   Jeremy E. Roller, WSBA No. 32021
18                                                 1218 Third Avenue, Suite 2100
                                                   Seattle, WA 98101
19                                                 Phone:  (206) 428-3250
                                                   Fax:  (206) 428-3251
20                                                 jroller@aretelaw.com

21                                                 *Attorneys for Defendants David Alan Johnson,*
                                                   *Leah Fishbaugh, Mickey Meehan, and Nathan*
22                                                 *Sullivan*

23

24

25

26

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250

**CERTIFICATE OF SERVICE**

I, Janet Fischer, certify that on June 7, 2021, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, thereby sending a notification of such filing to the following parties:

Benjamin Justus
Lybeck Pedreira & Justus, PLLC
Chase Bank Building
7900 SE 28th Street, Fifth Floor
Mercer Island, WA 98040
(206) 687-7805
ben@lpjustus.com

Matthew A. Kezhaya
Kezhaya Law PLC
1202 NE McClain Rd
Bentonville, AR 72712
(479) 431-6112
matt@kezhaya.law

DATED: June 7, 2021, at Seattle, Washington.

*/s/ Janet Fischer*
Janet Fischer
Paralegal

ARÊTE LAW GROUP
1218 THIRD AVE, STE 2100
SEATTLE, WA 98101
O: (206) 428-3250