1

2

3

4

5

6

7

8

9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10  UNITED FEDERATION OF          CASE NO. C20-0509RAJ
    CHURCHES, LLC,

11                                 ORDER GRANTING IN PART
                                   AND DENYING IN PART
12            Plaintiff,           DEFENDANTS' MOTION TO
        v.                         DISMISS SECOND AMENDED
13                                 COMPLAINT
    DAVID ALAN JOHNSON, et al.,
14
              Defendants.
15

16                    **I.      INTRODUCTION**

17      Before the court is Defendants David Alan Johnson, Leah Fishbaugh, Mickey

18  Meehan, and Nathan Sullivan's (collectively, "Defendants") motion to dismiss Plaintiff

19  United Federation of Churches, LLC's (d/b/a "The Satanic Temple") ("TST") second

20  amended complaint.  (Mot. (Dkt. # 27); Reply (Dkt. # 29); *see also* 2d Am. Compl. (Dkt.

21

22

ORDER - 1

# 26).[1])  TST opposes Defendants' motion.  (Resp. (Dkt. # 28).)  The court has carefully reviewed all of the foregoing, the relevant portions of the record, and the applicable law. Being fully advised,[2] the court GRANTS in part and DENIES in part Defendants' motion to dismiss.

## II.    BACKGROUND

Below, the court sets forth the factual and procedural background of this case.

## A.    Factual Background[3]

TST is a religious organization that "advances seven fundamental tenets."  (2d. Am. Compl. ¶¶ 8-9 (quoting https://www.thesatanictemple.org/our-tenets.html).)  Its mission is to "encourage benevolence and empathy among all people, reject tyrannical authority, advocate practical common sense and justice, and be directed by the human conscience to undertake noble pursuits guided by the individual will."  (*Id.* ¶ 10 (quoting https://www.thesatanictemple.org/our-mission.html).)  It maintains sole title to the trade name "The Satanic Temple" in the context of religious organizations.  (*Id.* ¶ 12; *see also id.*, Ex. 1 (registration of trademark).)

---

[1] TST refers to Mr. Meehan as "Mr. Meeham."  (*See, e.g.*, 2d Am. Compl. at 1.) Defendants, however, clarify that "Meehan" is the correct spelling of his last name.  (*See, e.g.*, Mot. at 9.)

[2] Neither party requests oral argument (*see* Mot. at 1; Resp. at 1), and the court finds that oral argument would not be helpful to its disposition of the motions, *see* Local Rules W.D. Wash. LCR 7(b)(4).

[3] The following allegations are taken as true for the purpose of this motion to dismiss. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

1    TST has adherents in all 50 states, including Washington. (*Id.* ¶ 13.) It is

2    organized at local levels in "Chapters" that are largely autonomous but subject to

3    centralized control. (*Id.*) At all relevant times, TST has had a Washington State Chapter

4    (the "Chapter") led by two individuals: the Chapterhead, who has administrative

5    authority over the Chapter, and a Media Liaison, who promotes the Chapter's activities to

6    the general public. (*Id.* ¶¶ 14-16.)

7    At all relevant times, Facebook was the Chapter's primary platform for

8    communicating with its membership; Twitter was the Chapter's secondary

9    communication platform; and the Chapter used Google to "facilitate its organizational

10   purposes by creating and storing documents." (*Id.* ¶¶ 26-28.) In October 2014, the

11   Chapter created a business page on Facebook (the "Chapter page") having the name "The

12   Satanic Temple – Washington" and the URL

13   "https://www.facebook.com/thesatanictemplewashington" "for the benefit of TST in its

14   efforts to disseminate information for what was then the Seattle Chapter." (*Id.* ¶ 29; *see*

15   *id.*, Ex. 2 (Chapter page history).) Over the next several years, the Chapter page's

16   audience grew to over 17,000 followers. (*Id.* ¶ 30.) In January 2015, the Chapter created

17   a Twitter account with the URL "https://twitter.com/TST_Washington", which currently

18   has an audience of about 4,000 followers. (*Id.* ¶ 31.) In September 2018, the Chapter

19   created a secondary Facebook page named "TST WA Allies" (the "Allies page") to

20   communicate with individuals who were interested in TST but did not want to identify as

21   a member. (*Id.* ¶ 32.)

22

1        Defendants were four of sixteen members of the advisory council to the

2 Chapterhead.  (*Id.* ¶ 17.)  "Attendant to their positions on the council, Defendants were

3 entrusted with management of the Chapter's social media presence along with the other

4 councilors."  (*Id.*)  TST's Chapter page and Allies page were maintained and controlled

5 exclusively by administrators approved by TST, who were subject to a written Code of

6 Conduct.  (*Id.* ¶¶ 33-34; *id.*, Ex. 4 (form Code of Conduct agreement).)  TST entrusted

7 each of the Defendants with administrative rights to the Facebook pages, subject to the

8 Code of Conduct.  (*Id.* ¶ 36.)

9        On March 2, 2020, Mr. Johnson shared a post on the Allies page that, according to

10 TST, was outside of the authority granted under the Code of Conduct.  (*Id.* ¶ 39.)  The

11 post was subsequently deleted.  (*Id.* ¶ 40.)  Between March 2 and March 12, 2020, TST's

12 Washington leadership "became increasingly frustrated with Defendants' organizational

13 failures and inflammation of interpersonal conflicts within the advisory council."  (*Id.*

14 ¶ 41; *id.* ¶ 42 (listing alleged organizational failures, including "repeatedly operating

15 TST's social media to endorse leftist politics as opposed to Satanism, despite repeated

16 reminders that this was unacceptable").)

17       On March 12, 2020, TST's Washington leadership removed Defendants from their

18 positions on the council.  (*Id.* ¶¶ 18, 43.)  According to TST, "[b]y removing Defendants

19 from their advisory positions, the Washington leadership revoked Defendants'

20 authorization to manage the Chapter's social media activity and revoked Defendants'

21 authorization to serve as custodians of records."  (*Id.* ¶ 44.)

22

1       On March 14, 2020, however, Mr. Meehan "exceeded authorization for the Allies

2    page" by removing all TST-approved administrators except for Defendants; changing the

3    name of the page to "Evergreen Memes for Queer Satanic Friends"; and posting a

4    "manifesto", which stated that the page was no longer affiliated with TST.  (*Id.* ¶ 46.)

5    Mr. Meehan and the other Defendants began posting material on the page in violation of

6    the Code of Conduct and in disregard of TST's revocation of their authority to manage

7    TST's social media.  (*Id.* ¶ 47.)  Mr. Sullivan, for example, publicly stated that he was no

8    longer affiliated with TST and posted that "we have a meme page that we stole from

9    TST."  (*Id.* ¶ 48; *id.*, Ex. 5.)  TST leadership subsequently removed Defendants'

10    "administrative access privileges" from its Facebook Chapter page, Twitter account, and

11    Google account.  (*Id.* ¶ 49.[4])

12       On or around March 18, 2020, however, Mr. Johnson "hacked" TST's Twitter

13    account, removed TST's approved administrators, replaced those administrators with his

14    co-Defendants, followed a number of "extremist groups," and changed the description of

15    the page from "Washington State Chapter of the Satanic Temple to "Satan stands as the

16    ultimate icon for selfless revolt.  We oppose irrational, unjust hierarchies like white

17    supremacy, patriarchy, ableism, & cishet normality."  (*Id.* ¶ 50.)  Mr. Johnson then "took

18    control of the Chapter page by removing all TST-approved administrators, modifying the

19    cover page without approval, and posting a three-page manifesto."  (*Id.* ¶ 51; *see id.*,

20    Ex. 6 (manifesto).)  TST alleges that the manifesto included false claims about TST's

21

---

22    [4] TST does not allege that it removed administrative access privileges from the Allies page. (*See id.*)

1    leadership, including that they were "cozy with the alt-right," white supremacists, and

2    "insufficiently leftist." (*Id.* ¶ 52.)

3         On March 20, 2020, the Chapter's Media Liaison emailed Mr. Johnson a "cease

4    and desist instruction," and requested the return of the Chapter page. (*Id.* ¶ 53; *id.*,

5    Ex. 7.) Mr. Johnson did not do so, and instead continued to make postings to the Chapter

6    page that were inconsistent with TST's Code of Conduct. (*Id.* ¶¶ 54-55; *see id.*, Ex. 8

7    (Chapter page postings).) Later that same night, Ms. Fishbaugh "attempted to change the

8    password to the Chapter's Google-based email account by changing the recovery email

9    and changing the phone number." (*Id.* ¶ 56.) TST alleges that this action, like Mr.

10   Johnson's, violated its explicit withdrawal of authority to manage its accounts following

11   its removal of administrative access to the account. (*Id.*)

12        On or about March 22, 2020, Mr. Johnson changed the name of the Chapter page

13   from "The Satanic Temple – Washington" to "Satanic Washington State – Archived

14   Temple Chapter" and modified the profile picture. (*Id.* ¶ 57.) He did not, however,

15   change the Chapter page's URL. (*Id.* ¶ 61.) TST alleges that these actions, too, were in

16   violation of its revocation of authority to manage TST's social media and its revocation

17   of his social media administrative access privileges. (*Id.*) TST estimates that the Chapter

18   lost between 20 and 30 members because of Mr. Johnson's postings to the Chapter page.

19   (*Id.* ¶ 62.)

20        TST further alleges that Mr. Sullivan has continued to have "exclusive control" of

21   TST's original signed membership agreements, cloud-based trade secret documentation,

22   background check documents, and an electronic database of members. (*Id.* ¶¶ 58-59.)

1        On March 23, 2020, TST sent a demand letter to Mr. Johnson, threatening

2    litigation unless he "permanently relinquish[ed] full control" of the Chapter page by

3    March 24, 2020.  (*Id.* ¶ 64; *id.*, Ex. 9.)  Mr. Johnson ignored the letter and, with his

4    co-Defendants, continued to maintain exclusive control over the Chapter page.  (*Id.* ¶ 65.)

5    After originally refusing to return control of the Chapter page to TST on the ground that

6    Defendants' use of that page was a "Page admin issue" rather than an "infringement[] of

7    [TST's] legal rights," Facebook returned control of the Chapter page to TST after it filed

8    the initial complaint in this matter.  (*Id.* ¶¶ 63, 66; *see also id.*, Ex. 2 (noting that the page

9    name was changed back to "The Satanic Temple – Washington Chapter" on May 27,

10    2020).)  TST also eventually recovered its Twitter and Google accounts through those

11    companies.  (*Id.* ¶ 68.)

12   **B.**   **Procedural Background**

13        TST filed its initial complaint in this court on April 3, 2020.  (Compl. (Dkt. # 1).)

14    It asserted claims for violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030

15    ("CFAA"); violation of the Anti-Cybersquatting Consumer Protection Act, 15 U.S.C.

16    § 1125(d) ("ACPA"); tortious interference with business expectancy; violation of

17    Washington's Consumer Protection Act, ch. 19.86 RCW ("CPA"); and defamation.  (*See*

18    *id.*)  On February 26, 2021, the court granted Defendants' motion to dismiss that

19    complaint.  (2/26/21 Order (Dkt. # 20).)  The court dismissed TST's CFAA, ACPA,

20    tortious interference, and CPA claims without prejudice and with leave to amend.  (*See*

21    *id.* at 19.)  It dismissed TST's defamation claim with prejudice.  (*Id.*)

22

1    TST moved the court to reconsider its dismissal of the ACPA and defamation

2    claims.  (MFR (Dkt. # 21).)  While that motion was pending, TST filed a first amended

3    complaint that, it asserted, "further developed" the facts supporting its CFAA and tortious

4    interference claims; "replaced" its CPA claim with claims for trespass to chattels and

5    conversion; and removed its ACPA and defamation claims pending the court's decision

6    on its motion for reconsideration.  (Am. Compl. (Dkt. # 22) ¶¶ 2-3.)  Subsequently, the

7    parties filed a stipulated motion for leave for TST to file a second amended complaint,

8    which the court granted.  (5/10/21 Stip. (Dkt. # 24); 5/11/21 Order (Dkt. # 25); *see* 2d

9    Am. Compl.)  The second amended complaint adds a claim for violation of the Federal

10   Trademark Dilution Revision Act of 2006, 15 U.S.C. § 1125(c) ("FTDRA").  (2d Am.

11   Compl. ¶¶ 106-18.)  The court denied TST's motion for reconsideration on April 12,

12   2022.  (4/12/22 Order (Dkt. # 30).)  Defendants' motion to dismiss TST's second

13   amended complaint is now ripe for consideration.

14                         **III.   ANALYSIS**

15   TST asserts five causes of action in its second amended complaint:  (1) violation

16   of the CFAA (2d Am. Compl. ¶¶ 69-81); (2) tortious interference with business

17   expectancy (*id.* ¶¶ 82-90); (3) trespass to chattels (*id.* ¶¶ 91-99); (4) conversion (*id.*

18   ¶¶ 100-05); and (5) violation of the FTDRA (*id.* ¶¶ 106-18).  Below, the court sets forth

19   the standard of review, then considers each claim in turn.

20   **A.   Standard of Review**

21   Federal Rule of Civil Procedure 12(b)(6) provides for dismissal when a complaint

22   "fail[s] to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  The

1   court construes the complaint in the light most favorable to the nonmoving party. *Livid*

2   *Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005). "To

3   survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted

4   as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678

5   (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial

6   plausibility when the plaintiff pleads factual content that allows the court to draw the

7   reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

8   **B.   CFAA**

9       The CFAA creates criminal and civil liability for "acts of computer trespass by

10  those who are not authorized users or who exceed authorized use." *Facebook, Inc. v.*

11  *Power Ventures, Inc.*, 844 F.3d 1058, 1065 (9th Cir. 2016). TST alleges that Defendants

12  violated 18 U.S.C. § 1030(a)(2), which creates liability when a person "intentionally

13  accesses a computer without authorization or exceeds authorized access, and thereby

14  obtains . . . information from any protected computer," by intentionally accessing the

15  Chapter page and attempting to access TST's Twitter and Google Accounts. (Resp. at 4

16  (citing 18 U.S.C. § 1030(a)(2)); *see also* 2d Am. Compl. ¶¶ 49-53.[5]) The CFAA

17

18      [5] In its prior order, the court noted that it was unclear whether TST intended to bring its
    claim under 18 U.S.C. § 1030(a)(2) or 18 U.S.C. § 1030(a)(4), which prohibits "knowingly and
19  with intent to defraud, access[ing] a protected computer without authorization, or exceed[ing]
    authorized access." (*See* 2/26/21 Order at 5; 18 U.S.C. § 1030(a)(4). TST has now clarified
20  that it brings its claim under 18 U.S.C. § 1030(a)(2) and does not address Defendants' argument
    that it failed to plead fraudulent conduct with particularity as required by Federal Rule of Civil
    Procedure 9(b). (*See* Resp. at 4-9; Mot. at 14-16.) To the extent TST does assert a claim under
21  18 U.S.C. § 1030(a)(4), the court agrees that TST failed to plead fraud with particularity and
    DISMISSES its claim, if any, for violation of 18 U.S.C. § 1030(a)(4). *See Synopsys, Inc. v.*
22  *Ubiquiti Networks, Inc.*, 313 F. Supp. 3d 1056, 1072 (N.D. Cal. 2018) (dismissing § 1030(a)(4)
    claim for failure to satisfy Rule 9).

1    authorizes a person damaged by prohibited conduct to bring a civil suit only where the

2    conduct involves one of an enumerated set of factors.  18 U.S.C. § 1030(g) (citing 18

3    U.S.C. § 1030(c)(4)(A)(i)).  In this case, TST may only bring suit if Defendants' conduct

4    caused "loss to 1 or more persons during any 1-year period . . . aggregating at least

5    $5,000 in value."  18 U.S.C. § 1030(c)(4)(A)(i)(I).

6         In its February 26, 2021 order, the court dismissed TST's CFAA claim because

7    TST failed to plausibly allege that Defendants accessed its social media accounts without

8    authorization or that Defendants exceeded their authorized access.  (2/26/21 Order at

9    6-9.)  In its original complaint, TST did not allege that it had revoked Defendants'

10   administrative access to the accounts.  (*Id.* at 6 (citing Compl. ¶ 30).)  Rather, it alleged

11   only that Defendants "exceeded their authority" when they failed to abide by the Code of

12   Conduct.  (*See id.* (citing Compl. ¶¶ 28-30, 33, 36-44); *see also id.* at 8 (noting that TST's

13   "conclusory" allegation that it "demanded return of the Facebook pages" from

14   Defendants was insufficient to show revocation of authority).)  The court observed that

15   TST did not allege that it ever explicitly revoked Defendants' authority; that demanding

16   the return of the Facebook pages was insufficient to show revocation of authority; and

17   that TST failed to state "when the revocation occurred, how the revocation was

18   communicated, and what actions Defendants took afterwards."  (*Id.* at 7-9.)  The court

19   concluded that TST's allegations were insufficient to meet the "without authorization or

20

21

22

1   exceeds authorized access" element of a CFAA claim.  (*Id.* at 6-9 (citing *United States v.*

2   *Nosal*, 676 F.3d 854, 857, 863 (9th Cir. 2012) (*en banc*)).)

3          In its second amended complaint, TST now alleges, based on further investigation

4   by counsel, that it revoked Defendants' authorization to manage the Chapter's social

5   media accounts when it removed them from their advisory positions on March 12, 2020;

6   that it revoked Defendants' administrative access privileges to the accounts sometime

7   before March 18, 2020; and that Mr. Johnson later "hacked" the Chapter page and

8   Defendants attempted to "hack" the Twitter and Google accounts.  (2d Am. Compl.

9   ¶¶ 43-44, 49-51, 56; *see also* Resp. at 4 (explaining the "clarified sequence of events").)

10  It asserts that Mr. Johnson's successful "hacking" of the Chapter page and Defendants'

11  attempts to "hack" the Twitter and Google accounts are actionable under the CFAA.

12  (Resp. at 5 (citing 18 U.S.C. § 1030(a)(2), (b)); *see* 2d Am. Compl. ¶¶ 69-81.)  It

13  estimates it suffered losses of $33,689.70 for misappropriation of the Chapter page and

14  $1,037.52 for the Allies page; and that it would have lost $8,246.70 had Defendants

15  successfully misappropriated the Twitter page.  (2d Am. Compl. ¶ 77.)

16         Defendants contend that they remain entitled to dismissal because TST still has

17  not stated a civil claim for violation of the CFAA.  (Mot. at 6.)  It argues (1) that TST's

18  allegations show that Defendants' access to the Chapter page was authorized by

19  Facebook, which is the true "owner" of the websites at issue (citing 2d Am. Compl.

20  ¶ 63); (2) TST fails to allege that it explicitly revoked Defendants' authority to access the

21  computers; (3) TST fails to sufficiently plead that it meets the $5,000 loss threshold of 18

22

1   U.S.C. § 1030(c)(4)(A)(i)(I); and (4) TST has not sufficiently alleged conduct by Mr.

2   Sullivan, Ms. Fishbaugh, and Mr. Meehan that would violate the CFAA.  (Mot. at 6-16.)

3       1.      Twitter and Google Accounts

4       The court begins by addressing TST's CFAA claims based on its Twitter and

5   Google accounts, and concludes that these claims must be dismissed because TST has not

6   sufficiently pleaded the threshold amount of "loss" necessary to sustain a CFAA civil

7   action.  TST may only bring suit under the CFAA if it "suffer[ed] damage or loss by

8   reason of a violation of this section."  18 U.S.C. § 1030(g).  Under the facts of this case,

9   TST must allege that its loss due to a violation of the CFAA exceeded $5,000 in a one-

10  year period.  18 U.S.C. § 1030(c)(4)(A)(i)(I).[6]  The CFAA defines "loss" as "any

11  reasonable cost to any victim, including the cost of responding to an offense, conducting

12  a damage assessment, and restoring the data, program, system, or information to its

13  condition prior to the offense, and any revenue lost, cost incurred, or other consequential

14  damages incurred because of interruption of service."  18 U.S.C. § 1030(e)(11).  The

15  CFAA maintains a "narrow conception of 'loss,'" and its definition, "with its references

16  to damage assessments, data restoration, and interruption of service—clearly limits its

17  focus to harms caused by computer intrusions, not general injuries unrelated to the

18  hacking itself."  *Andrews v. Sirius XM Radio Inc.*, 932 F.3d 1253, 1262-63 (9th Cir.

19

20      [6] TST incorrectly asserts that the $5,000 "loss" threshold applies only to claims brought
    under 18 U.S.C. § 1030(a)(4).  (*See* Resp. at 6-7.)  18 U.S.C. § 1030(g) is clear, however, that a
21  party may only bring a civil claim for violation of the CFAA if the claim involves one of the
    factors enumerated in 18 U.S.C. § 1030(c)(4)(A)(i).  *See* 18 U.S.C. § 1030(g).  As discussed
    above, the only possible factor at issue in this case is loss aggregating at least $5,000 in value in
22  a one-year period.  *See* 18 U.S.C. § 1030(c)(4)(A)(i)(I).

1    2019).  "[A]ny theory of loss must conform to the limited parameters of

2    the CFAA's definition."  *Id.* at 1263.

3          At the outset, the court agrees with Defendants that the alleged intrusions into the

4    Facebook, Google, and Twitter systems must be treated as three separate violations

5    involving three separate protected computers rather than considered together as a single

6    violation.  (*See* Reply at 5 (citing *Hayes v. Packard Bell NEC, Inc.*, 193 F. Supp. 2d 910,

7    912 (E.D. Tex. 2001)); *see* 18 U.S.C. § 1030(a)(2) (prohibiting accessing "*a computer*

8    without authorization" or in excess of authorized access) (emphasis added); 18 U.S.C.

9    § 1030(e)(1) (defining a computer as "an electronic, magnetic, optical, electrochemical,

10   or other high speed data processing device performing logical, arithmetic, or storage

11   functions, and includes any data storage facility or communications facility directly

12   related to or operating in conjunction with such device").  Thus, the court must separately

13   determine whether TST has sufficiently alleged loss of at least $5,000 in a one-year

14   period for each of the Facebook, Twitter, and Google "computers."

15         The court concludes that TST has failed to make this threshold showing with

16   respect to the Twitter and Google accounts.[7]  First, TST does not allege that it suffered

17   any "loss" with respect to Defendants' alleged interference with its Google account.  (*See*

18   *generally* 2d Am. Compl.; *see also id.* ¶¶ 69-81.)  Thus, it cannot bring a civil claim for

19   violation of the CFAA based on an intrusion into the Google account.  Second, with

20   respect to the Twitter account, TST alleges only that it "would have lost $8,246.70" if

21

22       [7] The court discusses TST's alleged "loss" due to the intrusions into its Facebook
     accounts below.  *See infra* § 3(B)(2)(b).

1    Defendants' misappropriation of that account had been successful.  (*Id.* ¶ 77.)  The

2    CFAA, however, authorizes a civil action only for persons who "suffer[] damage or loss"

3    meeting the threshold amount.  18 U.S.C. § 1030(g).  Because TST does not allege that it

4    suffered damage or loss due to misappropriation of the Twitter account—only that it

5    "would have" suffered a loss if the misappropriation were successful—it cannot meet the

6    threshold requirements for bringing a civil action based on the Twitter account.

7    Therefore, the court GRANTS Defendants' motion to dismiss TST's CFAA claims based

8    on alleged interference with its Google and Twitter accounts.

9         2.    Facebook Accounts

10        The court now must consider whether TST has sufficiently alleged a CFAA claim

11   based on Defendant's conduct with respect to its Facebook pages.  The court begins by

12   addressing whether TST has sufficiently alleged that Defendants acted without

13   authorization, then considers whether TST has sufficiently alleged a cognizable loss

14   exceeding $5,000.

15             a.    *Authorization*

16        Defendants contend that TST has not plausibly alleged that they acted either

17   without authorization or in excess of authorization as required to state a CFAA claim.

18   They argue that (1) TST's own allegations show that Facebook, the owner of the website

19   on which the Chapter page and Allies page are hosted, "explicitly determined that [Mr.]

20   Johnson was authorized to access and alter the Chapter page" (Mot. at 8 (citing 2d Am.

21   Compl. ¶ 63)); and (2) TST has not alleged that it explicitly revoked Defendants'

22

1  authority to access the social media accounts or otherwise informed Defendants of any

2  revocation of their authority (*id.* at 8-9).[8]

3      A defendant violates the "without authorization" provision of 18 U.S.C.

4  § 1030(a)(2) "'when he or she has no permission to access a computer or when such

5  permission has been revoked explicitly.  Once permission has been revoked,

6  technological gamesmanship or enlisting of a third party to aid in access will not excuse

7  liability.'"  *Domain Name Comm'n Ltd. v. DomainTools, LLC*, 449 F. Supp. 3d 1024,

8  1027 (W.D. Wash. 2020) (quoting *Facebook, Inc. v. Power Ventures, Inc.*, 844 F.3d

9  1058, 1067 (9th Cir. 2016)).  Breaching a duty owed to the owner of the computer is not

10  enough to violate the "without authorization" provision.  *Id.*  "Rather, whether access is

11  authorized or unauthorized 'depends on actions taken by the employer.'"  *Id.* (quoting

12  *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127, 1134-35 (9th Cir. 2009)).  "If the

13  computer owner has not affirmatively rescinded the defendant's right to access the

14  computer, any existing authorization/permission remains."  *Id.* (citing *Brekka*, 581 F.3d at

15  1134-35).

16

17      [8] To the extent TST's CFAA claim is based on an allegation that Defendants exceeded
their authority when they accessed the accounts, the court DISMISSES that claim.  The Supreme
18  Court has clarified that the "exceeds authorization" prong of 18 U.S.C. § 1030(a)(2) covers only
"those who obtain information from particular areas of the computer—such as files, folders, or
19  databases—to which their computer access does not extend."  *Van Buren v. United States*, ---
U.S. ---, 141 S. Ct. 1648, 1652 (2021); *see also* 18 U.S.C. § 1030(e)(6) (defining "exceeds
20  authorized access" as "access[ing] a computer with authorization and [using] such access to
obtain or alter information in the computer that the accesser is not entitled so to obtain or alter").
21  "It does not cover those who . . . have improper motives for obtaining information that is
otherwise available to them."  *Van Buren*, 141 S. Ct. at 1652.  TST makes no allegation that
22  Defendants obtained or altered information from areas of Facebook beyond their authorized
access.  (*See generally* 2d Am. Compl.)

1          As recounted above, TST alleges the following timeline of events.  Defendants

2   originally were authorized to access TST's social media accounts.  (2d Am. Compl.

3   ¶¶ 17, 36.)  On March 12, 2020, TST removed Defendants from its advisory council,

4   which "revoked Defendants' authorization to manage the Chapter's social media

5   activity."  (*Id.* ¶¶ 18, 43-44.)  On March 14, 2020 Mr. Meehan removed all

6   TST-approved administrators except Defendants from the Allies page, changed the name

7   of the page, and with other Defendants began posting material on that page.  (*Id.*

8   ¶¶ 46-47.)  Between March 14 and March 18, 2020, TST removed Defendants'

9   "administrative access privileges" from the Facebook Chapter account, Twitter account,

10  and Google account.  (*Id.* ¶ 49.)  On or around March 18, 2020, Mr. Johnson "took

11  control of the Chapter page by removing all TST-approved administrators, modifying the

12  cover page without approval, and posting a three-page manifesto."  (*Id.* ¶ 51.)  On March

13  20, 2020, the Chapter's Media Liaison emailed Mr. Johnson, stating "I'd like you to

14  return the [Chapter] page back to us please. Please re-add me and Siri as admins," but

15  Mr. Johnson did not do so.  (*Id.* ¶¶ 53-55; *id.*, Ex. 7.)  On March 23, 2020, TST sent a

16  demand letter to Mr. Johnson, threatening litigation unless he "permanently

17  relinquish[ed] full control" of the Chapter page, but Mr. Johnson did not respond.  (*Id.*

18  ¶ 64; *id.*, Ex. 9.)  In May 2020, after originally refusing to assist, Facebook returned the

19  Chapter page to TST.  (*Id.* ¶¶ 63, 66; *see also id.*, Ex. 2.)

20         The court begins with Defendants' argument that Facebook's original refusal to

21  assist TST demonstrates that Mr. Johnson's access to the Chapter page was authorized by

22  the "computer owner."  (*See* Mot. at 8-9.)  The court is not convinced.  As the Ninth

ORDER - 16

1   Circuit has recognized, the CFAA provides a civil action to "any person who suffers

2   damage or loss by reason of a violation" of the Act.  *Theofel v. Farey-Jones*, 359 F.3d

3   1066, 1078 (9th Cir. 2004).  Unauthorized access to a plaintiff's account on a computer

4   owned by another entity may be actionable under the CFAA as long as the other elements

5   of the claim are met.  *See, e.g.*, *Biesenbach v. Does 1-3*, No. 21-CV-08091-DMR, 2022

6   WL 204358, at *7 (N.D. Cal. Jan. 24, 2022) (holding that plaintiff plausibly alleged that

7   Defendants accessed his accounts on Google's Voice Over IP and cloud computing

8   systems without authorization, although his CFAA claim failed on other grounds).  The

9   court, therefore, must determine whether TST has plausibly alleged that Defendants

10  accessed its Facebook accounts without authorization.

11       Viewing the reasonable inferences in the light most favorable to TST, the court

12  concludes that TST has met its burden to plausibly allege that Mr. Johnson accessed the

13  Chapter page without authorization after TST removed his administrative access to the

14  page between March 14 and 18, 2020.  The court can infer from TST's allegations that it

15  revoked his ability to access and administer the page and that Mr. Johnson subsequently

16  "hacked" the page and made changes to it.  (*See* 2d Am. Compl. ¶ 49, 51.)  After TST

17  revoked his administrative access privileges, Mr. Johnson no longer had permission to

18  access the account.  As TST points out, Defendants have cited no authority to support its

19  contention that where the plaintiff has removed the defendant's technological credentials

20  to access a system, it must also send a separate notice in order to meet the revocation

21  requirement.  (*See* Resp. at 6); *see Facebook, Inc.*, 844 F.3d at 1067 (holding that a

22  defendant accesses a system  "without authorization" "when he or she has no permission

1    to access a computer *or* when such permission has been revoked explicitly" (emphasis

2    added)).

3          The same cannot be said for the Allies page:  TST alleges only that it revoked

4    administrative access to the Chapter page and the Twitter and Google accounts, and its

5    March 23, 2020 letter refers only to the Chapter page.  (*See* 2d Am. Compl. ¶ 49; *see id.*,

6    Ex. 9.)  TST thus has not plausibly alleged that Defendants' access to the Allies page was

7    "without authorization" within the meaning of the CFAA.  Similarly, TST states no basis

8    for a CFAA claim against Mr. Meehan, Ms. Fishbaugh, or Mr. Sullivan.  It makes no

9    allegation that any of them were involved in the alleged "hacking" of the Chapter page or

10   obtained or altered information on that page in violation of 18 U.S.C. § 1030(a)(2).  (*See*

11   *generally* 2d Am. Compl.)  Accordingly, the court DISMISSES TST's CFAA claim to

12   the extent it is based on the Allies page and to the extent it is asserted against Mr.

13   Meehan, Ms. Fishbaugh, and Mr. Sullivan.

14          *b.    Loss*

15          Defendants raise several challenges to TST's claimed losses due to

16   misappropriation of the Chapter page.  First, they assert that "loss" cannot include

17   expenses incurred in litigating an alleged CFAA allegation.  (Mot. at 13.)  The court

18   agrees that litigation expenses are not "losses" that are cognizable under the CFAA.  *See,*

19   *e.g.*, *Wichansky v. Zowine*, 150 F. Supp. 3d 1055, 1071-72 (D. Ariz. 2015) ("litigation

20   expenses . . . are not a cognizable loss under the CFAA").  Thus, to the extent TST claims

21   $6,000 in losses due to "researching and drafting the original complaint" and ongoing

22

"costs and fees related to this lawsuit" (*see* 2d Am. Compl. ¶ 79), those alleged losses

cannot be included in TST's calculation of the threshold "loss" amount.

Second, Defendants argue TST's alleged $1,037.52 loss based on the Allies page

is insufficient to meet the "loss" threshold.  (Mot. at 14.)  Because, as discussed above,

TST has failed to state a CFAA claim based on misappropriation of the Allies page, the

court agrees that this sum cannot be included in TST's alleged "loss."

Third, Defendants argue that TST's allegations are conclusory and insufficient to

support the "loss" element of a CFAA claim because they include no facts that support its

claimed loss of $33,689.70 for misappropriation of the Chapter page.  (Mot. at 13-14; *see*

2d Am. Compl. ¶ 77.)  The court agrees.  TST has alleged that the Chapter "lost between

20 and 30 members due to [Mr.] Johnson's false claims published to the Chapter page"

and that its social media accounts "help to foster the kind of relationship which results in

charitable donations to support TST's organizational purposes."  (Am. Compl. ¶¶ 62, 78;

*see also* Resp. at 7 (stating that TST's "loss" is "(1) the lost ability to communicate to an

audience which TST had built through years of effort; and (2) the 20-30 lost members, as

of the original complaint." (citations omitted)).)  TST does not, however, explain how to

value its temporary "lost ability to communicate" with its members and has not offered

authority for the proposition that a temporary "lost ability to communicate" is cognizable

under the CFAA.  *See, e.g., Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461, 485 (N.D. Cal.

2021) (concluding alleged "loss of use and control" of financial information was

insufficient to meet the "loss" element of the CFAA); *see also Andrews*, 932 F.3d at 1263

(emphasizing that "loss" must meet the "limited parameters of the CFAA's definition").

1    The court concludes that TST has not plausibly alleged "loss" arising from its "lost

2    ability to communicate."

3        Defendant further argues that the loss of members represents a "lost business

4    opportunity" or "damaged reputation" that is not actionable under the CFAA. (Mot. at

5    14; *see also* Reply at 5.)  Rather, according to Defendants, loss of members could only be

6    actionable if Defendants' actions caused an interruption of service on the Facebook page

7    that prevented members from donating. (*See* Reply at 5.)  It is true that lost revenue is

8    only cognizable under the CFAA if it occurred "because of [an] interruption of service."

9    18 U.S.C. § 1030(e)(11).  Defendants do not, however, provide the court with authority

10   that supports the proposition that a plaintiff's loss of access to its computer, during which

11   the defendant exerts control over that computer, cannot constitute an "interruption of

12   service."  TST contends that it meets the "interruption of service" requirement:  it alleges

13   that it lost members (and the revenue associated with them) because Defendants "stole"

14   its website, thus interrupting the service Facebook provided to TST. (Resp. at 7.)  The

15   court concludes that TST has plausibly alleged that it suffered "loss" due to the loss of its

16   members, which in turn was caused by Mr. Johnson's actions.  TST, however, leaves the

17   court no basis to allocate its alleged losses between those due to a temporary "lost ability

18   to communicate" (which are not cognizable) and the loss of its members. *See Domain*

19   *Name Comm'n*, 449 F. Supp. 3d at 1030 (finding plaintiff did not plausibly allege "loss"

20   where court could not allocate between losses attributed to periods before and after the

21   revocation of authority).  Accordingly, the court GRANTS Defendants' motion to

22   dismiss TST's CFAA claim based on Mr. Johnson's "hacking" of the Chapter page.

ORDER - 20

1          **C.      Tortious Interference with Business Expectancy**

2          Under Washington law, to plead a claim for tortious interference with a business

3    expectancy, a plaintiff must allege "(1) the existence of a valid contractual relationship or

4    business expectancy; (2) that defendants had knowledge of that relationship; (3) an

5    intentional interference inducing or causing a breach or termination of the relationship or

6    expectancy; (4) that defendants interfered for an improper purpose or used improper

7    means; and (5) resultant damage." *Leingang v. Pierce Cty. Med. Bureau, Inc.*, 930 P.2d

8    288, 300 (Wash. 1997).  In its prior order, the court held that although TST had

9    sufficiently pleaded the first, third, and fifth elements of the claim, it had failed to do so

10   with respect to the second and fourth elements.  (2/26/21 Order at 13-15.)  Specifically,

11   the court held that TST had failed to sufficiently plead the second element because it did

12   not allege that Defendants were "aware of some kind of business arrangement" between

13   Facebook and TST.  (*Id.* at 15 (quoting *Topline Equip., Inc. v. Stan Witty Land, Inc.*, 639

14   P.2d 825, 830 (Wash. Ct. App. 1982)).)  With respect to the fourth element, the court

15   held that TST had failed to allege that Defendants' interference was "wrongful by some

16   measure beyond the fact of the interference itself, such as a statute, regulation, recognized

17   rule of common law, or an established standard of trade or profession."  (*Id.* (quoting

18   *Moore v. Commercial Aircraft Interiors, LLC*, 278 P.3d 197, 200 (Wash. Ct. App.

19   2012)).)

20          In an attempt to cure the deficiencies the court identified in its prior order, TST

21   now alleges that "Defendants had subjective knowledge of the business relationship

22   between Facebook and TST" and "were aware that the social media accounts had an

1    economic value to TST." (2d Am. Compl. ¶¶ 85, 87.) It further alleges that

2    "Defendants' interference with TST's social media presence was wrongful beyond the

3    interference itself" because Defendants "abused TST's social media presence as a

4    channel to publish derogatory messages directly to TST's intended audience and to

5    falsely suggest that the Washington Chapter was replaced by Defendants' competitor

6    organization" with the purpose of "diminish[ing] TST's membership and donation base."

7    (*Id.* ¶ 88.)

8         Defendants argue that TST still fails to satisfy the second and fourth elements of a

9    tortious interference claim with respect to the Chapter page. (Mot. at 16-17.) With

10   respect to the second element, Defendants contend that TST's allegations remain too

11   conclusory with respect to Defendants' knowledge of a business relationship between

12   Facebook and TST. (*Id.*) With respect to the fourth element, Defendants contend that

13   TST has not alleged a violation of a "statute, regulation, common law rule, or

14   professional standard." (*Id.* at 17 (quoting *Moore*, 278 P.3d at 200).) Defendants further

15   argue that TST fails to satisfy the fifth element of a tortious interference claim—

16   damages—with respect to the Allies page. (*Id.*)

17        The court concludes that TST has, with its second amended complaint, plausibly

18   alleged that Defendants had knowledge of the business relationship between Facebook

19   and TST. (*See, e.g.*, 2d Am. Compl. ¶¶ 85, 87; *see also id.* ¶ 17 (alleging Defendants

20   were members of TST's advisory council and were "entrusted with management of the

21   Chapter's social media presence"); *id.* ¶ 36 (alleging Defendants "were entrusted with

22   administrative rights to" the social media accounts, including Facebook).) With respect

1    to the fourth element, the court concludes that TST has sufficiently pleaded that

2    Defendants acted with an improper purpose—to harm the Chapter, create a competitor

3    organization, and divert donations to that competitor.  (*See id.* ¶¶ 87-88; *see also id.* ¶ 45

4    (alleging Defendants had the "twin goals of forming a competitor organization and

5    harming TST").)  Although Defendants are correct that the "improper means" prong of

6    the fourth element requires a violation of a "statute, regulation, common law rule, or

7    professional standard," the "improper purpose" prong bears no such requirement.  *See,*

8    *e.g.*, *Pleas v. City of Seattle*, 774 P.2d 1158, 1163 (Wash. 1989) (noting that a cause of

9    action for tortious interference can arise from "*either* the defendants' pursuit of an

10   improper objective of harming the plaintiff *or* the use of wrongful means that in fact

11   cause injury to plaintiff's contractual or business relationships" (emphasis added)).

12          With respect to the fifth element, damages, TST alleges that, "[a]s a direct and

13   proximate result of Defendants' wrongful conduct, TST has suffered substantial

14   economic injury and loss of business opportunity and has incurred attorney's fees and

15   other costs in attempting to remedy the situation."  (2d. Am. Compl. ¶ 89.)  It also alleges

16   reputational damages flowing from the "misappropriation" of the Facebook pages.  (*Id.*

17   ¶ 80.)  The alleged "wrongful conduct" includes Defendants' interference with both the

18   Chapter page and Allies page.  (*Id.* ¶ 83.)  The court concludes that at this stage of the

19   proceedings, it can "reasonably infer that TST has sustained damages from the alleged

20   interference" with TST's Facebook pages.  *See Kische USA, LLC v. Simsek*, No.

21   C16-0168JLR, 2016 WL 6273261, at *10 (W.D. Wash. June 29, 2016) (noting

22   Defendants' failure to direct the court to any "authority for the position that a plaintiff

1 must plead specifically how and to what extent it was damaged by the interference").

2 Because TST has now plausibly alleged facts to support each element of its tortious

3 interference with business expectancy claim, the court DENIES Defendants' motion to

4 dismiss the claim.

5 **D.    Trespass to Chattels and Conversion**

6       Claims for trespass to chattels and conversion are very closely related.  Indeed, as

7 TST recognizes, "trespass to chattels differs from conversion as a matter of degree." (2d

8 Am. Compl. ¶ 104 (first citing *Intel Corp. v. Hamidi*, 71 P.3d 296, 2003 (Cal. 2003); and

9 then citing *Damiano v. Lind*, 163 Wash. App. 1017, 2011 WL 3719682, at *5 (Wash. Ct.

10 App. 2011) (unpublished[9]) (observing that "[t]respass to chattels is something less than a

11 conversion").)  Accordingly, the court discusses those claims together below.

12     1.   Governing Law

13       Trespass to chattels "is the intentional interference with a party's personal

14 property without justification that deprives the owner of possession or use." *Sexton v.*

15 *Brown*, 147 Wash. App. 1005, 2008 WL 4616705, at *5 (Wash. Ct. App. Oct. 20, 2008)

16 (unpublished) (citing Restatement (Second) of Torts § 217 (1965)). It "may be committed

17 by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling

18 with a chattel in the possession of another."  Restatement (Second) of Torts § 217.

19 "Generally, there are three types of cognizable harms for a trespass to chattels claim:  '(1)

20

21     [9] The court "may consider unpublished state decisions, even though such opinions have

22 no precedential value." *Emp'rs Ins. of Wausau v. Granite State Ins. Co.*, 330 F.3d 1214, 1220 n.8 (9th Cir. 2003).

1   actual dispossession, which implies that the plaintiff's access to the chattel is barred or

2   substantially limited for something more than a few moments; (2) physical harm to the

3   chattel; or (3) physical harm to the plaintiff or to someone or something in which the

4   plaintiff had a legal interest.'"  *G&G Closed Cir. Events, LLC v. Single, LLC*, No. C18-

5   1295JLR, 2020 WL 5815050, at *4 (W.D. Wash. Sept. 30, 2020) (quoting D. Dobbs, P.

6   Hayden, & E. Bublick, The Law of Torts § 60 (2d ed. 2015) (citations omitted).)

7   Conversion involves three elements: (1) willful interference with chattel belonging to the

8   plaintiff, (2) by either taking or unlawful retention, and (3) thereby depriving the owner

9   of possession.  *Burton v. City of Spokane*, 482 P.3d 968, 970 (Wash. Ct. App. 2021)

10   (citing *Judkins v. Sadler-Mac Neil*, 376 P.2d 837, 838 (Wash. 1962)).

11        2.    TST's Allegations

12        TST alleges trespass to chattel claims based on Defendants' acts of intentionally

13   dispossessing it of (1) "Facebook's computer network which manifested through the

14   internet as the Chapter page and the Allies page" "by logging in to Facebook's computer

15   network and replacing Defendants for TST's authorized administrators of the pages" (2d

16   Am. Compl. ¶¶ 93-95) and (2) TST's membership-related documents "by maintaining

17   exclusive control over the documents despite the termination of [Mr.] Sullivan's role as

18   custodian of records" (*id.* ¶¶ 97-98).  TST does not allege that it is entitled to damages;

19   rather, it seeks "injunctive relief in the form of a permanent injunction enjoining

20   Defendants from accessing any of TST's 'protected computers' under threat of contempt,

21   an order to return TST's membership related documents and destroy any copies thereof,

22   and costs and attorney's fees to be computed after entry of the decree." (*Id.* ¶ 99.)  For its

1   conversion claim, it states that the "same chattels are at issue . . . as the Trespass to

2   Chattels claim," and that it includes both claims in its complaint "because Washington

3   courts tend to discuss the two claims in tandem." (*Id.* ¶ 105 (first citing *Damiano*, 2011

4   WL 3719682; and then citing *Sexton*, 2008 WL 4616705).)

5       <u>3.</u>     <u>Claims Based on the Chapter Page</u>

6           Defendants argue that TST's trespass and conversion claims as to the Chapter

7   page are moot because Facebook returned that page to TST's control; TST has remained

8   in control of the page ever since; and TST seeks only prospective injunctive relief for

9   these claims, rather than damages. (*See* Mot. at 17-18 (citing 2d Am. Compl. ¶¶ 4, 66,

10  99, Ex. 2).) It points out that TST has not alleged any facts that would justify prospective

11  injunctive relief as to the Chapter page. (*Id.* at 18 (citing *City of Los Angeles v. Lyons*,

12  461 U.S. 95, 102 (1983)); *id.* at 19 (arguing that there "is not a single allegation that

13  Defendants' conduct while they were administrators of the Chapter Facebook page could

14  reoccur now that they have been removed as administrators").) Thus, according to

15  Defendants, TST has failed to allege a live controversy for which the injunctive relief

16  TST seeks would be an appropriate remedy, and the trespass and conversion claims based

17  on Defendants' interference with the Chapter page are moot and must be dismissed. (*Id.*

18  at 18-19.)

19          TST responds that Defendants "offer no legal support for the notion that the

20  eventual restoration of the Chapter page operates as a bar to either (1) recovery of

21  damages for the past deprivation of this page; or (2) prospective injunctive relief to

22  prevent Defendants from engaging in future similar conduct." (Resp. at 13.) But that is

not Defendants' position.  Rather, Defendants contend that TST has failed to allege either (1) damages flowing from Defendants' trespass to or conversion of the Chapter page, or (2) facts supporting its entitlement to prospective injunctive relief.  (*See* Mot. at 18-19.)  The court agrees with Defendants.  To state a claim for prospective injunctive relief, a plaintiff must plausibly allege an imminent future injury.  *See Elsharkawi v. United States*, 830 F. App'x 509, 512 (9th Cir. 2020) (citing *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 564 (1992) and affirming dismissal of claim seeking prospective injunction against future border searches for lack of Article III standing where plaintiff failed to allege imminent future injury).  Because TST has not done so here, the court DISMISSES its trespass and conversion claims based on Defendants' interference with the Chapter page.

      4.    Claims based on the Allies Page and Documents

Defendants argue that TST's trespass and conversion claims based on the Allies page and TST's business documents must be dismissed because, although TST alleges that Defendants originally had authorized access to and control over the page and documents by virtue of their roles on the advisory council, TST has not pleaded (1) that it demanded Defendants return the Allies page and documents after they were removed from the council and (2) that Defendants refused to do so.  (Mot. at 19-20 (citing *Burton*, 482 P.2d at 970 (noting that "[a] bailee who, on demand, refuses to return property to its owner is liable for conversion").)  Although Defendants contend that the plaintiff's express demand for the property and the defendant's refusal to do so are necessary elements of the torts of both conversion and trespass to chattels, the court concludes that Defendants read too much into their cited cases.  Rather, the court concludes that

Defendants' cited cases stand for the proposition that the plaintiff's demand for return of originally lawfully held property and the defendant's refusal to do so are sufficient—but not required—to prove the "taking or unlawful retention" element of a conversion claim. *See Guar. Nat'l Ins. Co. v. Mihalovich*, 435 P.2d 648, 652 (Wash. 1967) (noting that "the refusal of a demand to surrender possession is a customary way of proving conversion" but conceding that "there are other ways in which a conversion can be established"); *see also Burton*, 482 P.3d at 970-71 (analyzing whether the City's continued possession of decedent's property was authorized by statute); *Judkins*, 376 P.2d at 839 (holding that it was "clear that when [defendants] refused to surrender [the property's] possession to the plaintiff, who was entitled to its immediate possession, there was a conversion"); *Shaffer v. Walther*, 232 P.2d 94, 97-99 (Wash. 1951) (discussing multiple fact patterns in which courts found (or did not find) conversion).  Because Defendants' motion to dismiss TST's claims for trespass to or conversion of the Allies page and documents is based solely on the erroneous contention that TST was required to specifically plead a demand to return and a refusal to return (*see* Mot. at 19-20; Reply at 8-9), the court DENIES the motion to dismiss TST's trespass and conversion claims on that basis.

**E.    FTDRA**

To prevail on a trademark dilution claim, "a plaintiff must show that:  (1) the mark is famous and distinctive; (2) the defendant is making use of the mark in commerce; (3) the defendant's use began after the mark became famous; and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment."  *Lochirco Fruit & Produce Co., Inc. v. Tarukino Holdings, Inc.*, No. C18-0763RAJ, 2019 WL

1    157939, at *3 (W.D. Wash. Jan. 9, 2019) (quoting *Jada Toys, Inc. v. Mattel, Inc.*, 518

2    F.3d 628, 634 (9th Cir. 2008)); *see* 15 U.S.C. § 1125(c)(1).  The mark must be "widely

3    recognized by the general consuming public of the United States as a designation of

4    source of the goods or services of the mark's owner."  15 U.S.C. § 1125(c)(2)(A).

5    The requisite level of fame is that of "a household name"—that is, in a "select class" of

6    the "truly prominent and renowned" and "part of the collective national consciousness."

7    *Id.* at 870 (citing *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 911-12 (9th Cir.

8    2002)).  The statute expressly exempts "[a]ny noncommercial use of a mark" from its

9    coverage.  15 U.S.C. § 1125(c)(3)(C).

10            Defendants first argue that TST's FTDRA claim must be dismissed because TST

11   has not alleged "any supporting facts relating to a purported use of TST's mark, or that

12   the alleged use was commercial" as required to satisfy the second element of the claim

13   and negate the statutory exemption.  (Mot. at 20.)  TST has a registered trademark in the

14   trade name "The Satanic Temple" but it makes no allegation that it owns trademarks in

15   any other names.  (2d Am. Compl. ¶ 12; *see generally id.*)  TST alleges that the

16   "provisional" names of Defendants' alleged "competitor organization," "'The Satanic

17   Temple 2:  Electric Boogaloo' and 'Satanic Washington – Archived Temple Chapter'"

18   "directly cop[y] 'The Satanic Temple'" and "directly suggest[] that the Washington

19   Chapter has been replaced by Defendants' competitor organization."  (2d Am. Compl.

20   ¶ 111.)  It further alleges that "Defendants' competitor group is also selling merchandise

21   which features Defendants' derivative marks and which Defendants are advertising on

22   TST's Allies page."  (*Id.* ¶ 117.)

1          Defendants are correct that TST has failed to allege any commercial use by

2    Defendants of its trademark.  Indeed, the only mentions of the phrase "The Satanic

3    Temple 2:  Electric Boogaloo" in the second amended complaint are in paragraphs

4    alleging that Defendants "provisionally" used that phrase as the name for their alleged

5    competitor organization; it makes no factual allegations that would allow the court to

6    draw the plausible inference that such an organization exists.  (*See id.* ¶¶ 78, 87, 111; *see*

7    *generally id.*)  And the only mention of the phrase in TST's exhibits to its second

8    amended complaint is what appears to be a third-party comment on Mr. Sullivan's

9    Facebook page proposing possible names, including "The Satanic Temple 2: The Second

10    One" and "S2: The Mighty Satanists."  (*See id.*, Ex. 5 at 4.[10])  Although TST asserts that

11    Defendants are selling merchandise that "features Defendants' derivative marks," TST

12    does not identify the "derivative marks" Defendants are allegedly featuring, let alone

13    provide support for the contention that the unidentified "derivative marks" are subject to

14    protection under the FTDRA.  (*See id.* ¶ 117 (citing

15    https://www.redbubble.com/people/QueerSatanic/shop).)  Finally, TST argues that

16    Defendants "are using TST's trademark (the website formerly named 'TST WA Allies')"

17    to advertise this merchandise, but it does not allege or argue that "TST" is a famous and

18    distinctive mark within the meaning of the FTDRA.  (*See generally* 2d Am. Compl.;

19    Resp.)  Because TST fails to plausibly allege that Defendants are making a commercial

---

[10] Mr. Sullivan responds with the comment, "Satanism Reloaded actually." (*Id.*)

1  use of TST's famous or distinctive mark, its FTDRA claim cannot survive.  The court

2  GRANTS Defendants' motion to dismiss TST's FTDRA claim.

3  **F.    Leave to Amend**

4        "Normally, when a viable case may be pled, a district court should freely grant

5  leave to amend." *Cafasso v. General Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1058 (9th

6  Cir. 2011) (citing *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1039 (9th Cir. 2002)).

7  This liberal policy toward amendment, however, is subject to limitations including undue

8  prejudice to the opposing party, bad faith by the movant, futility, and undue delay.  *Id.*

9  (citing *Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989)).  A

10  "'district court's discretion to deny leave to amend is particularly broad where plaintiff

11  has previously amended the complaint.'"  *Id.* (quoting *Ascon Props.*, 866 F.2d at 1160).

12        Here, the court finds that amendment of TST's CFAA claim—to the extent it is

13  based on its Twitter and Google accounts, its Allies page, and conduct by Mr. Meehan,

14  Ms. Fishbaugh, and Mr. Sullivan—would be futile, and DENIES leave to amend those

15  portions of its claim.  The court, however, GRANTS TST leave to amend its CFAA claim

16  against Mr. Johnson based on the Chapter page to address the deficiencies in its

17  allegations relating to suffered loss.  The court finds that amendment of the loss

18  allegations would not be futile, and although TST has amended its complaint twice, it has

19  not yet had the benefit of this court's view of the law governing actionable losses under

20  the CFAA.  Similarly, the court GRANTS TST leave to amend its FDTRA claim because

21

22

1    it does not appear that amendment would be futile and because it has not previously

2    amended this claim.[11]

3                          **IV.    CONCLUSION**

4            For the foregoing reasons, the court GRANTS in part and DENIES in part

5    Defendants' motion to dismiss (Dkt. # 27).  Specifically, the court:

6            1.      GRANTS Defendants' motion to dismiss TST's CFAA claim and (a)

7    DISMISSES with prejudice TST's claims based on its Twitter account, Google account,

8    and Allies page; (b) DISMISSES with prejudice TST's CFAA claim with respect to Mr.

9    Meehan, Ms. Fishbaugh, and Mr. Sullivan; and (c) DISMISSES TST's CFAA claim with

10   respect to Mr. Johnson and the Chapter page, with leave to amend its loss allegations;

11           2.      DENIES Defendants' motion to dismiss TST's tortious interference with

12   business expectancy claim;

13           3.      GRANTS Defendants' motion to dismiss TST's trespass to chattels and

14   conversion claims with respect to the Chapter page;

15           4.      DENIES Defendants' motion to dismiss TST's trespass to chattels and

16   conversion claims with respect to the Allies page and business documents; and

17           4.      GRANTS Defendants' motion to dismiss TST's FTDRA claim, with leave

18   to amend.

19

20

21           _____

       [11] Because the court grants TST leave to amend its FTDRA claim and part of its CFAA
22   claim, the court does not address Defendants' argument that it should decline to exercise
       supplemental jurisdiction over TST's state-law claims.  (*See* Mot. at 23-24.)

1        TST shall file its amended complaint, if any, within 14 days after the filing date of

2   this order.

3        Dated this 15th day of April, 2022.

4

5

6        The Honorable Richard A. Jones
         United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

ORDER - 33